**THE SENECA NATION OF INDIANS, Plaintiff,**

**The Tonawanda Band of Seneca Indians, Plaintiff–Intervenor,**

**United States of America, Plaintiff–Intervenor,**

v.

**The State of NEW YORK; George E. Pataki, Governor, State of New York; Bernadette Castro, Commissioner, Parks, Recreation and Historic Preservation; Dr. Ronald W. Coan, Director, Erie County Industrial Development Agency; John Cahill, Commissioner, New York Department of Environmental Conservation; Joseph Boardman, Commissioner, New York Department of Transportation; John R. Platt, Executive Director, New York State Thruway Authority; the New York State Thruway Authority; Erie County; Moore Business Forms Corp.; Inducon, Inc.; Rado–Mat Holdings, U.S., Inc.; Ilona H. Lang; Robert W. Weaver; and Francis B. Pritchard; Defendants.**

No. 93–CV–688A.

United States District Court, W.D. New York.

June 21, 2002.

Samuel C. Alexandra, Indian Resources Section, Washington, DC, Alexandra C. Page, Indian Resource Center, Washington, DC, Arlinda Locklear, Jefferson, MD, Jeanne Whiteing, Boulder, CO, Robert P. Isaac, Jr., Seneca Nation of Indians, Salamanca, NY, Michael A. Brady, Hagerty & Brady, Buffalo, NY, for Plaintiffs.

Peter B. Sullivan, Asst. N.Y. State Atty. Gen., Buffalo, NY, Frederick G. Attea, Jr., Asst. Erie County Atty., Buffalo, NY, Gus P. Coldabella, Goodwin Proctor LLP, Boston, MA, Michael B. Powers, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY, for Defendants.

## DECISION AND ORDER

ARCARA, District Judge.

### Table of Contents

I. INTRODUCTION ..................................................... 453

II. PROCEDURAL BACKGROUND ......................................... 454

III. CLAIMS OF THE PARTIES ......................................... 455

IV. STATEMENT OF FACTS ............................................ 455
    A. Historical Sources ......................................... 455
    B. The Niagara River Region .................................. 456
        1. The Niagara River ..................................... 456
        2. The Channels and the Islands .......................... 456
        3. The River Boundary .................................... 457
    C. The Aboriginal Inhabitants of the Niagara Region .......... 457
        1. The Neutrals .......................................... 457
        2. The Wenros and the Eries .............................. 457
        3. The Senecas ........................................... 458
        4. Defeat of Wenros, Neutrals and Eries by the Senecas ... 458
    D. French Control of the Niagara Region ...................... 459
        1. French Plans to Control the Niagara Region ............ 459
        2. The Fur Trade ......................................... 460
        3. From La Salle to Denonville ........................... 460
        4. Denonville's Expedition Against the Senecas ........... 460

| | | |
|---|---|---|
| 5. | *The First Fort at Niagara* | 461 |
| 6. | *King William's War (1689–1701)* | 461 |
| 7. | *The French Return to Niagara (1701–1710)* | 461 |
| 8. | *Joncaire and Queen Anne's War (1702–1713)* | 461 |
| 9. | *French Use and Occupancy of the Niagara Region Extended* | 462 |
| 10. | *The French Fortify Niagara* | 462 |
| 11. | *British Reaction to Fort Niagara* | 463 |
| 12. | *King George's War (1745–1748)* | 464 |
| 13. | *Fort Little Niagara* | 464 |
| 14. | *The Ohio Expedition and the French and Indian War* | 464 |
| E. | *British Rule of the Niagara Region* | 465 |
| 1. | *British Indian Policy and the Royal Proclamation of 1763* | 465 |
| 2. | *Pontiac's Rebellion and the 1764 Treaties of Peace* | 466 |
| 3. | *Daniel Joncaire–Chabert's Claim to the Niagara Islands* | 469 |
| 4. | *The 1768 Treaty of Fort Stanwix* | 469 |
| F. | *The Niagara Region during the Revolutionary War* | 470 |
| G. | *The United States' Early Mechanisms for Dealing with the Indians* | 471 |
| H. | *The Articles of Confederation* | 471 |
| I. | *Recognition of New York's Boundaries* | 473 |
| J. | *The 1783 Treaty of Paris Ending the Revolutionary War* | 473 |
| K. | *The 1784 Treaty of Fort Stanwix* | 474 |
| 1. | *Proposal for Treaty between the United States and the Iroquois* | 474 |
| 2. | *New York's Attempt to Treat with the Iroquois* | 477 |
| 3. | he *Confederal Treaty of Fort Stanwix* | 478 |
| L. | *Seneca Discontent with the 1784 Treaty of Fort Stanwix* | 480 |
| M. | *The 1786 Hartford Compact* | 481 |
| N. | *The 1789 Treaty of Fort Harmer* | 481 |
| O. | *The Constitution and the Nonintercourse Act* | 482 |
| P. | *Geographical Error in the 1784 Treaty of Fort Stanwix* | 483 |
| Q. | *Continued Seneca Dissatisfaction* | 484 |
| R. | *The 1794 Treaty of Canandaigua* | 486 |
| S. | *New York Advised that Federal Approval Required for Purchase of Indian Land* | 494 |
| T. | *New York's 1802 Purchase of One–Mile–Wide Strip* | 494 |
| U. | *New York's 1815 "Purchase" of the Niagara Islands* | 495 |
| V. | *ICC Proceedings* | 498 |
| **V.** | **DISCUSSION** | 501 |
| A. | *Summary Judgment Standard* | 501 |
| B. | *Elements of Plaintiffs' Nonintercourse Act Claim* | 502 |
| C. | *Law of Indian Land Tenure* | 502 |
| D. | *Canons of Indian Treaty Construction* | 506 |
| E. | *The 1764 Treaties of Peace* | 508 |
| 1. | *The 1764 Treaties Extinguished Seneca Title to the Niagara Islands* | 508 |
| 2. | *The 1764 Treaties Did Not Simply Recognize Great Britain's Right of Preemption* | 510 |
| 3. | *The 1764 Treaties Did Not Violate the 1763 Royal Proclamation* | 511 |
| 4. | *The Land Grants in the 1764 Treaties Were Not Revoked by the 1768 Treaty of Fort Stanwix* | 514 |
| 5. | *Great Britain's Title to the Niagara Islands Passed to New York upon the Revolution* | 515 |
| 6. | *The Court's Conclusions are Consistent with Thos e of the ICC* | 515 |
| F. | *The 1784 Treaty of Fort Stanwix* | 516 |
| 1. | *The 1784 Treaty of Fort Stanwix Extinguished Seneca Title to the Niagara Strip and the Niagara Islands* | 516 |
| 2. | *As a Result of the 1784 Treaty, New York, Not th e United States, Obtained Fee Simple Absolute Title to the Niagara Strip and the Niagara Islands* | 517 |

    a.  *The 1784 Treaty Did Not Pass the Senecas Right of Possession to the United States* ...........................................518

    b.  *The 1784 Treaty Must Be Construed Consistently with the Articles of Confederation* ...........................................518

    c.  *The Continental Congress Did Not Intend to Infringe or Violate New York's Preemption Rights or Preexisting Title by Entering into the 1784 Treaty.* .......................................521

  3.  *Removal of the Senecas Was Not Required in Order to Effect an Extinguishment of Aboriginal Title under the 1784 Treaty of Fort Stanwix* ...........................................524

  4.  *The Constitution's Supremacy Clause Does Not Affect the Proper Construction of the 1784 Treaty of Fort Stanwix* .......................527

 G.  *The 1794 Treaty of Canandaigua* ...........................................528

  1.  *The 1794 Treaty of Canandaigua Cannot be Interpreted to Have Included the Niagara Islands* .......................................529

  2.  *New York Retained Its Title Because It Was Never Paid Just Compensation* ...........................................533

 H.  *New York's 1815 "Purchase" of the Niagara Islands* .......................537

 I.  *The Interests of Justice Support the Court's Conclusion* .......................540

**VI.  SUMMARY AND CONCLUSION** ...........................................542

MAP APPENDICES

## I.  *INTRODUCTION*

This action involves an Indian land claim under the Trade and Intercourse Act, 25 U.S.C. § 177 (the "Nonintercourse Act" or "Act"). Plaintiff Seneca Nation of Indians (the "SNI"), and plaintiff-intervenors Tonawanda Band of Seneca Indians (the "Tonawanda Band") and the United States of America,[1] claim that an 1815 conveyance in which the State of New York purportedly purchased Grand Island and other islands in the Niagara River (hereinafter referred to collectively as the "Niagara Islands" or the "Islands") from the historic Seneca Nation of Indians[2] (hereinafter referred to as the "Seneca Nation" or the "Senecas") was invalid, because there was no United States treaty commissioner present at the negotiations and the agreement was never ratified by the United States Congress as required by the Act.

Currently before the Court are the parties' cross-motions for summary judgment on the issue of liability under the Nonintercourse Act. For the reasons stated herein, the Court finds that the purported conveyance of the Niagara Islands to New York in 1815 did not constitute a violation of the Act because at the time of the conveyance, the Islands were not Seneca Nation tribal land protected by the Act. Pursuant to various pre–1815 treaties, any title to the Islands that the Seneca Nation may have once held was extinguished, resulting in New York obtaining full fee title to the Islands prior to the purported conveyance in 1815. Thus, plaintiffs cannot succeed on their Nonintercourse Act claim as a matter of law.

Accordingly, the Court: (1) denies plaintiffs' motions for summary judgment; (2) grants defendants' motion for summary

---

**1.** The SNI and the Tonawanda Band are referred to collectively herein as the "Plaintiff Tribes." The SNI, Tonawanda Band and United States are referred to collectively herein as the "plaintiffs."

**2.** The Tonawanda Band was part of the historic Seneca Nation, but split off from the Nation in the 1800's.

judgment; and (3) dismisses the case in its entirety.

## II. *PROCEDURAL BACKGROUND*

The SNI filed this suit in 1993. The Tonawanda Band intervened as a plaintiff. Both the SNI and the Tonawanda Band are Indian nations whose tribal status is recognized by the federal government and which have a trust relationship with the United States. The SNI and Tonawanda Band are both recognized by the United States as successors-in-interest to the historic Seneca Nation.

The Plaintiff Tribes allege that New York's acquisition of the Niagara Islands by purchase in 1815 violated the Nonintercourse Act and therefore is void. The Plaintiff Tribes seek to establish their continuing interest in the Islands.

The defendants in this case include the State of New York, the New York State Thruway Authority,[3] various State officials, Erie County[4] and all other landowners on the Niagara Islands.[5] Defendants asserted various counterclaims and affirmative defenses, including laches, statute of limitations, political question, nonjusticability, abatement, adverse possession, "surrounded by settlements," accord and satisfaction, estoppel, waiver and unclean hands.

The Plaintiff Tribes moved for certification of a defendant class and their motion was granted in May 1994. The Plaintiff Tribes also moved to dismiss defendants' counterclaims and affirmative defenses and that motion was also granted. The New York State Thruway Authority even-

tually moved to dismiss the complaint based on the Eleventh Amendment.

In September 1996, the Court stayed proceedings in this case pending the Supreme Court's decision in the case of *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). In *Coeur d'Alene*, the Supreme Court held that the Eleventh Amendment bars an Indian tribe from bringing a quiet title action against a state or state officials in federal court.

In March 1998, the United States moved to intervene as a plaintiff in this case and the Court granted the motion. Defendants moved to dismiss the United States' complaint-in-intervention on the ground that the statute of limitations in 28 U.S.C. § 2415 precluded the action. The State of New York and the New York Thruway Authority (the "State defendants") also moved on Eleventh Amendment grounds to dismiss the Plaintiff Tribe's claims. The Court denied both motions. The State defendants filed an interlocutory appeal of the Court's order denying dismissal on Eleventh Amendment grounds. The Second Circuit Court of Appeals affirmed. *See Seneca Nation of Indians v. New York*, 178 F.3d 95 (2d Cir.1999). The State defendants filed a petition for *certiorari*, which the Supreme Court denied in January 2000. *See New York v. Seneca Nation of Indians*, 528 U.S. 1073, 120 S.Ct. 785, 145 L.Ed.2d 662 (2000).

While the case was on appeal and immediately thereafter, the parties entered into lengthy settlement discussions. The settlement discussions ultimately proved unsuccessful and the parties cross-moved for

---

**3.** A portion of the New York State Thruway passes over Grand Island.

**4.** Grand Island is located in Erie County, New York.

**5.** Island landowners Moore Business Forms Corp., Inducon, Inc., Rado–Mat Holdings, U.S., Inc., Ilona H. Lang, Robert Weaver and Francis B. Pritchard are named as defendants both in their individual capacities and as class representatives for other landowners similarly situated.

summary judgment on the issue of liability. Following extensive briefing and oral argument, the matter was submitted for decision in March 2001.

## III. CLAIMS OF THE PARTIES

Plaintiffs contend that a conveyance of the Niagara Islands by the Seneca Nation to the State of New York in 1815, violated the Nonintercourse Act. They claim that in 1815, the Seneca Nation had both aboriginal title to the Niagara Islands and recognized title granted to it by the United States pursuant to the 1794 Treaty of Canandaigua. Thus, plaintiffs argue, in 1815, the Niagara Islands were tribal land for purposes of the Act, and as such, federal approval was required before they could be sold. Plaintiffs claim that, because such federal approval was lacking, the 1815 conveyance is void under the Act and the Plaintiff Tribes therefore retain title to the Islands.

For purposes of the summary judgment motion, defendants do not dispute that there was no federal approval of the 1815 conveyance. Instead, defendants contend that no such approval was required because in 1815, the Islands were not tribal land subject to the requirements of the Nonintercourse Act. Defendants argue that as the result of various treaties, discussed below, the Senecas held neither aboriginal nor recognized title to the Niagara Islands in 1815, and that New York already held full fee title thereto.

Thus, the question before the Court is whether in 1815, the Seneca Nation actually held either aboriginal or recognized title to the Niagara Islands, or whether, instead, the State of New York already held full fee title to the Islands as a result of prior extinguishment of Seneca title.

## IV. STATEMENT OF FACTS

### A. Historical Sources

In order to understand fully the parties' respective claims in this case and the context in which these claims arise, it is necessary to examine in some detail the historical background of the Niagara River region, the relationship of the aboriginal inhabitants to the region, and the development of Indian policy, first by France and Great Britain and then by the United States.

Because of the important role of the Niagara River in travel by water between the lower and upper Great Lakes, and the role of the Niagara peninsula, located west of the River in present day Ontario, Canada, in travel by land between New York and Upper Canada, the Niagara region was traveled by European explorers, traders and missionaries well before most of the rest of the western New York area. Accordingly, the history of the Niagara region is a long and well-documented one.

For the most part, the relevant historical facts in this case are over 200 years old and are not in dispute. In that regard the parties have entered into a Joint Stipulation of Undisputed Facts ("Joint Stip.").

Additionally, much of the region's history is documented in a report prepared in the 1960's for the United States Department of Justice by Donald H. Kent ("Kent Rep."). *See* Defendants' Exhibit ("Defs.Ex.") 12. The United States engaged Kent to prepare this history of the Niagara region-and in particular the Senecas' relationship to the region-for use in proceedings before the Indian Claims Commission ("ICC").[6] Much of the following history of the area is taken from Kent's report.

**6.** The ICC proceedings regarding the Niagara Islands are discussed in more detail *infra.*

The Court also relies extensively on the United States' Request for Findings of Fact in both the ICC case involving the Niagara Islands ("ICC Br."), see Defs. Ex. 25, and the ICC case involving the so-called Phelps–Gorham Purchase ("PG Br."). See Defs. Ex. 23. These documents relied extensively on the Kent Report, as well as other primary sources, the authenticity of which is undisputed.[7]

### B. *The Niagara River Region*

#### 1. *The Niagara River*

The Niagara River is actually a strait that connects Lakes Erie and Ontario. The River is comprised of waters flowing out of Lake Erie at present-day Buffalo, New York, running in a northerly direction for about 34 miles, and ending there with its waters flowing into Lake Ontario. See Appendix A.[8] From the outlet of Lake Erie, the River is navigable for about 20 miles to the upper rapids about one-half mile above Niagara Falls. After it plunges over Niagara Falls into a deep gorge, the River flows turbulently for about 7 miles though rocky cliffs to present-day Lewiston, New York, where it flows as a quiet river for about 7 miles to Lake Ontario. The River descends about 10 feet from Lake Erie to the upper rapids, 50 feet from the head of the rapids to

the Falls, 167 feet over the Falls, 98 feet in the lower rapids, and less than a foot in the final stretch from Lewiston to Lake Ontario-a total descent of about 326 feet. The River is comprised of fresh water and is unaffected by tides.

Despite the impediment of the Falls and rapids, the Niagara River and the land adjacent thereto have been an important avenue of communication since and prior to the earliest European contact with the Great Lakes region. At Lewiston, on the east side of the River, a trail or "portage" extended to the south over the Niagara Escarpment[9] to a point about one-half mile above the Falls at the beginning of the rapids, in the present-day City of Niagara Falls. See Appendices B and C. This portage was used by Indians and early Europeans traveling the Great Lakes as an overland route to bypass the Falls and rapids.

#### 2. *The Channels and the Islands*

About 5 miles north of Lake Erie the Niagara River divides into two channels, forming between them Grand Island. See Appendices A, B and C. This is the largest island in the Niagara River and encompasses approximately 19,000 acres of land. After passing Grand Island, the two channels again unite and resume the River's flow toward the Falls about 3 miles north.

---

7. The United States is taking a legal position in this case that is contrary to the position it took before the ICC. However, the Court sees no reason for the United States to disagree with or retreat from the facts contained in the Kent Report or its own proposed findings of fact. The United States represented to the ICC in 1967 that such facts were true and nothing has occurred since that time that would have changed those facts.

8. The Court has appended hereto several maps to assist the reader in understanding the Court's Decision and Order. These maps are only meant to guide the reader and are not intended to be dispositive of any issue.

9. The Niagara Escarpment (also referred to as Lewiston Heights) is a ridge of rock, several hundred feet high in some locations, that was created by the glaciers. It runs for approximately 650 miles (with breaks), beginning near present-day Rochester, New York, and extending west through western New York and Ontario, Canada into Wisconsin. Niagara Falls once flowed over the Escarpment at Lewiston, but through erosion, over thousands of years, has receded to its present location approximately 7 miles south of Lewiston.

Just prior to going over the Falls, the waters are again divided by a small island known as Goat Island. As a result, the Falls are divided into two separate falling waters, one west of Goat Island (the Canadian or "Horseshoe" Falls) and the other northeasterly of that Island (the American Falls). About 94% of the water flows over the Canadian Falls.

Besides Goat Island and Grand Island, there are about forty other islands situated between the Falls and Lake Erie. Some of these are larger than Goat Island, some are smaller. All of these together, however, contain but a small fraction of the acreage contained in Grand Island. Today, approximately 18,000 people inhabit the Niagara Islands.

### 3. The River Boundary

Besides its various utilitarian purposes and great beauty, the Niagara River serves as part of the boundary line between the United States and Canada. This came about by virtue of the Treaty of Paris between the United States and Great Britain on September 3, 1783, ending the Revolutionary War. The boundary between the United States and British Canada established in that Treaty, however, was very long and much of it was not described in detail. This was true of the part of the boundary formed by the Niagara River and early writers usually believed that the international boundary cut through the center of Grand Island with half of that island belonging to the United States and half to Great Britain. ICC Br. at 6. However, in 1822, it was finally determined that the westerly channel was the main channel of the River and that the center of that channel was the actual boundary line between the two countries. This con-

firmed that all of Grand Island was part of the State of New York.

### C. The Aboriginal Inhabitants of the Niagara Region

### 1. The Neutrals

At the time of the first European contact with the area, the land portion of the Niagara region was occupied, at least in part, by the Neutral Nation of Indians, an Iroquoian-speaking group.[10] During the first half of the seventeenth century, the Neutrals' territory encompassed the area immediately west of Lake Ontario and both sides of the Niagara River. *See* Appendix D. During that time, the Neutrals were one of the largest Indian groups in the Niagara region. Kent Rep. at 5. By 1641, the French were trading directly with the Neutrals.

Archaeological evidence confirms that the Neutral Indians once lived on Grand Island. Archaeologists have discovered a Neutral cemetery on Grand Island dating from 1635 to 1645. It contained at least 60 burial sites. Thus, it is likely there was a semi-permanent Neutral settlement on Grand Island or nearby. Several other archaeological sites on the east side of the River have also been identified as Neutral. In contrast, there is no archaeological evidence that the Senecas were ever actually present on Grand Island.

### 2. The Wenros and the Eries

To the east of the Neutral Nation, along the south shore of Lake Ontario, somewhere between the Niagara and Genesee Rivers,[11] lived the Wenros. *See* Appendix D. They are sometimes regarded as a subgroup or component of the Neutral Nation,

---

10. The word "Niagara" derives from the Neutral language.

11. The Genesee River is located approximately 60 miles east of the Niagara River in present-day Rochester, New York.

but more properly seem to have been a separate group allied or associated with the Neutrals.

To the south of the Neutrals and southwest of the Wenros were the Eries. The Eries occupied land south of the present-day City of Buffalo along the southeast shore of Lake Erie. *Id.*

### 3. The Senecas

In aboriginal times, the Senecas comprised the westernmost tribe of the Iroquois Confederacy, but were still located a considerable distance to the east of the Niagara River.[12] *See* Appendices D and E. The Iroquois initially consisted of five nations: the Senecas, the Cayugas, the Onondagas, the Oneidas and the Mohawks. In the first part of the eighteenth century, the Iroquois were joined by the Tuscaroras and were then often referred to as the Six Nations of the Iroquois or simply the Six Nations.

At the time of first European contact, the villages of the Senecas were all east of the Genesee River, extending eastward from the Genesee Valley to Cayuga territory at the watershed between Seneca Lake and Cayuga Lake. The Senecas, like the rest of the Iroquois, did not lead a nomadic existence. They maintained substantial permanent settlements, raised agricultural crops in the vicinity of their villages, and hunted widely for meat and pelts throughout an extensive area extending on both sides of Lakes Erie and Ontario. In addition to hunting, the Senecas fished extensively in Lakes Erie and Ontario, and for such purposes maintained temporary villages at generally permanent locations adjacent to the Lakes and the Niagara River. Other Indians, however, both Iroquois and non-Iroquois, also used the Niagara River and adjacent land as an avenue of communication and transportation.

### 4. Defeat of Wenros, Neutrals and Eries by the Senecas

At some point prior to 1638, the Neutrals terminated their relationship with the Wenros, leaving the Wenros vulnerable to enemy attack. In 1638, the Senecas defeated the Wenros and drove them from their territory. The Wenros eventually took refuge among the Huron Indians, who were located in present-day southern Ontario, Canada.

A similar fate befell the Neutral Nation. The Neutral Nation was named by the French because they kept themselves "equally in peace with both" the Hurons and the Iroquois, even though the Neutral country was "the ordinary land route" between these two hostile groups. ICC Br. at 12. Though strong themselves, the Neutrals never attacked either the Hurons or the Iroquois, who were constantly at war with each other. As the warfare between the Hurons and Iroquois intensified in the 1640's, however, the Neutrals found it increasingly difficult to avoid involvement. By 1649, the Neutrals found themselves in open warfare against the Senecas. The war raged evenly for several years, until the Senecas were able to obtain the assistance of the Mohawks. In 1651, with the aid of the Mohawks, the Senecas defeated the Neutral Nation. The remnants of the Neutrals scattered to the north and south, while those captured by the Iroquois were either killed or incorporated by adoption into various nations. Similarly, between 1654 and 1680, the

---

12. The Iroquois Confederacy, or Haudenosaunee ("People of the Longhouse"), is believed to have been formed in the fifteenth century when the legendary Hiawatha and the Great Peacemaker united the warring eastern Indian tribes. *See Banner v. United States*, 238 F.3d 1348, 1350 (Fed.Cir.2001).

Senecas defeated the Eries and drove them from the Niagara region.

After the withdrawal of the Wenros and the defeat of the Neutrals and the Eries in the 1650's, the territory between the Genesee River and the Niagara River remained an unoccupied wilderness. Kent Rep. at 15–19. According to historians, the Senecas may have had some small villages as bases for hunting and fishing, but there was no permanent occupancy of the country west of the Genesee River for almost a century. *Id.* Historians have theorized that the reason for this might have been that the area was too vulnerable to attack from enemies of the Senecas. *Id.* During that time, the Senecas were under constant attack by tribes from the west and the south. According to Kent:

> [The] expulsion or destruction of the original inhabitants [of the Niagara region], which was later to be termed a "conquest" when the British were seeking a basis for claiming the lands around the Great Lakes, was not followed by any appreciable resettlement or use of the Niagara land by the Senecas, and it does not appear that they made any effort to keep others away. On the contrary, the Niagara remained a relatively deserted locality for many years, open to all comers, Indian or white.

*Id.* at 164 (footnotes omitted). Thus, until the time of the Revolutionary War, it appears that the main body of the Senecas lived between the Genesee River and Seneca Lake. *Id.*; *see also* Appendices D and E.

**D. *French Control of the Niagara Region***

**1. *French Plans to Control the Niagara Region***

The French presence in the Niagara region began in the seventeenth century. Recognizing the strategic importance of the Niagara region, the government of French Canada, or New France, began to consider fortifying and controlling the Niagara portage. In 1673, Count Frontenac, Governor of French Canada, proposed that a fort be built at the mouth of the Niagara River, and that a vessel be built on Lake Erie in order to extend French control of the Great Lakes.

These plans for the expansion of New France began to take shape in the fall of 1678 when the explorer René Robert Cavalier, Sieur de La Salle sent an advance party to establish a post and prepare for building a ship above Niagara Falls to sail the upper Lakes. With his advance party was Father Louis Hennepin, a Franciscan missionary, whose memoirs, *A New Discovery of a Vast Country in America,* indicate that there were but a few Senecas in the Niagara area at that time, who seemed to be there only on temporary fishing, trading or hunting expeditions.

In 1678, La Salle traveled to the present site of Lewiston, New York, where his party built a palisaded storehouse, the first European structure in the Niagara region. That same year, La Salle discovered a Seneca fishing village at the mouth of the Niagara River. The nearest permanent Seneca village, however, was five days' journey to the east.

In 1679, La Salle established a shipyard at the mouth of Cayuga Creek on the Niagara River above Niagara Falls and began building a ship. *See* Appendices B and C. La Salle employed two Indians from a western Indian tribe to hunt for his party. They were able to operate without any interference from the Senecas. During the construction of the ship, La Salle had to leave the Niagara area in order to get supplies and try to satisfy his creditors. Before leaving on February 1, 1679, he gave orders for the building of a fort at

the mouth of the River, to be called Fort Conty or Conti. *See* Appendix C. A small fortification was built, but was accidently destroyed by fire so that only a storehouse was left.

At this time, the Iroquois were coming to the Niagara region from a distance to trade with the French, bartering their furs for trade goods. In August 1679, La Salle returned to the Niagara River and found that his ship, the *Griffon*, was built and ready to sail. After exploring farther west in his ship, La Salle returned east to Fort Frontenac in present-day Quebec, Canada. In the spring of 1681, Father Hennepin, returning from his missionary travels in the far West, came to the Niagara River and found Fort Conty deserted and the seasonal Seneca fishing camp unoccupied.

## 2. The Fur Trade

While Spain and Portugal aggressively exploited their new world colonies for gold, France and England early recognized an entirely different valuable commodity in the Americas to the north. This was the fur trade. The demand for furs in Europe was great, and since the northern woods abounded with fur-bearing animals, there remained only the job of gathering the furs and transporting them to Europe. The most effective way of doing this was with the help of the various Indian tribes. The Indians trapped the animals and brought the pelts in to trade for other wares. Thus, there grew a valuable fur trade-valuable to both the Indians and the French and English, each of whom vied to dominate the trade.

As time went on, the fur-bearing animals in New York became scarce and the Iroquois recognized that they would soon be left out of the fur trade. Seeing their main trading resource disappearing, the Iroquois began to develop the role as middlemen between the western Indian fur gatherers and the European fur buyers in the East. France and England, competing for the western fur market, needed avenues to and from the western areas. The Niagara region was the all-important link to the West. Thus, control of the Niagara region became crucial to both France and England.

## 3. From La Salle to Denonville

Following La Salle's abandonment of the Niagara region, the area was visited repeatedly in succeeding years by French traders and soldiers going to and returning from posts further west. The area was also visited by various transient Indian tribes, including large parties of western Indians coming east to reinforce the French in their wars with the Senecas and other Iroquois which broke out in 1684.

The British also were becoming increasingly aware of the Niagara River and the portage, and of the fact that this area was a key to the interior of the continent. In May 1686, Governor Thomas Dongan of the New York Colony wrote to the Marquis de Denonville, the new Governor of French Canada, protesting about rumored intentions of the French to build a fort at the mouth of the Niagara River. By February 1687, Dongan was urging the British to build a fort at the same location.

## 4. Denonville's Expedition Against the Senecas

The increasing number of British trading expeditions through the area alarmed the French. Even while renewing their war with the Senecas, the French decided to fortify the post at the mouth of the Niagara against possible British attack.

In 1687, Denonville came west by way of the St. Lawrence River and Lake Ontario. He marched inland from Irondequoit Bay near present-day Rochester, New York,

and proceeded to burn and destroy villages and crops throughout. Seneca country. The Senecas fled eastward for refuge among the other Iroquois nations. The French were supported in their campaign against the Senecas by reinforcements from the western Indian nations (Indian tribes located to the west of Iroquois territory).

### 5. *The First Fort at Niagara*

After defeating the Senecas, Denonville moved to the mouth of the Niagara River and there constructed a substantial log fort which was called Fort Denonville. The Fort fell upon hard times however, and was abandoned the following year. In 1690, Governor Andros of the New York Colony protested the building of a French fort "at Oniagra [Niagara] in the Senneka's [sic] Country." Joint Stip. at ¶ 31.

### 6. *King William's War (1689–1701)*

In 1689, following the ascent of King William III to the throne of England in 1688, hostilities broke out between France and England. Upon learning of the hostilities between the French and the British, the Iroquois sided for the most part with the British and began to attack the French. They repeatedly raided French settlements on the St. Lawrence River near Montreal, while the French successfully invaded and ravaged the Mohawk country in 1693, and the Onondaga and Oneida country in 1696. The war took a large toll on the Iroquois and they eventually entered a peace treaty with the French in 1701.

From 1689, the beginning of King William's War, until the peace treaty between the French and the Five Nations of Iroquois in 1701, the Niagara region continued to be an unguarded gateway open in both directions. ICC Br. at 25. The Senecas used it in attacking the western tribes allied with the French, and the western tribes also used it in attacking the Senecas.

The Treaty of Peace of 1701 provided that the Iroquois would remain neutral in any further wars between the French and the British. This was a significant concession to the French, and by the same token a disappointment to the British in New York, who not only lost an ally, but also lost control of and any claim to lands which the Iroquois might claim. In an effort to avoid this result, the British took a deed from the Iroquois that allegedly ceded them all the Iroquois title in a vast area of land that included the Niagara region.

### 7. *The French Return to Niagara (1701–1710)*

It was not long after King William's War before the French were again using the Niagara region regularly. During that time, there was a steady flow of French officers, soldiers, settlers and their families over the Niagara portage to Detroit and other western posts. Indians of various western tribes also continued to come and go by way of Niagara usually for the purpose of trading, but occasionally with hostile intentions toward the Senecas. The French were using and occupying the Niagara region without a fort and felt no particular urgency about refortifying the Niagara portage.

### 8. *Joncaire and Queen Anne's War (1702–1713)*

The gradual process through which the French established firm control of the Niagara portage following the peace of 1701 was carried out by several individuals who enjoyed particularly close and friendly relations with the Iroquois and had been adopted into various tribes. The most important of these individuals was Louis

Thomas Joncaire, Sieur de Chabert the dominant figure in the Niagara region for more than thirty years.

Joncaire was a French-born soldier who was captured in the 1690's by pro-English Senecas and adopted by his Seneca captors. Following the peace of 1701, when the Iroquois were formally declared neutral in the rivalry between England and France, Joncaire began promoting Seneca–French rapprochement.

In 1704, Joncaire sent word to the French Governor that the British had called a meeting of the Iroquois at Onondaga in order to counteract French influence among them, and also to persuade them to let the western Indians pass through their country and trade at Albany. This alarmed the French for it was important to hold the Iroquois to their promise of neutrality, now that war had broken out again between France and Great Britain-the War of the Spanish Succession or Queen Anne's War. The French Governor ordered Joncaire to attend the meeting at Onondaga, where he successfully persuaded the Iroquois to remain neutral. Down to the end of Queen Anne's War in 1713, the British repeatedly attempted to get the Iroquois to join in hostile action against the French, but the Iroquois remained neutral.

### 9. *French Use and Occupancy of the Niagara Region Extended*

Joncaire's influence over the Senecas had been an important factor in keeping them neutral and friendly to the French during Queen Anne's War. It was to be equally effective in consolidating the French control of the Niagara River portage.

In June 1708, Joncaire met with French officials at the mouth of the Niagara River at the site of the former Fort Denonville. There they discussed the possibility of a new military post being constructed. Joncaire stated the advantages to be derived from building and garrisoning a fort at that location. He was sure that if the fort were built, many Iroquois would move from the east and establish villages around the fort, thereby reducing the opportunity for British influence. Plans for a fort, however, were delayed.

In the early part of the eighteenth century, the Niagara River portage was a well-established operation. Both European traders and Indians used the portage regularly during this time period. As a supplement to a French troop garrison in the Niagara region, local help was required. Joncaire proposed that the pro-English Senecas be allowed to work on the Niagara portage and told French officials that the Senecas would be under his personal influence and control. He pointed out the benefits to be derived from having at least some Iroquois on the French side. Portaging supplies and pelts between the River below the Falls and the River above provided work to many Senecas. These Senecas lived near their work at the foot of the portage in camps and cabins along the road.

During this time, the British constantly complained to the French about French trespass on territory which the British claimed belonged to them because the Senecas and other Iroquois were British subjects. The French replied that the Indians believed themselves to be independent and that the French right to the Niagara region had been established by actual occupation by La Salle and Denonville.

### 10. *The French Fortify Niagara*

In 1720, Joncaire, under orders of the French Governor, approached the Senecas for permission to build a house upon their

land and maintain that settlement even if the British opposed it. The Senecas acquiesced and Joncaire built a Royal Store at the foot of the portage road in present-day Lewiston. *See* Appendix B. The building of the Royal Store was the opening move toward the establishment of a permanent French fort along the Niagara River.

With continued efforts by the British to secure a foothold in the Niagara region, the French decided to augment the Royal Store with additional fortifications. In 1726 and 1727, the French constructed Fort Niagara at the mouth of the Niagara, at the same site where Fort Denonville had been erected. *See* Appendices B and C. By the building of Fort Niagara, the French established open military control of the Niagara River and the Niagara portage, and thereby made more effective their control and supervision over the Niagara region.

Fort Niagara served several important functions for the French. It protected and regulated the movement of traders, settlers, military forces and Indians over this important avenue of communication between Lake Ontario and the upper Great Lakes. With the aid of sailing vessels on Lake Ontario, it sought with varying success to prevent both Indians and French traders from taking their furs and skins to the British post at Oswego, New York, located at the eastern end of Lake Ontario, and it was a barrier to keep British traders from penetrating to the upper Great Lakes region. Its own trading store was intended to intercept the trade of the Indians coming from the west and to attract the trade of the Senecas to the east. It was also a base for various French military expeditions.

In relation to the Senecas, Fort Niagara was the center from which the French influenced and "overawed" them. ICC Br.

at 35. Fort Niagara and the portage road which it guarded attracted Senecas from their villages in the Genesee Valley. The Senecas sought to profit by carrying goods over the portage and to maintain friendly relations with their powerful new neighbor. The Seneca understood that so long as they remained on good terms with the French and avoided warring on France's Indian allies, the Fort served to protect them also against possible raids from the west.

As noted, a few Senecas had begun to profit by carrying goods for French traders and military forces over the Niagara portage early in the 1700's, and by 1718 this work was sufficiently steady and productive to provide employment for a little village of about ten cabins which was reported there in that year. In fact, from 1720 until 1750 the few Frenchmen who resided at Niagara were readily outnumbered by the Senecas who had come to live there in the hope of profiting by supplying the French with food and labor.

## 11. *British Reaction to Fort Niagara*

The construction of Fort Niagara by the French caused the British great alarm. The British were concerned that western Indians wishing to bring furs to Fort Oswego and Albany to trade via Lake Erie might be intercepted at the Niagara portage and convinced to trade with the French. In the fall of 1727, the British summoned representatives of the Iroquois to Albany and inquired into their reasons for allowing the French to build the fort at Niagara. The British were unable, however, to convince the Iroquois to take any action against the French. In the end, the British took a deed from the Iroquois which ceded any title they might have had to certain lands, including the Niagara region.

Joncaire died at Fort Niagara on June 29, 1739. He was succeeded by his sons, Philippe and Daniel de Joncaire–Chabert.

### 12. *King George's War (1745–1748)*

In 1745, with the outbreak of King George's War between the French and the British, the British Governor, George Clinton, recommended that a fort be built in the Seneca country, that two or three vessels be built, and that Fort Niagara be captured. The British hoped that by capturing Fort Niagara it would bring the Iroquois firmly onto the British side. The Iroquois, however, seeing that neutrality continued to serve their best interests, were still insistent that neither the French at Fort Niagara nor the British at Fort Oswego be attacked. The Senecas lived east of Fort Niagara and west of Fort Oswego and could trade at either place. To them, Fort Niagara was no obstacle, but rather a place to gain profitable employment by carrying on the portage.

During King George's War, goods became scarcer and higher in price at French posts, and consequently trade at Fort Niagara fell off. The Indians wanted more in return for their furs and could secure higher payment from the British at Fort Oswego.

### 13. *Fort Little Niagara*

In order to ensure even better control of the fur trade and of the Indians, the French decided to build, in addition to Fort Niagara, a fort at the landing above Niagara Falls. In 1750 and 1751, the French, under the direction of Joncaire's son, Daniel, built Fort Little Niagara, later called Fort Schlosser by the British, a mile and a half above the Falls. *See* Appendices B and C. Daniel Joncaire–Chabert used all his talents of persuasion to keep the Indians from going to Fort Oswego to trade with the British and was generally successful in this endeavor.

During this time, the French also worked to improve the portage route. The French constructed a new road in 1752, that made it easier to haul goods over the Niagara Escarpment.

### 14. *The Ohio Expedition and the French and Indian War*

In 1753, the Niagara region bustled with activity in preparation for a great French expedition being readied to occupy and fortify the Ohio country. Between 1753 and 1754, thousands of soldiers and craftsmen, and tons of supplies and equipment, moved through the Niagara region westward toward the Ohio River Valley. The French plan was to conquer that area and to build four forts there. In 1754, the Ohio expedition ultimately led to open warfare between France and Great Britain. This has commonly been referred to as the French and Indian War.

The intensive use of Fort Niagara as a military base and of the Niagara portage as an important military road was continued by the French until 1759. From 1753 to 1759, Fort Niagara was greatly improved, enlarged and strengthened. As a result, France dominated and controlled the Niagara region during this period.

Despite initial successes against the British, including the capture and destruction of the British fort at Oswego, France's domination of the Niagara region was soon to end. In 1759, the French were on the defensive on all fronts. The British had raided and destroyed Fort Frontenac in August 1758, making it more difficult to send supplies to Fort Niagara. Fort Duquesne, at the forks of the Ohio River near present-day Pittsburgh, Pennsylvania, was captured by the British in November 1758. In December 1758, the British planned an expedition against Fort Niagara. Sir Wil-

liam Johnson, who was second-in-command of the proposed expedition under Brigadier General John Prideaux, was able to win over the Iroquois and gain their assistance and support. He was even able to win over the "Chenossia Indians," or Genesee Senecas, who had been strongly under French influence. Now that the. French were losing, the Genesee Senecas agreed to join the alliance against them. After a long siege, Fort Niagara surrendered to the British on July 25, 1759.

French rule on the Niagara River had ended and was succeeded by British rule. The surrender of Fort Niagara was soon followed by the surrender of Quebec in September 1759, and then by the surrender of all of Canada in September 1760. In 1763, France and Great Britain entered into the Treaty of Paris whereby France ceded to Great Britain all its claims to territories east of the Mississippi River.

## E. *British Rule of the Niagara Region*

### 1. *British Indian Policy and the Royal Proclamation of 1763*

The British Crown, having conveyed the fee title to land to the colonists by various charters and patents, initially permitted the colonists to purchase and extinguish Indian title, either individually or through the colonies. Many of the colonies, in order to minimize disputes with the Indians, enacted laws requiring colonial approval for individually negotiated land cessions. Unauthorized and unrestricted encroachments on Indian lands continued, however, causing military frictions with the Indians.

The Crown eventually recognized the need to devise plans for a comprehensive, centralized Indian policy. In 1754, for example, the Lords of Trade in England proposed a plan by which "the sole direction of Indian affairs [would] be placed in the hands of some single person." Robert N. Clinton & Margaret Tobey Hotopp, *Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims,* 31 Me. L.Rev. 17, 21 (1979) (*quoting* 6 *Documents Relative to the Colonial History of the State of New York* 903–95 (E.B. O'Callaghan ed. 1855)).

At the outbreak of the French and Indian War in 1754, the British government tried to assume direct control over colonial dealings with the Indians. Felix S. Cohen, *Handbook of Federal Indian Law* 57 (1982 ed.). Two superintendents of Indian affairs were appointed, one each for the northern and southern colonies. The superintendents were, in effect, ambassadors whose duties consisted of negotiating treaties, reporting events to the home government, and keeping peace generally among the Indian tribes and the border settlers.

The efforts of the Crown culminated on October 7, 1763 with the issuance of the Royal Proclamation by King George III. The 1763 Proclamation forbade the purchase or settlement of Indian lands west of the crest of the Appalachian Mountains by anyone, including the colonial governors, without permission of the Crown.[13] *See* Clinton & Hotopp, *supra,* 31 Me. L.Rev. at 22; *see also* Appendix F. It also reaffirmed the requirement of imperial approval prior to the issuance of patents to Indian lands lying east of the demarcation line. *See* Clinton & Hotopp, *supra,* 31 Me. L.Rev. at 22. The 1763 Proclamation was the first attempt to delineate an "Indian country" by drawing a boundary line separating Indians and settlers.

---

**13.** The Proclamation is reprinted in *Documents Relating to the Constitutional History of* *Canada 1759–1791* 119–23 (Adam Shortt & Arthur G. Doughty ed.1907).

During the pre-revolutionary period the colonies were expanding their settlements and trying to consolidate their charter land claims. They saw the Proclamation of 1763 and Great Britain's centralization of Indian affairs as an attempt to give favored traders and land speculators western lands to the colonies' detriment. *Oneida Indian Nation of New York v. New York,* 649 F.Supp. 420, 425 (N.D.N.Y. 1986), *aff'd,* 860 F.2d 1145, 1167 (2d Cir. 1988), *cert. denied,* 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). The colonists considered the Proclamation of 1763 an unwarranted intrusion into colonial affairs. Great Britain's centralization of Indian affairs eventually became one of the grievances which led to the American Revolution. *Id.*

### 2. *Pontiac's Rebellion and the 1764 Treaties of Peace*

Following the French and Indian War, part of the Senecas became hostile toward the British and there was a gradual development of unrest in the years after 1760. Sir William Johnson, now Superintendent of Indian Affairs for the Northern Colonies, was successful in containing the unrest until 1763, when actual open warfare broke out. Johnson managed to hold five and a half of the Six Nations of Iroquois friendly to the British, but the western Senecas allied themselves with the western Indians attacking British posts. This insurrection is commonly referred to as "Pontiac's Rebellion" or "Pontiac's War."

There was no attack on Fort Niagara by the Indians, but there was a damaging attack on a British army convoy passing over the Niagara portage on its way to send reinforcements and supplies to Fort Detroit, which was under siege by the Ottawa Indians. On September 14, 1763, some 500 Senecas hiding in ambush beside the Niagara portage drove a number of British soldiers and a convoy of wagons over a precipice and down into the Niagara River Gorge onto the jagged rocks below. It was a bloody fight and the place is still called "Devil's Hole" or "Bloody Run" because of it. *See* Appendix C.

At the time of the attack at Devil's Hole, the British did not know which Indians had attacked them. ICC Br. at 48–49. In fact, they speculated that it might have been Mississauga Indians, who were also present in the area at that time. *Id.* It was not until later that the British found out that the western element of the Senecas was involved in the attack.

After learning that the Senecas were responsible for the attack at Devil's Hole, the British prepared to retaliate against them unless they could be brought to seek terms of peace. Sir William Johnson applied pressure to the other five nations and the Senecas that remained friendly to the British so that they, in turn, would apply pressure to the western Senecas to seek peace.

In April 1764, delegates of the Seneca Nation and Sir William Johnson on behalf of Great Britain met at Johnson Hall, New York, to consider treaty arrangements. On April 3, 1764, Johnson signed the "Preliminary Articles of Peace, Friendship and Alliance" with the Seneca Nation ending hostilities after the French and Indian War. Article 3 of the April 3, 1764 Preliminary Articles of Peace provided that the Senecas:

> cede to His Maj'ty and his successor for ever, in full Right, the lands from the Fort of Niagara, extending easterly along Lake Ontario, about four miles ... and running from thence southerly, about fourteen miles to the Creek above Fort Schlosser or little Niagara, and down the same to the River, or Strait and across the same, at the great Cataract; thence Northerly to the Banks of

Lake Ontario, at a Creek or small Lake about two miles west of the Fort, thence easterly along the Banks of the Lake Ontario, and across the River or Strait to Niagara, comprehending the whole carrying place, with the Lands on both sides the Strait, and containing a Tract of [about] fourteen miles in length and four in breath. -And the Senecas do engage never to obstruct the passage of the carrying place, or the free use of any part of the said Tract. . . .

7 *Documents Relative to the Colonial History of the State of New York* ("NYCD") 621 (E.B. O'Callaghan ed. 1855); Joint Stip. at ¶ 47.

In the margin of Article 3, the instrument states as follows: "Agreed to, provided the Tract be always appropriated to H.M.'s sole use that at the definite Treaty, the lines be run in presence of Sr. Wm Johnson and some of the Seneca's [sic] to prevent disputes hereafter." 7 NYCD *supra,* at 621; Joint Stip. at ¶ 48.

Thus, under the April 3rd treaty, the Senecas agreed to cede to the British Crown a four-mile wide strip of land running along each side of the Niagara River, from Lake Ontario to a point just above Niagara Falls. This has been referred to in this case and in the ICC proceedings as the "northern Niagara strip." *See* Appendix G.

Preparations were made for a multi-tribal peace conference at Fort Niagara in July of 1764. A final peace treaty with the Senecas was to be concluded in this context.

Prior to the July 1764 peace conference, Sir William Johnson had been in frequent correspondence with British military authorities about threats to the security of the Niagara portage and the degree of security necessary to guarantee its safety. *See* 3 *The Papers of Sir William Johnson* 162–63 (Milton W. Hamilton ed.1921). His

anxiety was increased when the Senecas were late reaching the July 1764 peace conference at Fort Niagara. Johnson wrote: "It has been a happy Circumstance for you that you came in Yesterday, otherwise the Army would certainly have gone against you. I hope for your own sakes you are sufficiently prepared for answering, and fulfilling all your Engagements." *Id.* at 318; Joint Stip. at ¶ 51.

Johnson called for an expansion of the Preliminary Articles of Peace of April 3, 1764:

With regard to your present Promises, I wish you may be sincere in them:—it is for your Interest, and Security that you should be so—You have so often broke them that we can only Judge by your future Conduct. . . . What remains for you yet to perform is to acknowledge your perfect Agreement with the Articles concerning the Carrying Place, the Posts at the Rapids . . . also that you repeat your Engagements for the Security of this Carrying Place against all them, who would Obstruct it;—all which must be fully performed, else all your Promises must be considered as nothing.—I would further recommend it to you to give a higher Proof [of] your friendship,—that you should cede to his Majesty the Lands from above your late Gift, to the Rapids at Lake Erie on both Side the Streights [sic], in Breadth as the former, and to include all the Islands.—If you do this, I have reason to think his Majesty will be well pleased, & consider you for it.

3 *The Papers of Sir William Johnson, supra,* at 318–19; Joint Stip. at ¶ 52.

On August 6, 1764, Johnson signed a "Treaty of Peace and Alliance" with the Seneca Nation. Article 5 provided that:

In addition to the grant made by the Chenussio Deputys to His Majesty at

Johnson Hall, in April, of the Lands from Fort Niagara, to the upper end of the carrying place, beyond Fort Schlosser and four miles in breadth on each side of the River, the Chenussios now, surrender up all the lands from the upper end of the former Grant (and of the same breadth) to the Rapids of Lake Erie, to His Majesty, for His sole use, and that of the Garrisons, but not as private property, it being near some of their hunting grounds; so that all that Tract, of the breadth before mentioned, from Lake Ontario to Lake Erie, shall become vested in the Crown, in manner as before mentioned, excepting the Islands between the great Falls and the Rapids, which the Chenussios bestow upon Sir Wm. Johnson as proof of their regard and of their knowledge of the trouble he has had with them from time to time. All of which the Chenussios hope will be acceptable to His Majesty, and that they may have some token of His favour [sic].

7 NYCD, *supra*, at 652; Joint Stip. at ¶ 53.

The August 6th treaty was a continuation of the April 3rd treaty and under it, in addition to the land ceded in the previous treaty (*i.e.*, the northern Niagara strip), the Senecas agreed to cede a four-mile wide strip of land on each side of the Niagara River, from the southern-end of the northern Niagara strip to Lake Erie. This has been referred to in this case and in the ICC proceedings as the "southern Niagara strip." *See* Appendix H.

On August 30, 1764, Johnson transmitted the August 6, 1764 Treaty to the Earl of Halifax, with a cover letter describing the 5th Article of the Treaty and his acceptance of the Niagara Islands as follows:

The Senecas gave me all the Islands laying in the straits, between the two Lakes Ontario and Erie, one of which I know to be very fine Land, and computed at about 15 thousand acres, there are several others, which with the former, have a good deal of clear land, and vast large meadows of grass on them, and will prove absolutely necessary for the Oxen, Horses, ettc. [sic] to be employed in His Maj'ty's service, as well as the Cattle of the Garrisons, there being no land fit for Meadow or grain near the Fort. I could not agreeable to the Custom of Indians refuse their offer, without giving great offence, and the great addition themselves had made to what their Deputies had agreed to, last April together with their other proposals induced me to accept them, that I might have it in my power, to make an [sic] humble offer of them to His Maj'ty for such uses as he may think proper, I must beg leave to entreat your Lord'p to present my most profound duty to His Maj'ty on this occasion and to assure him, that I should not presume to make this offer, but that I know these Islands will prove of importance within a little time & may be extremely useful at present.

7 NYCD, *supra*, at 647; Joint Stip. at ¶ 54. That same day, Johnson also wrote the following to the Lords of Trade:

My sole motive, for accepting of the Islands, which they so earnestly pressed on me, was to have it in my power humbly to offer them to His Majesty; one of them contains near 15000 acres and has much Grass land, which will be very useful to the Cattle at the Garrisons.

7 NYCD, *supra*, at 649; Joint Stip. at ¶ 54. There is no known response from the King to Johnson's communications regarding the Islands. Joint Stip. at ¶ 55.

Sir William Johnson died in 1774. His will made no mention of the Niagara Islands and contained no residuary clause. George P. Decker, *Diversion of Water*

*from the Niagara River, The Niagara Title Papers, Hearings Before the Committee of Foreign Affairs, House of Representatives,* 63rd Cong., 2nd Sess. 32–33 (Jul. 15, 1914); Laurence M. Hauptman. *Who Owns Grand Island (Erie County, New York)?,* 23 Okla. City Univ. L.Rev. 151, 154 (1998); Joint Stip. at ¶ 56.

After the 1764 treaties of peace, work on the Niagara portage continued under British control. The Senecas no longer had a monopoly on carrying goods on the portage as they once did under the French. They now had to compete with the Mississaugas, who were also working on the portage.

### 3. *Daniel Joncaire–Chabert's Claim to the Niagara Islands*

In about 1764, after the French and Indian War, Joncaire's son, Daniel Joncaire–Chabert, petitioned the King of England for the return of certain property allegedly taken from him during the War. He claimed that the Iroquois, in consideration for the many years that he had spent among them and to induce him to settle there, had deeded him all the land from Gill Creek located in the vicinity of Fort Little Niagara to Buffalo Creek (also known as the Buffalo River) located in present-day Buffalo, New York, including the Niagara Islands. *See* Appendix A. He contended that this deed was confirmed twice by the Iroquois and was approved by the French government. He stated in his petition that he had invested much money and time clearing the land, planting crops and erecting buildings. He complained that much of his property had been taken or destroyed by the British during the French and Indian War, and asked that his property be returned to him. Not surprisingly, in light of his past support of France, the British turned down his petition.

### 4. *The 1768 Treaty of Fort Stanwix*

The 1768 Treaty of Fort Stanwix (located at present-day Rome, New York) between the British and the Iroquois established the actual boundary line between Indian and Crown lands mandated by the Proclamation of 1763. On November 5, 1768, Sir William Johnson witnessed the "Deed determining the Boundary Line between the Whites and the Indians," which set a line between Iroquois land and the colonies. 8 NYCD, *supra,* at 135–37; Joint Stip. at ¶ 58. The line was drawn at the eastern boundary of Oneida territory, which was located far to the east of Seneca territory. *See* Appendices D and I.

During the 1768 Treaty negotiations, representatives of the Six Nations stated the following:

> Meetings amongst ourselves and with you and from all that you have said to us thereon, we have at length come to a final resolution concerning it, and we hope that what is now agreed upon shall be inviolably observed on your parts as we are determined it shall be on ours and that no further attempts shall be made on our Lands but that this Line, be considered as final and we do now agreed to the Line we have marked upon your Map, now before you on certain conditions on which we have spoken and shall say more and we desire that one Article of this our agreement be, *that none of the Provinces or their people shall attempt to invade it under color of any old Deeds,* or other pretences [sic] what soever for in many of these things we have been imposed upon, and therefore we disclaim them all. . . .

8 NYCD, *supra,* 127 (emphasis added); Joint Stip. at ¶ 59.

At the conclusion of the negotiations, Johnson made the following statement:

As to the several reservations you make in your Cession to the King and the other points you recommend you may be assured that His [Maj'y] shall be made acquainted with them, as I shall transmit to him a copy of our transactions at this place & I may venture to assure you that they will meet with all possible regard from a Prince of His clemency & Justice & I now give you this Belt to strengthen ratify and confirm the Boundary to all transactions necessary thereto.

8 NYCD, *supra,* at 130; Joint Stip. at ¶ 60.

Johnson forwarded the minutes from these meetings to the Lords of Trade, who stated in response that the King would "give the necessary directions for the confirmation of it [the Treaty] as agreed upon at Fort Stanwix." 8 NYCD, *supra,* at 166; Joint Stip. at ¶ 61.

## F. *The Niagara Region during the Revolutionary War*

When the Revolutionary War began in 1776, Fort Niagara became the British center for carrying on military operations against the United States in the middle section of the country. The British Indian Superintendent moved his headquarters from eastern New York to Fort Niagara and British communication with the Iroquois took place from there. Fort Niagara was also a staging base for raids against the American frontier.

Maintenance of peaceful or at least neutral relations with the Six Nations of the Iroquois was an important factor to the United States in its conduct of the Revolutionary War, since they were the most powerful of the Indian nations and had a history of alliance and friendship with the British Crown, as evidenced by the Proclamation of 1763 and the 1768 Treaty of Fort Stanwix, both of which protected Iroquois lands. *See Oneida Indian Nation of New York v. New York,* 691 F.2d 1070, 1088 (2d Cir.1982) (citations omitted); *United States v. Oneida Nation of New York,* 217 Ct.Cl. 45, 576 F.2d 870, 876 (1978). Accordingly, in 1775, the Continental Congress sought the assurance of the Six Nations that they would remain neutral in the war between the United States and Great Britain. *See* 2 *Jour. Continental Cong.* 174–77 (Jul. 12, 1775), 177–83 (Jul. 13, 1775). The Six Nations pledged their neutrality, but by mid–1776, it became apparent that some of the Six Nations, namely the Senecas, Cayugas, Onondagas and Mohawks, were engaging in combat on the side of the British. *Oneida Nation of New York,* 576 F.2d at 876.

In August 1776, United States commissioners held a conference with the Six Nations at which they accused the hostile tribes of violating their pledges of neutrality and asked them to declare their true intentions. *Id.* Despite further assurances of neutrality, by 1777, the hostile tribes were engaged in combat against the United States. On December 3, 1777, the Continental Congress sent a message to the Six Nations asking the hostile tribes why they were disloyal and telling the friendly tribes that they would be protected. *See* 9 *Jour. Continental Cong.* 994–99 (Dec. 3, 1777).

At the beginning of the War, except for those working on the portage, the Senecas were still living on their original homelands along the Genesee River, some sixty miles or so to the east of the Niagara River. In 1779, an expedition under General John Sullivan of the Continental Army invaded Seneca country. After defeating the Senecas at New Town, near present-day Elmira, New York, the army proceeded north through the Genesee Valley, destroying the Senecas' homes and crops. Many of the Senecas fled to Fort Niagara seeking the protection of the British. Af-

ter the conclusion of the War, the Senecas tended to remain in the Niagara region. These facts were summarized by Orasmus H. Marshall in his paper concerning the Niagara frontier that was presented to the Buffalo Historical Club in 1865:

> During the Revolutionary War [the Senecas] espoused the British cause. The atrocities they committed in their savage mode of warfare culminated in 1778 in the memorable massacre at Wyoming, and induced General Washington, in imitation of De Nonville, to send an army for their chastisement. The famous expedition under General Sullivan was organized for this purpose which, penetrated the heart of the Seneca country, resulted, for the time being, in their overthrow and complete dispersion. The proud and formidable nation fled, panic stricken, from their "pleasant valley," abandoned their villages, and sought British protection under the guns of Fort Niagara. They never, as a nation, resumed their ancient seats along the Genesee, but sought and found a new home on the secluded banks and among the basswood forests of the Buffalo Creek, whence they had driven the Neutral Nation one hundred and thirty years before.

ICC Br. at 52–53. Thus, permanent Seneca residence in the Niagara region was first brought on by the French hiring them to work on the portage and then ultimately by the British furnishing them protection during the Revolutionary War. *Id.* at 53.

## G. *The United States' Early Mechanisms for Dealing with the Indians*

From the first days of the Continental Congress and through the struggle for independence, the American government showed great solicitude for the Indians. *See* Cohen, *supra*, at 58. Almost immediately after its formation, the Continental Congress pledged itself to secure and pre-

serve the friendship of the Indian nations. 2 *Jour. Continental Cong.* 174–77 (Jul. 12, 1775).

The Continental Congress's perceived need for a national Indian policy resulted in the creation of certain federal administrative mechanisms even prior to the adoption of the Articles of Confederation. The Congress attempted to centralize authority over Indian matters in the national government by establishing boards of commissioners to secure the friendship of the tribes and to counter British-inspired hostilities. On July 12, 1775, as one of its first acts, the Congress created the northern, southern and middle departments of Indian affairs. Five commissioners were appointed to head the southern department, and three each were appointed to head the northern and middle departments. Their duties were "to treat with the Indians ... in order to preserve peace and friendship with the [said] Indians and to prevent their taking any part in the present commotions." *Id.* at 175. Thus, the responsibilities of the new commissioners were similar to those of the British superintendents. These federal mechanisms for dealing with the Indians were continued under the Articles of Confederation.

## H. *The Articles of Confederation*

In 1777, after the commencement of the Revolutionary War, the Continental Congress drafted the Articles of Confederation, which when finally ratified in 1781, were to govern the relationship between the federal (or "confederal") government and the states until ratification of the United States Constitution in 1789. The Articles were, in essence, the first constitution of the United States.

Drafted during the throes of the Revolutionary War, the Articles reflected the wariness by the states of a strong central

government. The fundamental structure of the Articles was one of limited delegation of powers to the national government with reservation to the states of all powers not delegated. Article II provided that: "Each State retains its sovereignty, freedom and independence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled." The Necessary and Proper Clause, which played such a significant part in the shaping of federal powers under the Constitution, *see M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), was absent from the Articles of Confederation.

The framing and ratification of the Articles of Confederation occurred against a background dominated by two overriding circumstances pertinent to the issues present here. *See generally Oneida Indian Nation,* 860 F.2d at 1152–53. First, treaties of peace with both Great Britain and the Iroquois had not yet been concluded. The Articles were submitted to the states in 1777 and ratified by Maryland, the last state to do so, in 1781. The Treaty of Paris, formally ending hostilities with Great Britain, was not signed until September 3, 1783. The Treaty of Fort Stanwix, ending hostilities with the four Iroquois nations that had sided with the British—the Senecas, Onondagas, Cayugas and Mohawks—and assuring protection to the two Iroquois nations that had sided with the United States—the Oneidas and the Tuscaroras—was not signed until October 22, 1784.

Second, there existed a major controversy between the so-called "landed" states—those claiming western lands—and the so-called "landless" states—those without such claims. The landed states, New York, Connecticut, Massachusetts, Virginia, North Carolina, South Carolina, and Georgia, asserted their claims to western lands primarily on the basis of their colonial charters, except for New York, which based its claim on its one-hundred year history of special relationship with the Six Nations. The landless states were New Hampshire, Rhode Island, New Jersey, Pennsylvania, Delaware, and Maryland. The landless states feared that the landed states would dominate the national government if they were permitted to retain control over their unsettled western expanses. The landless states also wanted the national government to control the sale of these territories so that all the states would benefit. On the other hand, the landed states wanted to control as much land as they could. *See* Jack N. Rakove, *The Beginnings of National Politics: An Interpretive History of the Continental Congress* 156 (1979).

The new national government wanted to limit the territory of the landed states to their traditional borders near the East Coast and secure for the United States the vast domain of land these states claimed westward to the Mississippi River, or even "to the South Sea," as stated in the colonial charters of Connecticut, Massachusetts, Virginia, North Carolina, South Carolina, and Georgia. From the national government's point of view, these western lands were necessary to finance the nation's war debt and to compensate the soldiers who had fought in the Revolutionary War.

This controversy over western lands was one of the primary reasons why final ratification of the Articles of Confederation was delayed for several years. *See Oneida Indian Nation,* 649 F.Supp. at 429. Maryland, for example, instructed her delegates not to agree to the Articles until matters concerning the western lands had been settled. *See* U.S.C.A. Art. of Confed., Historical Notes 15 (1987); 14 *Jour. Continental Cong.* 621–22 (May 21, 1779).

Finally, a compromise was reached whereby the landed states ceded "their"

western lands to the United States, often in exchange for recognition of favorable boundaries for their traditional areas of state jurisdiction. *See Oneida Indian Nation,* 860 F.2d at 1152. The landed states also won two important constitutional guarantees in the Articles, one protecting the states' territories from encroachment by the national government and the other curtailing national power over Indian affairs. *See id.* at 1153, 1156–57; Merrill Jensen, *The Articles of Confederation* 159–60 (1940). First, Article IX(2) provided that: "no State shall be deprived of territory for the benefit of the United States." *See* U.S.C.A. Art. of Confed. art. IX, cl. 2. Thus, under the Articles, the national government could not take land belonging to a state for its own purposes. Second, in the contentious area of Indian affairs, Article IX(4) provided that:

> The United States in Congress assembled shall also have the sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians, not members of any of the States, *provided that the legislative right of any State within its own limits be not infringed or violated* [.]

*Id.* at art. IX, cl. 4 (emphasis added). The so-called "legislative right proviso" in Article IX(4) protected the states' right of preemption to Indian lands within their borders.[14] *Oneida Indian Nation,* 860 F.2d at 1155–58. Thus, under Article IX(4), the national government had the sole power to manage Indian affairs, so long as its actions did not interfere with the states' right of preemption. *Id.*

### I. *Recognition of New York's Boundaries*

As stated, as part of the compromise leading to ratification of the Articles of Confederation, the landed states, of which New York was one, ceded their western lands to the United States in exchange for recognition of favorable boundaries for their traditional areas of state jurisdiction. On March 1, 1781, pursuant to a 1780 Act of the New York Legislature entitled "An Act to Facilitate the Completion of the Articles of Confederation and Perpetual Union Among the United States of America," New York offered to restrict its claims to western land. *See* 19 *Jour. Continental Cong.* 208–13 (Mar. 1, 1781); Joint Stip. at ¶ 64. The Act allowed New York's delegates to the Continental Congress to limit and restrict the boundaries of western New York as they judged to be expedient. Under the boundaries offered by New York, the Niagara Islands were included within the State's territory. 19 *Jour. Continental Cong.* at 212–13.

On October 29, 1782, the Continental Congress accepted New York's cession of land that included its most western lands, *i.e.,* all lands west of a meridian drawn south from the western tip of Lake Ontario. *See* 23 *Jour. Continental Cong.* 693–94 (Oct. 29, 1782), 695 (Oct. 30, 1782); Joint Stip. at ¶ 65. Thus, as of 1782, New York's western boundary had been fixed by the national government, with the Niagara region and the Niagara Islands lying within the State's territory. *See Oneida Indian Nation,* 860 F.2d at 1167.

### J. *The 1783 Treaty of Paris Ending the Revolutionary War*

The Preliminary Articles of Peace between the United States and Great Britain brought the Revolutionary War to a conclusion in November 1782. On September 3, 1783, the United States and Britain

---

**14.** The right of preemption is the right to acquire Indian land once Indian title has been extinguished. This concept is discussed in more detail *intra.*

entered into the Treaty of Paris finalizing the terms of peace. One of the most important issues during the Treaty negotiations was where the international boundary dividing the United States and British Canada would be located. Article 2 of the Treaty ultimately described the northern portion of the boundary as a line:

> along the middle of said river [the St. Lawrence] into Lake Ontario through the Middle of said Lake until it strikes the Communication by Water between that Lake and Lake Erie [the Niagara River]; Thence along the middle of said Communication into Lake Erie; through the Middle of said Lake until it arrives at the Water Communication between that Lake and Lake Huron....

Treaty of Paris, Sept. 3, 1783, 8 Stat. 80; Joint Stip. at ¶ 68.

Notwithstanding this agreed upon boundary, the British continued to maintain a significant presence on the eastern side (the United States' side) of the Niagara River, thereby presenting a continued threat of renewed warfare with the United States. The British retained possession of Fort Niagara until 1796, when they finally evacuated the Fort in compliance with the terms of the 1794 Jay Treaty. Jay Treaty of 1794, Nov. 19, 1794, 8 Stat. 116.

### K. *The 1784 Treaty of Fort Stanwix*

#### 1. *Proposal for Treaty between the United States and the Iroquois*

Great Britain and the United States made no provision for their former Indian allies in the Treaty of Paris. The Treaty confirmed the sovereignty of the United States without reservation of Indian rights. *See Oneida Indian Nation,* 691 F.2d at 1088. Thus, even after the Treaty of Paris, there was no peace treaty in place between the United States and Britain's Indian allies.

With no peace treaty in place, hostilities, or at least the threat of hostilities, with the Indians continued. For example, as late as May 1, 1783, fighting with the Indians continued in the Mohawk Valley and on the Pennsylvania border. 24 *Jour. Continental Cong.* 319 (May 1, 1783); H.S. Manley, *The Treaty of Fort Stanwix* 14 (1932). The Continental Congress feared that the Indians might again ally themselves with the British, who refused to vacate their forts at Niagara, Oswego and Detroit. *See* 24 *Jour. Continental Cong.* 319 (May 1, 1783); 25 *Jour. Continental Cong.* 682 (Oct. 15, 1783). Congress also feared that further incursions onto Indian land or fraudulent dealings with the Indians might induce the tribes to unite against the United States in an Indian war. *See* 24 *Jour. Continental Cong.* 503 (Aug. 12, 1783), 505–06 (Aug. 13, 1783); 25 *Jour. Continental Cong.* 602 (Sept. 22, 1783). In the immediate aftermath of the Revolutionary War, neither the new national government nor the individual states had the economic resources or manpower to engage in a major Indian war. *See Oneida Indian Nation,* 691 F.2d at 1077. Moreover, Congress recognized that continued Indian hostilities would delay settlement of the western lands. *See Oneida Indian Nation,* 649 F.Supp. at 443.

George Washington had a major influence in shaping Indian policy during this period. He believed that the territory held by those tribes that had allied with the British should be regarded as "conquered provinces," although he opposed driving the Indians from the land altogether. Cohen, *supra,* at 59. In a September 7, 1783 letter to James Duane, chairman of the congressional advisory committee to the Commander–in–Chief, Washington set forth his views as to the nature and purposes of a treaty with the Six Nations. *See* 27 *The Writings of George Washing-*

*ton* 134–37 (Fitzpatrick ed.1938). Washington urged that a treaty should be negotiated to establish a boundary line for the lands of the Six Nations. He cautioned that private entrepreneurs should not be permitted to purchase Indian land and that the plans of some states, including New York (discussed in more detail *infra*), to expel the tribes from their borders posed a threat to establishing both peace and a national domain in the West.

The following month, the Continental Congress adopted a report of its Committee for Indian Affairs, recommending that the United States negotiate a peace treaty with the Six Nations of the Iroquois. 25 *Jour. Continental Cong.* 680–83 (Oct. 15, 1783). "The report pointed out that the subjugation of the Indians would be expensive, and would only result in their emigrating to Canada, with attendant advantages to the British in peace and war." Manley, *supra*, at 48. The report also recommended that the Indians be "informed that the British had given up the territory without reservation for the Indians," but that the United States would insist that the Indians release title to only a limited amount of land. *Id.* The report stated:

> That although motives of policy as well as clemency ought to incline Congress to listen to the prayers of the hostile Indians for peace, yet in the opinion of the committee it is just and necessary that lines of property should be ascertained and established between the United States and them, which will be convenient to the respective tribes, and commensurate to the public wants, because the faith of the United States stands pledged to grant portions of the uncultivated lands as a bounty to their army, and in reward of their courage and fidelity, and the public finances do not admit of any considerable expenditure to extinguish the Indian claims upon such lands;

because it is become necessary, by the increase of domestic population and emigrations from abroad, to make speedy provision for extending the settlement of the territories of the United States; and because the public creditors have been led to believe and have a right to expect that those territories will be speedily improved into a fund towards the security and payment of the national debt. Nor in the opinion of the committee can the Indians themselves have any reasonable objections against the establishment recommended. They were, as some of them acknowledge, aggressors in the war, without even a pretence [sic] of provocation; they violated the convention of neutrality made with Congress at Albany, in 1775 and in return for proffered protection, and liberal supplies, and to the utter ruin and impoverishment of thousands of families, they wantonly desolated our villages and settlements, and destroyed our citizens. To stop the progress of their outrages, the war, at a vast expense to the United States, was carried into their own country, which they abandoned. Waiving then the right of conquest and the various precedents which might be quoted in similar instances, a bare recollection of the facts is sufficient to manifest the obligation they are under to make atonement for the enormities which they have perpetrated, and a reasonable compensation for the expenses which the United States have incurred by their wanton barbarity; and they possess no other means to do this act of justice than by a compliance with the proposed boundaries. The committee are of the opinion, that in the negotiation which they recommend, care ought to be taken neither to yield nor require too much; to accommodate the Indians as far as the public good will admit; and if they should ap-

pear dissatisfied at the lines which it may be found necessary to establish, rather to give them some compensation for their claims than to hazard a war, which will be much more expensive; but it is supposed that when they shall be informed of the estimate of the damages which our citizens have sustained by their irruptions, and of the expenses which the United States have incurred to check their career, it will have a tendency to suppress any extravagant demands.

25 *Jour. Continental Cong.* 682–83 (Oct. 15, 1783).

In the resolution adopting the Committee's recommendation, the Congress specified the land to be ceded to the United States by the Iroquois. The resolution stated:

> That the following lines shall be proposed to be mutually agreed upon and established between the United States and the several tribes of Indians who shall be affected thereby;
>
> [B]eginning at the mouth of the great Miami River, which empties into the Ohio, thence along the said river Miami to its confluence with the Mad river; thence by a direct line to the Miami fort at the village of that name on the other Miami river which empties into lake Erie; thence along the last mentioned river to lake Erie, comprehending all the lands between the above mentioned lines and the State of Pennsylvania on the East, Lake Erie on the North and the River Ohio on the South East.

*Id.* at 686. These lands were located in the so-called "Northwest Territory." *i.e.*, present-day Ohio, outside New York's recognized western boundary. Congress planned to sell this land to pay the United States' war debts. Neither the Committee's report nor the congressional resolution mentioned the Niagara region or the Niagara Islands as lands to which the Indians would be required to relinquish title under the treaty. In adopting the report, Congress provided that the authorization for the treaty "shall not be construed to affect the territorial claims of any of the states, or their legislative rights within their respective limits." *Id.* at 693.

On March 4, 1784, Congress elected the treaty commissioners who would negotiate the treaty. 26 *Jour. Continental Cong.* 124 (Mar. 4, 1784). The next day, Congress ordered the commissioners to meet in New York City on April 10, 1784, for the purpose of fixing a time and place for the treaty. 26 *Jour. Continental Cong.* 124–25 (Mar. 5, 1784).

On March 12, 1784, Congress approved the formal commission under which the treaty commissioners would act. 26 *Jour. Continental Cong.* 133–35 (Mar. 12, 1784). It granted the commissioners "full power and authority for us and in our name to confer, treat, agree and conclude" with the Indians, "of and concerning the establishment of peace ..., extinguishing their claims and settling boundaries between them and the citizens of the United States, in as ample form and with the same effect as if we were personally present and acted therein, hereby promising to hold valid and to fulfill and execute whatever shall be agreed upon, concluded and signed by our said commissioners or any three of them." *Id.* Commissioner Richard Butler interpreted these instructions as follows: "From these instructions I am of Opinion the Commissioners are authorized to make the best bargain for the U.S. that circumstances may put in their power, or reduce them to." Richard Butler's Notes on the Treaty of Fort Stanwix (October 18, 1784). *Richard Butler Papers,* 3 Frontier Wars Papers (Series U), Lyman Draper Manuscripts (State Historical Society of Wisconsin).

On March 19, 1784, Congress revised the description of the boundary line to be drawn between Indian and United States territory. The new western boundary line was described as "a meridian line passing through the lowest point of the rapids of Ohio to the northern boundary of the United States." 26 *Jour. Continental Cong.* 152–53 (Mar. 19, 1784). The rest of the boundaries were unchanged from the resolution of October 15, 1783. There was still no mention of the Niagara region or the Niagara Islands as lands to which the Indians would be required to relinquish title.[15]

Due to a delay in the commissioners arriving in New York City to schedule the treaty, the treaty had to be put off until sometime after August so as not to conflict with the Indians' corn planting season. *See* Manley, *supra*, at 49.

## 2. *New York's Attempt to Treat with the Iroquois*

At the same time the United States was planning to treat with the Six Nations of the Iroquois, New York was also planning to enter into a treaty of peace with them. New York believed that it had the right under the Articles of Confederation to treat with the Indians located within its borders. *Id.* at 24–25. In March 1783, the New York legislature had formulated a plan to end hostilities with the Six Nations under an arrangement whereby New York would displace the Senecas, the Cayugas, and the Onondagas from the lands they claimed within New York's borders and then negotiate with the Oneidas to exchange their land for land previously owned by the Senecas. *Id.* at 28–29. New York's plan aroused serious concern in Congress that New York's attempt to negotiate peace with the Six Nations by removing some of the tribes from New York's borders would precipitate hostilities.

New York's Governor George Clinton knew of the United States' plan to treat with the Six Nations. The Governor advised the confederal treaty commissioners not to enter into any stipulations with Indians residing in New York prejudicial to the State's interest. They, in turn, informed him that New York should subordinate its business with the Indians to that of the general treaty, as Pennsylvania had done.[16] *Id.* at 54–55.

Undaunted, Governor Clinton in April 1784, invited the tribes of the Six Nations to a meeting to adjust all differences between them and the State of New York. A meeting was eventually set for the end of August at Fort Stanwix.

On September 4, 1784, after some delay, the treaty negotiations between New York

---

**15.** The March 19, 1784 resolution also instructed the commissioners, if convenient, to treat with the Indian tribes (including specifically the Six Nations) separately rather than as a confederacy. This instruction, however, was itself revised one month later, when, citing considerations of time and expense, Congress authorized the commissioners to treat with different tribes in whatever manner they found convenient. 26 *Jour. Continental Cong.* 238 (Apr. 16, 1784).

**16.** Prior to the treaty at Fort Stanwix, Pennsylvania notified Congress of its intention to purchase land from the Six Nations. Congress directed that Pennsylvania be notified of the time and place of the federal treaty so that Pennsylvania's representatives could attend for the purpose of making such a purchase. Congress instructed its commissioners at Fort Stanwix to assist the Pennsylvania commissioners in their attempt to purchase Indian land within Pennsylvania so long as such purchase was consistent with the interests of the United States. *See* 25 *Jour. Continental Cong.* 591–96 (Sept. 20, 1783), 717–19 (Oct. 22, 1783), 762–67 (Oct. 30, 1783); *see also Six Nations v. United States*, 173 Ct.Cl. 899, 903 (1965).

and the Six Nations commenced at Fort Stanwix. *See* Manley, *supra*, at 68. Governor Clinton and the New York Indian commissioners met first with the Oneidas and Tuscaroras, assuring them of their friendship. They then met with the four hostile nations, the Mohawks, Cayugas, Onondagas, and Senecas, hoping to obtain an outright cession of their lands within New York's borders.

The Six Nations were represented primarily by Joseph Brant, the famous Mohawk Chief, at the treaty negotiations. Speaking on behalf of the Senecas and the other tribes of the Six Nations, Chief Brant informed the New York delegation that the Six Nations preferred to meet first with the national government and then meet with New York, if necessary. *Id.* at 70. Governor Clinton responded by explaining to the Indians that under the Articles of Confederation and the State Constitution, New York had a right to treat with them. He then explained that in order to establish peace between New York and the Six Nations, it would be necessary to draw a boundary line between the two, and that in consideration for New York's losses during the War, it would be reasonable for the Six Nations to cede some of their land to the State. *Id.* at 71. He stated that "he would not for the present mention any particular quantity or tract, until he was more fully informed of their sentiments, but he did expect part of the lands to be ceded would be in the vicinity of Niagara and Oswego, to accommodate the settlements at those places." *Id.; see also* 1 *Proceedings of the Commissioners of Indian Affairs Appointed by Law for the Extinguishment of Indian Title in the State of New York* ("NYCIA") 57 (Franklin B. Hough ed. 1861). In reply, the Indians recognized the right of New York to treat with the Six Nations, and that a cession of land would be reason-able. Manley, *supra*, at 72. They also explained, however, that the delegates present at the treaty did not have the authority to stipulate to any particular cession. They told Governor Clinton and the New York commissioners that they expected the Six Nations to treat with New York about such a cession, but only after the treaty with the United States. With regard to the Niagara lands, however, Chief Brant acknowledged that the Six Nations' rights to those lands had already been ceded as a result of their previous treaty with Great Britain:

> Brothers! You have particularly expressed your wish to have land at Niagara and Oswego, for the Accommodation of your ancient Settlement at those places. We have formally ceded some Lands to the Government of the late Colony of New York for the Use of the King. This already belongs to You by the Treaty with Great Britain . . . .

1 NYCIA, *supra*, at 61. Due to the Six Nations' unwillingness to enter into an agreement with New York before their meeting with the confederal treaty commissioners, the Governor terminated the treaty negotiations. New York's attempt to consummate a separate peace had ended in failure.

### 3. *The Confederal Treaty of Fort Stanwix*

The confederal commissioners appointed to negotiate with the Six Nations made arrangements to meet with the Indians in October 1784, at Fort Stanwix. Formal treaty sessions began on October 12, 1784. On October 20, 1784, after several days of negotiation, the confederal commissioners dictated the terms of peace to the Indians. On October 22, 1784, the treaty was signed by the commissioners and representatives

of the Six Nations.[17] *See generally* 2 *The Olden Time* 404–28 (Craig ed. 1846); Minutes of the proceedings at Fort Stanwix, Wayne Manuscripts, Indian Treaties 1778 to 1795, B (Historical Society of Pennsylvania); Hallock F. Raup, *Journal of Griffith Evans,* Pennsylvania Magazine of History and Biography 204–15 (April 1941).

As stated, one of the purposes of the United States in entering the Treaty of Fort Stanwix was to obtain the release of any Iroquois claims to the Northwest Territory (lands lying to the west of New York's recognized western boundary), thereby creating a national domain, which the United States could then use to pay its war debts. Although the Continental Congress had only instructed the treaty commissioners to obtain the relinquishment of Indian claims to the Northwest Territory, the commissioners also obtained, in Article 3 of the Treaty, the relinquishment of the Six Nations' claims to a large portion of the Niagara region, including the Niagara Islands all of which lies within the western boundary of New York as fixed by the national government in 1782. Article 3 of the Treaty reads:

> A line shall be drawn, beginning at the mouth of a creek about four miles east of Niagara, called Oyonwayea, or Johnston's Landing–Place, upon the lake named by the Indians Oswego, and by us Ontario from thence southerly in a direction always four miles east of the carrying path, between Lake Erie and Ontario, to the mouth of the Tehoseroron, or Buffaloe [sic] Creek, on Lake Erie; thence south to the north boundary of the state of Pennsylvania; thence west to the end of the said north boundary; thence south along the west boundary of the said state, to the river Ohio;

the said line from the mouth of the Oyonwayea to the Ohio, shall be the western boundary of the lands of the Six Nations, so that the Six Nations shall and do yield to the United States, all claims to the country west of said boundary, and then they shall be secured in the peaceful possession of the lands they inhabit east and north of the same, reserving only six miles square round the fort of Oswego, to the United States, for the support of the same.

Treaty with the Six Nations, 1784, Oct. 22, 1784, 7 Stat. 14; *see also* Appendix J.

After the conclusion of the Treaty, the commissioners sent a message to the President of the Congress, stating in part:

> We have the honor of transmitting to your Excellency, the articles of a treaty we concluded with the Six Nations, by which the cession of territory is fixed, so far as it depends upon these Nations. *We have also secured Niagara, the carrying place between lakes Erie and Ontario, together with Oswego, and a competent district around it, to the United States.*

Letter, Arthur Lee, Oliver Wolcott and Richard Butler to the President of the Continental Congress (Oct. 22, 1784). *Papers of the Continental Congress* item 56, f. 137–40 (emphasis added); Manley, *supra,* at 96.

On December 3, 1784, the committee appointed by the Continental Congress to review the terms of the Treaty recommended "[t]hat the United States in Congress assembled approve of this treaty and every part of the same." 27 *Jour. Continental Cong.* 659 (Dec. 3, 1784). Although there is no record of formal approval of the Treaty by the Congress, on June 3,

---

**17.** Chief Joseph Brant was not present at the treaty with the confederal commissioners. There, the Six Nations were represented primarily by Cornplanter, a Seneca Chief and leader of the Senecas, and Captain Aaron Hill, a Mohawk Chief.

1785, Congress ordered the Treaty published. The Treaty was later recorded in a 1846 official compilation of Indian treaties. *See Treaties Between the United States and the Several Indian Tribes*, 7 Stat. 15.

When Congress received the Treaty and ordered it published, it adopted language offered by Melancton Smith a delegate from New York declaring that "no purchases, which have been or hereafter may be made from the Indians, at any treaties held or to be held with them, of their right to soil within the limits of any state, can, ought, or shall be considered as interfering with the right of any such state to the jurisdiction or soil." 28 *Jour. Continental Cong.* 426 (June 3, 1785).

On October 4, 1785, a committee of the Continental Congress recommended that the Congress appoint an agent to reside in the country of the Six Nations and that the agent "be instructed to inform the Oneidas and also the Cayogan Chiefs, that Congress will preserve inviolate the Treaty of Fort Stanwix, concluded between their commissioners and the Chiefs of the Six Nations...." 29 *Jour. Continental Cong.* 806 (Oct. 4, 1785).

**L. *Seneca Discontent with the 1784 Treaty of Fort Stanwix***

The 1784 Treaty of Fort Stanwix created much discontent among the Senecas. They felt that they were required to relinquish too much land under the Treaty. The Senecas continued to occupy lands west of the Fort Stanwix line and complained to both the national and state governments about the terms of the 1784 Treaty.

For example, in 1787, Seneca leaders met with the New York State Commissioners of Indian Affairs to seek the State's assistance in convincing the United States

to restore to the Senecas their lands taken by the Treaty. The Seneca leaders stated to the New York Indian Commissioners:

Brothers! The United States have sent Word to us, that they expect soon to get Possession of Oswego and Niagara, and that they will take no more Land around each than the King of England had, and that they then would open the Trade to every Part of our Country.

Brothers! Whenever the United States take Possession of Oswego and Niagara, we request that the Troops may go up the Mohawk River and by the Lakes, and not through our Country, as it may disturb our Wives and Children, and we request that no more Lands round each may be taken Possession of than what the King of England had, which was four Miles square at Oswego, and at Niagara, from Johnson's Landing four Miles along the River till it reaches Lake Erie.

*See* 1 NYCIA, *supra*, at 111.

New York's Indian Commissioners reported to Governor Clinton regarding the Seneca request for assistance as follows:

They [the Seneca Chiefs] complained that the Commissioners of Congress at Fort Schuyler [18] had extorted from them Concessions which the Deputies they had sent had no right to make. They however declared that the Extent of four Miles round the Posts of Oswego and Niagara, and the Road from the latter place to Lake Erie were proper, they would abide by it.

*Id.* at 112 (footnote added).

In response to the Seneca Chiefs' request, the New York State Senate resolved, in part:

That his Excellency the Governor be requested to make such communications

---

**18.** Fort Schuyler was the American name for Fort Stanwix.

to the Seneca Chiefs, now at Albany, in answer to their speech, as he shall deem conducive to conciliate the good will of the Six Nations to this, and the United States; and to inform them, that the land ceded at the treaty of Fort Schuyler [Stanwix] in 1784, to the United States, (except those they mention in the vicinity of Oswego and Niagara) are not deemed to be comprehended within the jurisdiction of this State.

*Journal of the Senate of the State of New York* 75, 80 (1787). The State Assembly concurred in this resolution by their own resolution. *Journal of the Assembly of the State of New York* 139 (1787).

## M. *The 1786 Hartford Compact*

Despite the Continental Congress's acceptance of New York's cession of its western land claims in 1782, and its recognition of New York's western border, New York still faced a land claim by the Commonwealth of Massachusetts. *See* Joint Stip. at ¶¶ 79–82. Massachusetts claimed that its original royal grant of 1620 ran "from sea to sea" and extended past the former Dutch colony of New York into the western part of what is now New York State.

This dispute between Massachusetts and New York was resolved by an agreement (the "Hartford Compact") entered into between commissioners representing the two states in Hartford, Connecticut, on December 16, 1786. The Hartford Compact, by its terms, applied to all of the lands in New York State west of a meridian running north from the New York Pennsylvania line "at a point distant eighty two miles west from the northwest corner of the State of Pennsylvania, on the Delaware river," a line which runs, approximately, through Seneca Lake to Sodus Bay on Lake Ontario. The two states further agreed to a line "which will pass one mile due east from the northern termination of the strait or waters between Lake Ontario

and Lake Erie; . . . thence on the eastern side of the said strait by a line always one mile distant from and parallel to the said strait to Lake Erie." *See* Appendix K.

The Compact provided that Massachusetts "cede[d], grant[ed], release[d] and confirm[ed] to the State of New York . . . the government, sovereignty and jurisdiction" to all the lands west of the meridian, and New York "cede[d], grant[ed], release[d] and confirm[ed] to the said Commonwealth of Massachusetts . . . the right of preemption of the soil from the native Indians . . . which the State of New York hath" west of the meridian, except for those lands west of the line drawn one mile east of the Niagara River, to which New York retained its right of preemption. *See id.*

## N. *The 1789 Treaty of Fort Harmer*

The Senecas' misgivings over what they perceived as the injustice of the 1784 Fort Stanwix Treaty posed a threat of renewed hostilities against the United States, particularly in light of the continued British presence on the east side of the Niagara River. On January 9, 1789, in an attempt to soothe Seneca dissatisfaction with the 1784 Treaty, the United States treated again with the Six Nations at Fort Harmer (present-day Marietta, Ohio). *See* Joint Stip. at ¶ 83. In the Fort Harmer Treaty, the United States compensated the Six Nations for the land they relinquished in the 1784 Treaty of Fort Stanwix but did not alter the line drawn by the 1784 treaty. The purpose of the Treaty of Fort Harmer, as stated in its preamble, was for:

removing all causes of controversy, regulating trade, and settling boundaries, between the Indian nations in the northern department and the . . . United States, of the one part, and the sachems

and warriors of the Six Nations, of the other part[.]

Treaty with the Six Nations, 1789, Jan. 9, 1789, 7 Stat. 33. The Fort Harmer Treaty, which was executed after the ratification of the United States Constitution, was never ratified by the Senate or proclaimed by the President.

## O. *The Constitution and the Nonintercourse Act*

The United States Constitution became effective on March 4, 1789.[19] The Indian Commerce Clause of the Constitution, art. I, § 8, cl. 3, gave the federal government the sole power over Indian affairs and put to rest the dispute between the national government and the states under the Articles of Confederation as to who had authority to deal with Indian matters.

On July 22, 1790, pursuant to the Indian Commerce Clause, Congress passed the first Indian Nonintercourse Act, ch. 33, 1 Stat. 137, which declared, in part:

> That no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of preemption to such lands or not, unless the same shall be made and duly executed at

some public treaty, held under the authority of the United States.

The Nonintercourse Act was reenacted in 1793, 1796, 1799 and 1802.[20] The Act, as modified in 1834, is currently codified in 25 U.S.C. § 177.

In passing the Nonintercourse Act, Congress's dual purposes were "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties," *Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 119, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), and to prevent Indian unrest over encroachment by settlers on Indian lands. *Mohegan Tribe v. Connecticut,* 638 F.2d 612, 621–22 (2d Cir.1980). The Act essentially requires federal consent of all land purchases from Indian nations and tribes.

The new preeminent role of the federal government in Indian affairs under the Constitution was highlighted by an exchange between President Washington and leaders of the Seneca Nation in 1790. On December 1, 1790, Seneca Chiefs Cornplanter, Half–Town and Great–Tree complained to President Washington about, *inter alia,* the fraudulent practices of certain land speculators who were trying to purchase Seneca land. On December 29, 1791, President Washington responded to the Senecas, stating:

---

19. The United States Constitution was ratified on June 21, 1788, after the ninth state, New Hampshire, acceded to its provisions. Nevertheless, the old government, bound by the Articles of Confederation, continued to exist until it passed a resolution calling for the new government, bound by the Constitution, to become operative.

20. The 1802 Act, which is at issue in this case, provided, in pertinent part:
    That no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian, or nation, or tribe of Indians, within the bounds of the United States, shall be of any validity, in law or equity, unless the same be made by treaty of

convention, entered into pursuant to the constitution: ... *Provided nevertheless,* that it shall be lawful for the agent or agents of any state, who may be present at any treaty held with the Indians under the authority of the United States, in the presence, and with the approbation of the commissioner or commissioners of the United States, appointed to hold the same, to propose to, and adjust with the Indians, the compensation to be made, for their claims to lands within such state, which shall be extinguished by the treaty.

Ch. 13, § 12, 2 Stat. 138 (1802) (emphasis in original).

I am not uninformed, that the Six Nations have been led into some difficulties, with respect to the sale of their lands, since the peace. But I must inform you that these evils arose before the present Government of the United States was established, when the separate States, and individuals under their authority, undertook to treat with the Indian tribes respecting the sale of their lands. But the case is now entirely altered; the General Government, only, has the power to treat with the Indian nations, and any treaty formed, and held without its authority, will not be binding.

4 *American State Papers* 142 (1832). Apparently referring to the Nonintercourse Act, President Washington then stated:

No State, nor person, can purchase your lands, unless at some public treaty, held under the authority of the United States. The General Government will never consent to your being defrauded but it will protect you in all your just rights.

*Id.*

## P. *Geographical Error in the 1784 Treaty of Fort Stanwix*

New York's western boundary, as established by its cession to Congress in 1781 and Congress's acceptance of that cession in 1782, is a "meridian line" running due south from the most westerly bent of Lake Ontario until it intersects the northern border of Pennsylvania, which lies a considerable distance south of Lake Chautauqua, New York.[21] *See* 19 *Jour Continental Cong.* 212 (Mar. 1, 1781); *see also* Manley,

*supra*, at 111. When the western boundary of the Six Nations (insofar as it related to the lands in New York) was described in the 1784 Treaty of Fort Stanwix as running from the mouth of the Buffalo Creek on Lake Erie south to the northern border of Pennsylvania, it was thought that this line was coterminous with the western boundary of New York and that the land to the west of the line was part of the public domain of the United States. PG Br. at 29–30. However, when, in 1790, the western boundary of New York was finally surveyed, it was found to run considerably farther west than the Fort Stanwix line. *Id.* In fact, the Fort Stanwix line cut off from New York State all of Chautauqua County and parts of Erie and Cattaraugus Counties.[22] *See* Manley, *supra*, at 111.

In the meantime, in 1788, the United States sold this area to Pennsylvania. *See generally*, PG Br. at 29–30. The agreement for the sale of the land placed the eastern boundary of the tract sold along the actual western boundary of New York State. However, both Pennsylvania and the United States thought it contained the larger area bounded in the east by the line described in the Treaty of Fort Stanwix. Pennsylvania, despite the fact that Indian claims to the area had already been extinguished at Fort Stanwix in 1784, agreed to satisfy Indian claims to the area by purchasing it from the Six Nations. Because several Seneca villages were located within the tract, the Pennsylvania commissioners agreed that the Senecas could reserve a portion of it for their residences and for

---

21. *See supra* at Section IV, Part I.

22. This geographical error by the Fort Stanwix treaty commissioners probably resulted from errors in the maps in use at that time. Manley, *supra*, at 111. Contemporary maps represented Lake Erie's southern shore as farther east and south than it actually is, and placed the northern boundary of Pennsylvania

north of Chautauqua Lake, which is located well within New York's borders. Thus, the maps showed New York considerably shortened on the west, so that it would have been unaffected by the Fort Stanwix line running due south from the mouth of Buffalo Creek. *See, e.g.,* Appendix E.

hunting and fishing. This reserve was located east of Chautauqua Lake.

When the western boundary of New York was surveyed in 1790, it was then discovered that the village area reserved by Pennsylvania for the Senecas was not, in fact, in Pennsylvania, but was instead in New York. In other words, the agreement between Pennsylvania and the Six Nations supposedly reserved for the Senecas land lying west of the western boundary of New York and east of Chautauqua Lake, a geographical impossibility.

The situation created by this geographical error was the subject of dissatisfaction among the Senecas. PG Br. at 28. On January 10, 1791, Seneca Chiefs Cornplanter, Half–Town and Great–Tree complained to President Washington, saying that the

> land which lies between the line running south from lake Erie to the boundary of Pennsylvania as mentioned at the treaty of fort Stanwix, and the eastern boundary of the land which you [the United States] sold [to Pennsylvania], and the Senecas confirmed to Pennsylvania, is the land on which Half–Town and all his people live, with other chiefs, who always have been, and still are, dissatisfied with the treaty of fort Stanwix. They grew out of this land, and their fathers' fathers grew out of it, and they cannot be persuaded to part with it. We therefore entreat you to restore to us this little piece.

4 *American State Papers, supra,* at 143. President Washington replied:

> Half–Town, and the others, who reside on the land you desire may be relinquished, have not been disturbed in their possession, and I should hope, while he and they continue to demean themselves peaceably, and to manifest their friendly dispositions to the people

of the United States, that they will be suffered to remain where they are.

*Id.* at 144.

## Q. *Continued Seneca Dissatisfaction*

The 1789 Treaty of Fort Harmer proved ineffective in soothing Seneca complaints regarding the Treaty of Fort Stanwix boundary line. In 1790–91, the Senecas complained to President Washington about what they perceived to be the unfairness of the Stanwix Treaty. On December 1, 1790. Seneca Chiefs Cornplanter, Half–Town and Great–Tree stated to President Washington:

> When our chiefs returned from the treaty at fort Stanwix, and laid before our council what had been done there, our nation was surprised to hear how great a country you had compelled them to give to you, without paying to us any thing [sic] for it. Every one [sic] said that your hearts were yet swelled with resentment against us for what had happened during the war, but that one day you would reconsider it with more kindness. We asked each other, What have we done to deserve such severe chastisement?

> \*   \*   \*   \*   \*   \*

> [At Fort Stanwix] our chiefs had felt your power, and were unable to contend against you, and they therefore gave up that country. What they agreed to, has bound our nation, but your anger against us must, by this time, be cooled; . . . we ask you to consider calmly, Were the terms dictated to us by your commissioners reasonable and just?

> \*   \*   \*   \*   \*   \*

> The French came among us, and built Niagara; they became our fathers, and took care of us. Sir William Johnston [sic] came and took that fort from the French; he became our father, and

promised to take care of us, and did so, until you were too strong for his king. To him we gave four miles round Niagara as a place of trade. We have already said, how we came to join against you; we saw that we were wrong; we wished for peace; you demanded a great country to be given up to you; it was surrendered to you, as the price of peace, and we ought to have peace and possession of the little land which you then left us.

\* \* \* \* \* \*

[W]e must know from you whether you mean to leave us and our children any land to till. Speak plainly to us concerning this great business. All the lands we have been speaking of belonged to the Six Nations; no part ever belonged to the King of England, and he could not give it to you. The land we live on, our fathers received from God, and they transmitted to us, for our children, and we cannot part with it.

*Id.* at 140–42.

President Washington responded on December 29, 1790, promising to protect the Senecas from unscrupulous land speculators. *Id.* at 142–43. He did not, however, address the Senecas' complaints regarding the Treaty of Fort Stanwix.

On January 10, 1791, the Senecas again voiced their complaints about the Stanwix Treaty to President Washington:

You say that you have spoken plainly on the great point. That you will protect us in the land secured to us. at fort Stanwix ... This is very good. But our nation complain [sic] that you compelled us at that treaty to give up too much of our lands. We confess that our nation is bound by what was done there; and acknowledging your power, we have now appealed to yourselves against that treaty, as made while you were too angry at us, and, therefore, unreasonable and un-

just. To this you have not given us an answer.

Father: That treaty was not made with a single State, it was with the thirteen States. We never would have given all that land to one State. We know it was before you had the great authority, and as you have more wisdom than the commissioners who forced us into that treaty, we expect that you have also more regard to justice, and will now, at our request, consider that treaty, and restore us part of that land.

\* \* \* \* \* \*

Father: We see that you ought to have the path at the carrying place from lake Erie to Niagara, as it was marked down at fort Stanwix, and we are all willing it should remain to be yours ... Our nation will rejoice to see an open path for you and your children ... [b]ut let us also pass along the same way, and continue to take fish of those waters in common with you.

*Id.* at 143.

President Washington replied on January 19, 1791, as follows:

You say your nation complain [sic] that, at the treaty of fort Stanwix, you were compelled to give up too much of your lands; that you confess your nation is bound by what was there done, and acknowledging the power of the United States; and that you have now appealed to ourselves against that treaty, as made while we were angry against you, and that the said treaty was, therefore, unreasonable and unjust.

But, while you complain of the treaty of fort Stanwix, in 1784, you seem entirely to forget that you yourselves, the Cornplante, Half–Town, and Great–Tree, with others of your nation, confirmed by the treaty of fort Harmer, upon the Muskingum, so late as the ninth of Janu-

ary, 1789, the boundary marked out at the treaty of fort Stanwix, and that, in consideration thereof, you then received goods to a considerable amount.

Although it is my sincere desire, in looking forward, to endeavor to promote your happiness, by all just and humane arrangements, yet I cannot disannul treaties formed by the United States, before my administration, especially, as the boundaries mentioned therein have been twice confirmed by yourselves. The lines fixed at fort Stanwix and fort Harmer, must, therefore, remain established.

*Id.* at 144.

### R. *The 1794 Treaty of Canandaigua*

Hostilities between the United States and the western Indians (Indian tribes located west of Pennsylvania and New York in the old Northwest Territory) continued intermittently after the Revolutionary War. PG Br. at 25. These Indians were aided by British agents who wished to establish an "Indian barrier state" between Canada and the United States and to prevent the Indians from making peace with or territorial cessions to the United States. *Id.*; Manley, *supra*, at 17. These conflicts with the western Indians threatened to prevent or delay the United States from settling the new national domain obtained through the Treaties of Fort Stanwix and Fort Harmer.

After unsuccessful military campaigns against the western Indians, the United States decided to try treating with them. Initial efforts to treat in 1791–92, however, proved unsuccessful, as the Indians demanded return of territory ceded at previous treaties.

In February 1793, the United States made plans to treat again. *See* 25 *Papers of Thomas Jefferson* 220–21 (John Catanzariti ed. 1992). Secretary of War Henry

Knox provided President Washington with proposed instructions to the treaty commissioners that would have allowed the commissioners to recede from the boundaries drawn at previous treaties if peace could not be otherwise established. President Washington forwarded the proposed instructions to his cabinet and asked them for their advice "as to the propriety of instructing the Commissioners to recede from the present boundary, provided peace cannot be established with the Indians upon other terms." *Id.* at 220. The four members of the cabinet replied as follows:

> The Secretary of Treasury [Hamilton], Secretary at war [Knox] and Attorney general [Randolph] are of the opinion that the Executive and Senate have such authority, *provided that no grants to individuals nor reservations to states be thereby infringed.* The Secretary of state [Jefferson] is of the opinion they have no such authority to relinquish.

*Id.* at 258–59 (emphasis added). Attempts to reach a peaceful resolution ultimately failed and the United States prepared for renewed military action against the western Indians. Cohen, *supra*, at 74.

During this time, the Six Nations remained peaceful, but in 1794 rumors began to circulate that they, or at least the Senecas, might join the western Indians and take up arms against the United States. PG Br. at 25; Cohen, *supra*, at 73. After a preliminary meeting with the Six Nations near Buffalo Creek, it was decided to hold a treaty with them "for the purpose of amicably removing all causes of misunderstanding and establishing permanent peace and friendship between the United States and the Six Nations." PG Br. at 26 (internal quotations and citation omitted). The treaty was scheduled to be held at Canandaigua, New York, in the fall of 1794. In the meantime, on August 20, 1794, federal

troops defeated the western Indians at the Battle of Fallen Timbers.

The United States was represented at the Canandaigua treaty by treaty commissioner Colonel Timothy Pickering. Pickering was one of the treaty commissioners who unsuccessfully tried to negotiate a peace treaty with the western Indians in 1793. William N. Fenton, *The Great Law and the Longhouse: A Political History of the Iroquois Confederacy* 627 (1998). Although the Six Nations were nominally the other party-in-interest to the treaty, the real party-in-interest was the Seneca Nation. *See* Jack Campisi & William A. Starna. *On the Road to Canandaigua: The Treaty of 1794,* 19 Am. Indian Quarterly 467, 486 (1995). It was the Senecas who lost the most land as a result of the 1784 Treaty of Fort Stanwix, and it was the Senecas who were most likely to join the western Indians against the United States. The Senecas were represented at the treaty primarily by the Seneca leader Red Jacket.

The purposes of the 1794 Treaty of Canandaigua were: (1) to reconfirm peace and friendship between the United States and the Six Nations (the Senecas in particular); (2) to correct the inadvertent geographical error in the boundaries allotted to the Indians at the 1784 Treaty of Fort Stanwix; and (3) to relinquish any rights the United States may have acquired through that error. *See Seneca Nation of Indians v. United States,* 173 Ct.Cl. 917, 922 n. 5 (1965); *see also Seneca Nation of Indians v. United States,* slip op. No. 342–H, at *4 (I.C.C. Aug. 30, 1963); Manley, *supra,* at 112; PG Br. at 28–30; Joint Stip. at ¶ 84.

During the negotiations, the Senecas demanded the return of the southern Niagara strip, to which they released all claims

in the 1784 Treaty of Fort Stanwix. In 1794, the Niagara River and the land along the River were of great strategic importance to the fledgling federal government. Joint Stip. at ¶ 89. Realizing this, Pickering tried to convince the Senecas to drop their demand. He offered to pay the Senecas for the strip, but they refused and persisted in their demand for its return. Seneca leader Red Jacket stated:

> Brother,—We told you before of the two rusty places on the chain, which were also pointed out by the sachems. Instead of complying with our request, respecting the places where we told you the chain was rusty, you offered to relinquish the land on lake Erie, eastward of the triangular piece sold by Congress to Pennsylvania, and to retain the four-mile path between Cayuga and Buffalo Creek, by which you expect to brighten the chain.[23]

> Brother,—We thought you had a sharp file to take off the rust, but we believe it must have been dull, or else you let it slip out of your hands. With respect to the four-mile path, we are in want of it on account of the fisheries. Although we are but children we are sharp-sighted, and we see that you want that strip of land for a road, that when you have vessels on the lakes you may have harbours [sic], & c. But we wish, that in respect to that land, the treaty at Fort Stanwix may be broken.

Jonathon Evans, comp., *A Journal of William Savery* 84 (1844) (footnote added); Joint Stip. at ¶ 86.

Pickering replied:

> If I understand you right, your minds are easy excepting with regard to the strip of land between the two lakes.
>
> \*  \*  \*  \*  \*  \*

but refused to adjust the boundary along the Niagara River.

---

**23.** In other words, the United States had agreed to redraw the 1784 Fort Stanwix boundary to correct the geographical error,

You say, if we relinquish the four-mile path from Cayuga to Buffalo Creek, a lasting peace will take place. The other day I gave you strong reasons why we could not give it up. I told you, if I could not rub out the rusty spots, I would cover them over, and I told you how I would cover this, (alluding to the money offered as an equivalent.) You seem to be sensible that the United States stand in need of a passage from lake to lake, by land. I therefore conclude, you would have no objection, if the land remains yours, to our cutting a road, and if we do so, it will be very inconvenient, unless we can have taverns to accommodate travellers [sic], as the distance is great. You know they [the British] have a road and accommodations on the opposite side of the river, and as there can be no communication between the lakes unless we have that privilege, the United States will have the same necessity for a road on this side.

\*　　\*　　\*　　\*　　\*　　\*

When I came from Philadelphia, it was not expected that I would relinquish a hand's breadth of land; but finding your villages on the part which I have offered to cede back, I freely give it up. I am growing impatient to conclude the business, and would be glad to know, whether you will give me an answer, or take some time longer to consider of it.[24]

Evans, *supra*, at 85–86 (footnote added).

Red Jacket replied:

[I]f we consent to your proposals, we know it will injure us. If these houses should be built, they will tend to scatter us and make us fall in the streets (mean-ing, by drinking to excess) instead of benefitting us; you want land, to raise provisions, hay, etc.; but as soon as the white people settle there, they would think the land theirs, for this is the way of the white people.... [T]he Great Spirit has made a road for you, you can pass and repass by water; what you want to reserve, is entirely in your own favour [sic].

\*　　\*　　\*　　\*　　\*　　\*

[I]t is but a very small thing that keeps the chain from being brightened; if you will consent to give up this small piece and have no houses on it, the chain will be made bright. As to harbours, the waters are between you and the British, you must talk to them, you are of the same colour [sic].

*Id.* at 87–88; Joint Stip. at ¶ 88.

At some point, Pickering asked if the Senecas would give up three or four mile-square tracts on the river bank to be used as "convenient stages" in return for $500 annually. Letter, Timothy Pickering to Secretary of War Henry Knox (Nov. 12, 1794). *Pickering Papers, supra,* at 60:207–09; Joint Stip. at ¶ 87. They refused. Eventually, Pickering gave up and agreed, as part of the treaty, to include the southern Niagara strip within the boundaries of the Seneca Nation. The Senecas did agree, however, to allow the United States to construct a road from Fort Schlosser to Buffalo Creek.

The Treaty of Canandaigua was executed on November 11, 1794. Treaty of Canandaigua, Nov. 11, 1794, 7 Stat. 44. It was

---

24. Pickering expressed his impatience and frustration in a November 7, 1794 letter to Secretary of War Henry Knox: "I was never more weary of Indian negotiations; more than the patience of Job is requisite, to endure their delays, their trifling and their drunkenness. By the middle of next week I expect to be relieved." Letter, Timothy Pickering to Secretary of War Henry Knox (Nov. 7, 1794). *Pickering Papers* 60:206–07 (Massachusetts Historical Society).

drafted by Pickering. Article II of the Treaty provides:

The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the state of New York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them or either of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but the said reservation shall remain theirs, until they chose to sell the same to the people of the United States, who have the right to purchase.

*See* Joint Stip. at ¶ 90.

Article III of the 1794 Treaty provides:

The land of the Seneka nation is bounded as follows: Beginning on Lake Ontario, at the north-west corner of the land they sold to Oliver Phelps, the line runs westerly along the lake, as far as O-yong-wong-yeh Creek, at Johnson's Landing-place, about four miles eastward from the fort of Niagara; then southerly up that creek to its main fork, then straight to the main fork of Stedman's creek, which empties into the river Niagara, above fort Schlosser, and then onward, from that fork, continuing the same straight course, to that river; (this line, from the mouth of O-yong-wong-yeh Creek to the river Niagara, above fort Schlosser, being the eastern boundary of a strip of land, extending from the same line to Niagara river, which the Seneka nation ceded to the King of Great–Britain, at a treaty held about thirty years ago, with Sir William Johnson;)[25] then the line runs along the river Niagara to Lake Erie; then along Lake Erie to the north-east corner of a triangular piece of land which the Unit-

ed States conveyed to the state of Pennsylvania, as by the President's patent, dated the third day of March, 1792; then due south to the northern boundary of that state; then due east to the south-west corner of the land sold by the Seneka nation to Oliver Phelps; and then north and northerly, along Phelp's line, to the place of beginning on Lake Ontario. Now, the United States acknowledge all the land within the aforementioned boundaries, to be the property of the Seneka nation; and the United States will never claim the same, nor disturb the Seneka nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but it shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase.

*See Id.* at ¶ 91 (footnote added); *see also* Appendices L and M.

Article IV of the Treaty provides:

The United States having thus described and acknowledged what lands belong to the Oneidas, Onondagas, Cayugas and Senekas, and engaged never to claim the same, nor to disturb them, or any of the Six Nations, or their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: Now, the Six Nations, and each of them, hereby engage that they will never claim any other lands within the boundaries of the United States; nor ever disturb the people of the United States in the free use and enjoyment thereof.

*See* Joint Stip. at ¶ 92.

Article V of the Treaty provides:

The Seneka nation, all others of the Six Nations concurring, cede to the United States the right of making a wagon road

---

**25.** This an apparent reference to the April 3, 1764 treaty.

from Fort Schlosser to Lake Erie, as far south as Buffaloe [sic] Creek; and the people of the United States shall have the free and undisturbed use of this road, for the purposes of travelling [sic] and transportation. And the Six Nations, and each of them, will forever allow to the people of the United States, a free passage through their lands, and the free use of the harbours and rivers adjoining and within their respective tracts of land, for the passing and securing of vessels and boats, and liberty to land their cargoes where necessary for their safety.

See Id. at ¶ 93.

On November 12, 1794, the day after the Treaty was executed, Pickering transmitted the final Treaty to Secretary of War Henry Knox, with the following explanation of its terms:

I have the pleasure to inform you that yesterday Peace and Friendship with the Six nations were established; I hope for perpetuity; and on terms which may prove acceptable to the President and Senate. A copy is inclosed.

The fear of offending the British on one hand, and the Western Indians on the other, induced the Chiefs to persist in their opposition to an explicit cession of land; tho' finally they said they were willing to declare that they would never claim any of the land which we were solicitous to have relinquished. On this ground the treaty has assumed its present form. I had previously moulded [sic] it into various shapes: but no one gave them satisfaction.

You will see the great object is obtained: an express renunciation which takes in all the lands in Pennsylvania, including the Triangle which comprehends Presqu'lsle; and a pointed declaration that they will never obstruct the people of the U. States in the free use and enjoy-

ment of them or any other lands not contained within the present described boundaries of the lands of the Six Nations. These boundaries, as they respect the Senekas' country, differ from those agreed on at Fort Stanwix: Yet not a foot of land has been given up which by the cession then made the U. States had a right to hold: all that I have relinquished falling within the pre-emption right of Massachusetts, and lying within the State of New York. The tract extending from the eastern end of the Triangle to a line running due south from the mouth of Buffaloe [sic] Creek to the Pennsylvania line, is as important to the Senekas as any part of their country. They have settlements upon it which contain nearly as many people as the whole Oneida nation.

The strip four miles wide along the Strait of Niagara, I strove to secure in such manner that altho' the United States could not take possession, by virtue of former treaties, they might transfer the Indian Title to those who have the pre-emption right: but it was in vain. They were extremely tenacious of this tract. When they desired me to add 500 dollars to the proposed annuity (to make it 5000) I asked them, as a consideration to cede only four small pieces of a mile square each, between Fort Schlosser and Lake Erie, for a Landing place on the Lake, and convenient stages between that and Fort Schlosser, but they chose rather to relinquish the annuity of 500 dollars. In this they were influenced by their fears of offending the British; and not by the particular value of the land, even of the whole strip. I therefore gave it up; knowing that as soon as we should possess Niagara, it would be ceded of course. This has since been declared to me by a very sensible and influential

war chief: "As soon (said he) as you get Niagara, that strip will be yours."

But tho' I have relinquished what title the U. States acquired to this strip, by the treaty of Fort Stanwix, I have secured the important part of it which extends from the Fort of Niagara to Fort Schlosser, comprehending the Carrying–Place: and this in full right: if by the treaty of peace with Britain the United States became entitled to the land which belonged to the Crown. As soon as I mentioned this old cession to the King, the Seneka Chiefs acknowledged it; and immediately produced an old man who was present at running the line as I have described it. The original treaty being in possession of the British, and not attainable, I thought it of some consequence to get an explicit acknowledgment of it from the Six Nations.

Letter, Timothy Pickering to Secretary of War Henry Knox (Nov. 12, 1794). *Pickering Papers, supra,* at 60:207–09 (emphasis in original); Joint Stip. at ¶ 96.

In a November 20, 1794 letter to Mohawk Chief Joseph Brant, Pickering discussed his relinquishment of title to the southern Niagara strip:

I have also relinquished the United States claim to the strip of land four miles wide, including the carrying path, from Lake Ontario to Lake Erie, along the Niagara Strait, except that part of it which, in a treaty held thirty years ago, with Sir William Johnson, the Seneka Nation deeded to the King of Great Britain, to whose right therein I considered the United States as succeeding. Or, as the Chiefs expressed it, that piece became our [sic] (the United States) by the right of War: Its eastern boundary is a line from Johnson's Landing to Stedman's Creek, and thence to Niagara Strait, and the Strait itself bounds it on the west and southwest.

Letter, Timothy Pickering to Joseph Brant (Nov. 20, 1794). *Henry O'Reilly Papers* 10:48 (New York Historical Society).

In a subsequent letter to Secretary Knox dated December 26, 1794, Pickering wrote:

I was proceeding to complete my journal of the negotiations with the Six Nations at the treaty lately held at Kanondaigua. But in consequence of your request this morning that I would first state my reasons for relinquishing what title the U. States might have acquired to certain lands in the country of the Six Nations which were ceded by the treaty of Fort Stanwix, I now lay before you the principles and motives of that measure, just observing that all the lands in question originally belonged to the Senekas.

1. I knew that the U. States had no right to any part of the Seneka Country but by virtue of the cession made by the States of New York and Massachusetts which Congress had accepted.

2. I knew that the line of cession, when ascertained by Mr. Ellicot [sic], was what now constitutes the eastern boundary of the triangular piece of land which the U. States sold to Pennsylvania.

3. I knew that by the agreement between the two States, New York and Massachusetts, the pre-emption rights to all the land in question belonged to Massachusetts, excepting a strip a mile wide, along the Strait of Niagara, which I understood New York was to retain: and that the whole lay within the jurisdiction of New York.

4. I knew that by the Constitution of the State of New York, no purchase or contract for the sale of lands made of or with the Indians within the limits of that State, could be *binding on the Indians,* or deemed valid, unless made under the authority, and with the consent of the legislature of that State. And from the

nature of the case, I knew that such authority and consent could never have been given, in regard to the lands in question, when in the terms of the treaty of Fort Stanwix, they were ceded to the United States.

5. I knew therefore that the United States had no right to the lands which I relinquished. In truth, when I proposed to give up the tract between the Pennsylvania Triangle and the Meridian of the mouth of Buffalo Creek, I felt myself embarrassed—not in making the relinquishment itself but for words to express it which should not be deceptive, by presenting an idea of something *very valuable*, while in fact the subject of the relinquishment was *a shadow*. The words used in my speech were these: "All this tract you, by former treaties ceded to the United States: but I am now willing to relinquish *all their claim to it*.["]

6. I knew the practical construction of the New York Constitution on this point. John Livingston and others obtained from the Six Nations a vast cession of land within that State, which had been made void, because done without the Consent of the Legislature. And I considered that the United States had no better right than individuals to receive from the Indians a cession of the same lands.

7. It is true, that I strenuously endeavored to obtain the strip of land four miles wide, along the Strait of Niagara, etc; and I also inserted an article to comprehend land round the Fort of Oswego to the extent of six miles square—because the same had been comprehended in the treaty of Fort Stanwix: but not seeing how the *United States* exclusively could hold these lands I had draughted [sic] another article, in these words, "All the cessions and relinquishments of the rights and claims of the Six Nations and each of them hereby made, shall be for the benefit of the United States and any of them, and of any citizen or citizens thereof, to whom, according to their laws and usages, the right of taking and holding the Same, does or shall belong." The form which the treaty finally assumed, superseded this provision.

8. The objects of my conference with the Six Nations were to remove from their minds all causes of complaint and to establish a firm and permanent friendship.

The great cause of complaint, from all the Indian Nations, it is too well known, has been the depriving them of their lands, by means not always honorable, [too often] fraudulent and sometimes to an unreasonable extent.

The Six Nations, particularly the Senekas, have frequently complained of the treaty of Fort Stanwix. Their complaints of that and of the subsequent treaties on the Ohio, were renewed at the late conference.

\* \* \* \* \* \*

These observations, with those contained in my letter of November 12th, will, I trust, abundantly justify the relinquishment of the title of the United States, *if they had any*, to the tract of land which lies between the meridian of the mouth of Buffalo Creek and the western boundary of the State of New York. I might have added, that General Chapin, a judicious man, and well acquainted with the situation, temper and necessities of the Seneka nation was decidedly of opinion that this tract should be relinquished, without the least hesitation and thought I insisted too strongly by retaining the strip of land four miles wide along the strait of Niagara from Buffalo Creek down to Stedman's Creek. I indeed

strove to retain it, by every argument and persuasion I could think of: For I knew the land was little necessary for them, for Indians say they had very few, perhaps three or four, families living upon it; but I did not then know how seriously the fear of offending the British affected their minds. How extremely tenacious they were of this strip will appear from the following fact:

Having offered them an annuity of 4500 dollars, and to enable them to conceive justly of that sum, as many strokes being made as it contained hundreds, in the form of four rows of ten strokes, and one of five—they desired, as their last request, that I would add five more strokes, to make all the rows even, and thus fix the annuity at 5000 dollars. Having a pencil in my hand, I marked down the other five strokes, and said, "Tis done: But I have now, in return, one request to make of you. Desirous of forming such a treaty with you as would remove every just complaint; and that you might leave this Council Fire with minds perfectly satisfied, I have been granting you things of very great importance to your interest and welfare. On the other hand, I have represented to you the importance to the people of the United States of the whole strip of land from Buffaloe [sic] Creek to Stedman's Creek: tho' when I found you very averse to yielding it, I gave it up; and asked for three or four tracts only each of one mile square at such places in that strip as the convenience of our people might require: but these also you denied me. Now to show you how desirous I am to please you, I will add to the proposed annuity the five hundred dol-

lars you request, provided you will grant me only those three or four small pieces of a mile square each." They answered, "No. You must rub out the five last strokes."

The Indians readily admitted my claim to the strip of land from Stedman's Creek to Lake Ontario which includes the Carrying Place at the Great Falls of Niagara, and nearly half the land on the strait which was comprehended in the treaty of Fort Stanwix, acknowledging it to be ours by the Right of War, as they had formerly ceded the same to the King of Great Britain. That they had made this cession, I first learned in conversations with Col. Butler, last year, in Canada. Since then, by accident, I found the treaty itself by which the cession was made. A copy of it is herewith presented. As soon as I had explained this transaction, the Senekas brought forward one of their elderly men who was present at running the line from the Creek at Johnson's Landing place on Lake Ontario to Niagara River above Fort Schlosser. The description of this line described in the Treaty is founded on his information.[26]

Letter, Timothy Pickering to Secretary of War Henry Knox (Dec. 26, 1794). *Pickering Papers, supra,* at 60:192–97 (emphasis in original) (footnote added); Joint Stip. at ¶ 97.

The United States Senate ratified the Treaty of Canandaigua on January 9, 1795, and the President of the United States proclaimed the Treaty on January 21, 1795. Joint Stip. at ¶ 95.

---

26. It appears that at the time of the Canandaigua Treaty, Pickering was not aware of August 1764 treaty between the British and the Senecas whereby the Senecas ceded the southern Niagara strip: he was apparently aware of only the April 1764 treaty which involved the northern Niagara strip. Decker, *supra,* at 26 ("It seems plain that Co. Pickering then knew nothing of the cession of August, 1764.").

## S. *New York Advised that Federal Approval Required for Purchase of Indian Land*

In 1795, Timothy Pickering, who had become Secretary of War almost immediately after the Treaty of Canandaigua, was informed that the State of New York was attempting to purchase land from the Oneidas, Cayugas and Onondagas. He inquired of the United States Attorney General, William Bradford, whether New York had a right to purchase lands lying within the State from the Six Nations without the intervention of the federal government. On June 16, 1795, Bradford responded that title to the Six Nations' land could be extinguished only by a treaty held under authority of the United States. *See* Opinion, Attorney General William Bradford with Letter of Transmittal to Secretary of War (Jun. 16, 1795). *Henry O'Reilly Papers, supra,* at 11. Pickering forwarded a copy of the Attorney General's opinion to Israel Chapin, Jr., Superintendent of the Affairs of the Six Nations, and ordered him not to aid New York in any purchases of Indian land. *Id.* Pickering also forwarded a copy of the Attorney General's opinion to New York Governor George Clinton. *Id.;* Joint Stip. at ¶ 98.

## T. *New York's 1802 Purchase of One–Mile–Wide Strip*

On July 10, 1801, Secretary of War Henry Dearborn wrote to the Holland Land Company's chief surveyor, Joseph Ellicott,[27] seeking clarification of the Senecas' boundary as a result of the Treaty of Canandaigua. Dearborn wrote:

> Sir it being a matter of great importance to ascertain correctly the course of the line according to treaty, between lakes Erie and Ontario, presuming that you

are fully acquainted therewith. I request that you will be so obliging as to favor me as soon as possible with the information that you may possess on the subject, and especially whether Black Rock be within our line or not.

Joint Stip. at ¶ 99. Dearborn was planning on erecting a new fort at Black Rock, New York, a site located on the Niagara River in present-day Buffalo, New York, a short distance north of Lake Erie. *See* Appendices A and C.

Ellicott answered Dearborn's inquiry on August 27, 1801, enclosing a map (which is not known to have survived). *See* Joint Stip. at ¶ 100. Ellicott's letter stated the following:

> [Y]ou will find inclosed "A Map or Military Prospective of Niagara River and the Lands adjoining thereon," comprehending Part of that Tract of Country between the Lakes Ontario and Erie laid down from a correct survey, exhibiting that Part of the Boundary "Line between the United States and the Seneca Nation of Indians," extending from Johnston's Landing on Lake Ontario to the Niagara River, and bounding on said River to the Shore of Lake Erie, as confirmed and more particularly explained by the Treaty held at Konondaigua on the 11th Day of November 1794; likewise the Boundary Line of the Lands reserved to the State of New York [by the Hartford Compact] along said River' also showing the precise and local Situation of Black Rock, the principal object of your Inquiry . . . .

> The inclosed Map shows what part of the Lands contained in the New York Reservation has been ceded by the Seneca Nation of Indians to the King of

Joint Stip. at ¶ 101.

---

27. In 1801, Joseph Ellicott was an expert concerning boundaries in western New York.

Great Britain, and by him relinquished by Treaty to the United States, and what Part of said Reservation the Seneca Nation of Indians yet retain. And as the Part retained included Black Rock it follows of course that the Scite [sic] intended by the Commander in Chief for the Erection of a Fortification (and probably the most eligible on the River) is yet the Property of the Seneca Nation of Indians.

Letter, Joseph Ellicott to Secretary of War Henry Dearborn (Aug. 27, 1801). 26 *Publications of the Buffalo Historical Society* 140 (1922); Joint Stip. at ¶ 100. Ellicott's letter made no mention of the Niagara Islands.

On March 19, 1802, in order to facilitate the United States' plan to build a fort at Black Rock, the New York State legislature authorized Governor George Clinton to purchase from the Seneca Nation a strip of land "[a]t the east end of Lake Erie one mile wide on Niagara River from Buffalo Creek to Stedman's farm[28] ..."[29] Act of March 19, 1802, ch. XLVII, 1802 N.Y. Laws 73–75, 170 (footnote added); Joint Stip. at ¶ 102; *see also* Hauptman, *supra*, 23 Okla. City Univ. L.Rev. at 159. The statute authorizing the purchase made no mention of the Niagara Islands.

In August 1802, Governor Clinton treated with the Senecas at Albany. On August 19, 1802, Red Jacket, the Seneca leader, stated:

We propose to sell you the whole tract, with the reservation however of all of the Islands [in the Niagara River]; the line to run at the edge of the water, but

the use of the river to be free to you-We wish to reserve also the privilege of using the beach to encamp on, and wood to make fires, together with uninterrupted use of the river for the purpose of fishing ...

40 *N.Y. Assembly Papers* 398; Hauptman, *supra*, 23 Okla. City Univ. L.Rev. at 159.

The next day, August 20, 1802, New York concluded a land transaction with the Senecas. A federal commissioner was present at the agreement. *N.Y. State Assembly Doc. No. 51* ("Whipple Report") 214 (1889); Hauptman, *supra*, 23 Okla. City Univ. L.Rev. at 159. The agreement stated that the Senecas "do sell, cede, release and quit-claim to the People of the State of New York, all that tract of land one mile wide on the Niagara River, extending from Buffalo to Stedman's Farm, including Black Rock, and bounded Westward by the shore or waters of said river." Whipple Report, *supra*, at 214–15; *see also* Appendix O. The agreement made no mention of the Niagara Islands. The agreement was approved by the United States Senate on December 30, 1802. 1 *Journal of the Executive Proceedings of the Senate* 427–28 (1828).

By 1805, the area ceded in 1802 was surveyed and laid out in lots. The Niagara Islands were not included in that survey. Joint Stip. at ¶ 103.

## U. *New York's 1815 "Purchase" of the Niagara Islands*

In a December 10, 1810 letter to the United States Secretary of State, New York Governor Daniel D. Tompkins ex-

---

**28.** It appears that Stedman's Farm was located in the present-day City of Niagara Falls in the general vicinity of Fort Schlosser.

**29.** The land to the east of the one-mile wide tract was purchased from the Senecas by Robert Morris pursuant to the Treaty of Big Tree, Sept. 15, 1797, 7 Stat. 601; *see also*

Appendix N. Morris obtained the right of pre-emption (the right to obtain Indian land once Indian title is extinguished) to that land from the Commonwealth of Massachusetts. Massachusetts held the right of preemption as a result of the 1786 Hartford Compact.

pressed his concern about the ambiguity of the United States–British Canada boundary under the 1783 Treaty of Paris, as it related to the Niagara River Islands. Daniel D. Tompkins, 2 *Public Papers of Daniel D. Tompkins* 303–05 (1902). On December 22, 1810, Governor Tompkins wrote a letter to Congressman Peter B. Porter, Chairman of the House Foreign Relations Committee, further reflecting this concern. *Id.* at 305–06. Governor Tompkins, anticipating a possible new war with Great Britain, discussed the strategic and economic importance of the Niagara Islands to both New York and the United States.

On March 8, 1811, the New York State Legislature authorized Governor Tompkins to purchase the islands in the Niagara River from the Senecas. Act of March 8, 1811, ch. XXXVII, 1811 N.Y. Laws 50–51; Joint Stip. at ¶ 105. On April 11, 1811, Governor Tompkins wrote to Jasper Parish, a sub-agent to the Six Nations, attempting to facilitate negotiations for the purchase. Tompkins, *supra*, at 339–40. In his letter, Governor Tompkins recognized the unsettled nature of the United States–British Canada border:

The Treaty between this Country and Great Britain establishes the territorial line to be along the middle of the water communication between Lakes Ontario and Erie. Whether these words establish as the limit of Jurisdiction, a channel of the Niagara River or a line equidistant at all places from the two shores, may become a question of litigation or for negotiation between the two governments. It will, therefore, be necessary to provide in any treaty to be made, that upon a final settlement for demarcation of that line, by commissioners or otherwise, the Islands to be purchased, or any part of them, shall fall within British

Jurisdiction, our payments shall cease, and the treaty from thenceforth be void. *Id.* at 340.

On February 12, 1812, Governor Tompkins wrote to Thomas Grosvenor, Chairman of the New York State Assembly's Committee on Indian Affairs, to advise that he had postponed negotiations for the purchase of the Islands due to the then precarious relations with British Canada. Governor Tompkins wrote:

The authority to treat with the Seneca Nation of Indians, for the purchase of the Islands in the Niagara River, was predicated upon a previous suggestion from some of the Chiefs, of willingness to dispose of those Islands. In May I rec'd. a notification, that they had changed their minds & were disinclined to negotiate upon that subject during the last year. In the course of a journey to the westward, however, I had an interview with a deputation of chiefs and warriors of that Nation which produced no change of the determination of which I had been notified in May. I took that opportunity of explaining to them the nature and slenderness of their title by shewing [sic] them that by Mr. Pickering's Treaty held at Canandaigua in November 1794, the lands which they reserved were specifically described by metes and bounds, which metes and bounds excluded the aforesaid Islands, and that as by that treaty they expressly released every pretention [sic] and claim to any lands without the boundaries of their Reservation, the said Islands did now in strictness belong to the State of New York. The supposed right of Sir John Johnson [son of Sir William Johnson] to those Islands was noticed, and the consequent title of the State to them without a purchase from the Indians explained. If Sir William Johnson ever had a valid title for those Islands from

the Indians, it descended upon his death to Sir John Johnson, upon whose attainder it vested in the people of this State. It was suggested to the Senecas, that the State would nevertheless manifest its friendship and liberality towards them by purchasing and paying for that which by rigid Rules might be recovered without consideration. It was barely urged by me that the preceding circumstances ought to have great weight upon their minds in deciding upon the price of the land contained in those Islands.

I have no doubt the precarious State of our relations with Canada alone, induced the Senecas to defer any negotiation relative to the sale of the Islands in the Niagara River to some period at which a treaty might be held by them on that subject without exciting the jealousy and suspicion of the Canadian Government.

Tompkins, *supra*, at 480–81; Joint Stip. at ¶ 106.[30]

The Seneca initially remained neutral during the War of 1812. However, late in the summer of 1812, British forces were rumored to have invaded Grand Island. The Senecas, believing they owned Grand Island, abandoned their neutrality and allied themselves with the United States to protect their interests. Red Jacket consulted with Erastus Granger, the United States Indian agent for the Six Nations, and stated:

Brother–You have told us that we had nothing to do with the war that has taken place between you and the British: but we find that the war has come to our doors. Our property is taken possession of by the British and their Indian friends. It is necessary for us now to take up the business, defend our property and drive the enemy from it. If we sit still upon our seats, and take no

measures of redress, the British (according to the customs of you, white people) would hold it by conquest—and should you conquer the Canadas [sic], you will claim it upon the same principles, as conquered from the British. We, therefore, request permission to go with our warriors and drive out those bad people, and take possession of our lands.

Buffalo Gazette, Aug. 4, 1812; *see also* William Ketchum, 2 *History of Buffalo* 272–73 (1865). As it turned out, the rumor of a British invasion of Grand Island proved false.

The Treaty of Ghent, executed on December 24, 1814, concluded the War of 1812. Treaty of Ghent, Dec. 24, 1814, 8 Stat. 218. The Treaty provided for several boundary commissions to determine the precise boundary between Canada and the United States as set forth in the 1783 Treaty of Paris. Joint Stip. at ¶ 107. Article VI of the Treaty of Ghent provided for a boundary commission to determine the location of the boundary in the Niagara River basin.

After the War of 1812, New York once again sought to purchase the Niagara Islands from the Senecas. On July 10, 1815, Governor Tompkins wrote to Jasper Parish the following:

Genl. Porter informs me that you think the present a favourable [sic] time to effect a purchase from the Seneca Indians (which the Legislature have authorized me to make) of the Islands in the Niagara River.

Although it is questionable whether these Indians have any title to the lands, yet I am willing (with a view to avoid any collisions, and to perpetuate the good understanding which at present exists between them & the government) to

---

**30.** Governor Tompkins mentions later in the letter, with regard to the quality of timber on Grand Island, that the Island belongs to the Senecas.

pay Twelve thousand dollars for the relinquishment of their right to all the Islands—This sum is however to cover all the incidental expenses attending the purchase.

ICC Br. at 63; Defs. Ex. 39.

On September 12, 1815, the State of New York and the Seneca Nation entered into an agreement by which the Senecas agreed to "sell, grant, convey and confirm to the people of the State of New York, all the islands in the Niagara river between Lake Erie and Lake Ontario and within the jurisdiction of the United States." Whipple Report, *supra*, at 211–12; Joint Stip. at ¶ 108. In consideration, New York paid $1,000 and a perpetual annuity of $500. There was no federal commissioner present at the 1815 transaction. Joint Stip. at ¶ 109.

When the State of New York purchased the Niagara Islands from the Senecas in 1815, the boundary commission appointed under Article VI of the Treaty of Ghent had not yet determined whether the Niagara Islands fell within the territory of the United States or Canada. *See* H. Perry Smith, 1 *History of City of Buffalo and Erie County* 427 (1884). Nevertheless, the State of New York proceeded to exercise jurisdiction over the Islands. Governor De Witt Clinton wrote the New York State Senate on March 11, 1819, that a number of non-Indian squatters had settled on Grand Island and refused to recognize the State's authority over the Island. He stated that this situation arose " 'because the jurisdiction over the islands in that river has not been settled under the treaty of Ghent.'" Hauptman, *supra*, 23 Okla. City Univ. L.Rev. at 172 (*quoting 2 Messages from the Governors* 995 (Charles Z. Lincoln ed.1909)). In response, on August 13, 1819, the State Legislature passed an act authorizing the removal of the squatters from Grand Island. *Id.*; Joint Stip. at

¶ 111. A group of State officers removed 150 non-Indian squatters from Grand Island on December 9, 1819. Joint Stip. at ¶ 111.

Although New York exercised jurisdiction over Grand Island after the 1815 conveyance, it refrained from authorizing any settlement thereon until the United States–Canada boundary was finally delineated. In an April 15, 1820 letter to Henry Livingston, the New York State Surveyor–General Simeon De Witt, wrote: "Nothing will probably be done with Grand Island in the Niagara River till the boundary line between us and the British is settled which may not be done in some years from this." *See* Hauptman, *supra*, 23 Okla. City Univ. L.Rev. at 172 n.68 (stating that letter is on file with the Historical Society of Tompkins County (Ithaca, New York)).

In 1822, the Boundary Commission finalized its report on the location of the Treaty of Paris boundary between the United States and Canada in the Niagara River basin. Joint Stip. at ¶ 112. The boundary through the Niagara River generally followed the main channel of the River to the west of Grand Island. *Id.* Thus, with the exception of Navy Island, all the Niagara Islands were determined to be within the boundaries of the United States. *See* Hauptman, *supra*, 23 Okla. City Univ. L.Rev. at 171.

In 1824, the State of New York authorized a survey of Grand Island into lots. *Id.* at 172. The lots were sold at auction the following year. *Id.*

## V. *ICC Proceedings*

In 1946, Congress passed the Indian Claims Commission Act (the "ICC Act"), which established the Indian Claims Commission or ICC to hear and resolve Indian claims against the federal government. *See* Act of Aug. 8, 1946, ch. 907, 60 Stat.

939. The intent of Congress in passing the ICC Act was to settle once and for all the claims arising from the government's historical dealings with the Indians. The ICC Act gave the ICC jurisdiction over five categories of claims: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive Orders of the President; (2) all other claims in law and equity, including those sounding in tort; (3) claims which would result if the treaties, contracts and agreements between the Indians and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, and any other ground cognizable by a court of equity; (4) claims arising from a taking by the United States; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. ICC Act, Aug. 13, 1946, ch. 959, § 2, 60 Stat. 1049, 1050.

The ICC was authorized to hear only those tribal claims that had accrued prior to the enactment of the statute. § 12, 60 Stat. at 1052. Neither a statute of limitations nor the defense of laches was to apply to claims otherwise permissible under the ICC Act. § 2, 60 Stat. at 1050. The only redress available in the ICC proceedings was a monetary award. The United States Department of Justice represented the United States in these actions. The orders of the ICC were appealable to the Court of Claims.

Originally, the ICC was to exist for only ten years, but Congress repeatedly extended that time until the ICC's term finally expired on September 30, 1978. Remaining cases were transferred to the Court of Claims.

The Plaintiff Tribes in this case, the SNI and the Tonawanda Band, brought claims against the United States before the ICC in the 1950's, asserting that the United States had a fiduciary duty to protect their lands. In particular, the Plaintiff Tribes claimed that the United States was liable under the ICC Act for the 1802 conveyance of the one-mile-wide Niagara strip (ICC subdocket 343B), the 1815 conveyance of the Niagara Islands (ICC subdocket 342C), and the cession of the northern Niagara strip (ICC subdocket 342D).

The United States opposed those claims, initially arguing that the United States had no fiduciary duty to the Plaintiff Tribes and, therefore, was not liable. The United States prevailed on this argument before the ICC. *Seneca Nation of Indians v. United States*, 12 Ind. Cl. Comm. 780 (1963). The Court of Claims reversed this holding, however, ruling that the United States had a fiduciary duty to the Plaintiff Tribes pursuant to the Nonintercourse Act. *Seneca Nation of Indians*, 173 Ct.Cl. at 917.

On remand, the ICC adjudicated, among other claims, whether the Plaintiff Tribes owned the Niagara Islands and the bed of the Niagara River. Contrary to the position it takes in this case, the United States argued before the ICC that in 1815, when New York purported to purchase the Niagara Islands from the Senecas, the Seneca Nation had no property interest in the Islands. Specifically, the United States argued that any interest the Seneca Nation may have had in the Islands was extinguished on numerous occasions prior to 1815, including by the 1764 treaties of peace between Great Britain and the Seneca Nation, the 1784 Treaty of Fort Stanwix, the 1789 Treaty of Fort Harmer, and the 1794 Treaty of Canandaigua. With respect to the sale of 1815, the United States argued:

> Despite the fact that their interest in the subject lands had already been ceded, relinquished, and disclaimed many times

by the Senecas, New York saw fit to enter into an additional purchase. This was for the Islands in the Niagara River. Here again, New York's agreement to purchase was not based on the concept that the Senecas owned the islands but based on diplomatic justification.

ICC Br. at 61.

The United States concluded its argument as follows:

Even in the early period, [the Senecas'] claim to exclusive use and occupancy of the subject lands was very weak. Moreover, the Senecas were thereafter dispossessed of what little interest they might have had in the lands by France and Great Britain and they clearly had no title in the lands when the United States and the State of New York took over possession thereof. In the circumstances, ... the United States and the State of New York do not owe [the Senecas'] ancestors anything for the Niagara strip. Necessarily the payments as made were gratuitous and certainly cannot be equated with unconscionable consideration, a lack of fair and honorable dealings, or any other wrongdoing contemplated by the Indian Claims Commission Act.

*Id.* at 65.

The ICC concluded that as a result of the treaties of cession of 1764 to Great Britain, the Senecas did not have a compensable interest in either the northern or southern Niagara strips or the Niagara Islands or the riverbed, as of the date of American sovereignty. *Seneca Nation of Indians v. United States,* 20 Ind. Cl. Comm. 177, 180, 208 (1968). In other words, the ICC agreed with the United States' argument that the 1764 treaties of peace extinguished any aboriginal title to the Niagara region that the Senecas may have had. The ICC further stated that the Senecas' cession of the northern strip,

"that containing the portage around the Falls, was repeated in the treaties of 1784, 1789 and 1794 and of the southern strip in the treaties of 1784 and 1789." *Id.* at 180. The ICC then dismissed the Senecas' claim regarding the northern Niagara strip. However, with respect to the southern Niagara strip, the Niagara Islands and the riverbed, the ICC stated as follows:

The 1794 [Treaty of Canandaigua] ... we hold to have the effect of a treaty of recognition, or grant of the U.S. interest in the southern strip and the islands. The words of the treaty grant are clear and unequivocal, and it is not material that the Seneca no longer had aboriginal title to that tract.

Colonel Timothy Pickering, the United States negotiator for the 1794 treaty, wrote of his embarrassment in making the ostensible relinquishment to the Indians of land of which he felt the United States did not have the power of disposition ... Fortunately, it is within the purpose of the Indian Claims Commission Act to cure any deception that might have been visited on the Indians.

We find that the words of grant in the 1794 treaty are sufficient to create an equitable estoppel against the United States to deny that these were then Indian lands in which the Seneca had a compensable interest equivalent to a recognized title. Any subsequent disposition of the lands by the Seneca would be under the protection of the Trade and Intercourse Act ...

\*　　\*　　\*　　\*　　\*　　\*

The Seneca acquired the same interest in the islands adjacent to the southern strip as they did to the shore. The 1794 Treaty boundary description, "... to that river; ... then the line runs along the River Niagara to Lake Erie; then along Lake Erie ...," by construction

includes the adjacent islands so far as United States ownership went, or to the main channel of the river.... No showing of a contrary intent of the parties is made. The 1802 sale to New York, however, is clearly only of a one mile wide strip on the shore.

No portion of the riverbed adjacent to the southern strip can be said to have been granted by the 1794 Treaty. The rule is well established that there is a presumption against the sovereign's alienation of title to the land under navigable waters....

\* \* \* \* \* \*

In summary, the Commission holds that although the Seneca had no compensable interest in the Niagara lands prior to 1794, the 1794 Treaty created a compensable interest in the Senecas to the southern strip and the islands. Under the fiduciary relationship required by the Trade and Intercourse Act the United States will owe compensation under our Act if the Seneca received less than a proper consideration for these lands in their sales to New York in 1802 and 1815.

*Id.* at 181–85 (citations and footnote omitted).

## V. DISCUSSION

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where the pleadings and discovery material "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The summary judgment rule permits a court " 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita Elec. Indus., Co. v. Zenith Ra-*

*dio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting* Fed. R.Civ.P. 56(e) advisory committee's note).

Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must set forth specific facts demonstrating a genuine issue in order to defeat the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate where the court must apply a legal standard to undisputed historical facts, notwithstanding the parties' disagreement about the legal significance of those facts. *See* William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issue of Material Fact,* 99 F.R.D. 465, 472–73 (1984).

In a Nonintercourse Act case, the issue of liability under the Act can often be resolved on summary judgment, without an evidentiary hearing or trial, where the parties present a well-developed record and the historical facts are not disputed. *See, e.g., Tonkawa Tribe of Okla. v. Richards,* 75 F.3d 1039, 1047 (5th Cir.1996) (affirming district court's grant of summary judgment in favor of defendants, finding that land at issue was not tribal land); *Seneca Nation of Indians v. New York,* 26 F.Supp.2d 555, 572 (W.D.N.Y. 1998) (entering summary judgment on issue of liability and holding that State violated the Nonintercourse Act as a matter of law), *aff'd,* 178 F.3d 95 (2d Cir.1999); *Cayuga Indian Nation of New York v. Cuomo,* 730 F.Supp. 485, 493 (N.D.N.Y. 1990) (entering partial summary judgment for plaintiffs and holding that property transaction at issue was invalid, absent evidence of federal ratification); *but see Oneida Indian Nation,* 691 F.2d at 1086 (reversing district court's grant of motion to dismiss because court improperly took

judicial notice of disputed issues of fact contained in historical sources).

In this case, the parties agree that on the issue of liability under the Nonintercourse Act, there is no genuine issue of material fact which requires a trial. Accordingly, they have all moved for summary judgment. The parties have presented a well-developed record and the historical facts are not disputed. The parties simply dispute the legal significance of those facts.

### B. *Elements of Plaintiffs' Nonintercourse Act Claim*

■ In order to establish a violation of the Nonintercourse Act, a plaintiff must show that: (1) it is an Indian nation or tribe; (2) the land at issue was tribal land at the time of the alleged violation; (3) the United States has never consented to or approved alienation of this tribal land as required by the Act; and (4) the trust relationship between the United States and the Indian nation or tribe has not been terminated or abandoned. *See Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 56 (2d.Cir.1994); *see also Seneca Nation of Indians,* 26 F.Supp.2d at 570. The parties do not dispute that plaintiffs can establish the first, third and fourth elements of their Nonintercourse Act claim. They do dispute, however, whether plaintiffs can establish the second element, *i.e.,* whether the land at issue was tribal land at the time of the alleged violation.

Plaintiffs argue that pursuant to the 1794 Treaty of Canandaigua, the United States granted to the Seneca Nation recognized title to the Niagara Islands, and that in 1815, at the time of the alleged violation, the Islands were therefore tribal land entitled to protection under the Act. In the alternative plaintiffs argue that in 1815, the Seneca Nation held aboriginal title to the Islands.

Defendants, on the other hand, argue that the Senecas never held aboriginal title to the Niagara Islands and even if they did, such title was extinguished prior to 1815. They further argue that prior to the 1794 Treaty of Canandaigua, the State of New York obtained full fee title to the Islands and that the Treaty did not divest the State of that title. Thus, defendants argue that the Islands were not tribal land in 1815.

### C. *Law of Indian Land Tenure*

At the outset, a brief explication of the law of Indian land tenure is necessary to understand the nature of the parties' claims and to place in proper perspective the historical facts.

The law of Indian land tenure has its origins in the so-called doctrine of discovery, a legal fiction developed by the United States Supreme Court in the early nineteenth century to reflect European policy toward the Indians and to explain the relative rights of the discovering nations and the Indians to Indian land. *See Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 543–44, 8 L.Ed. 483 (1832); *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 572–74, 5 L.Ed. 681 (1823). Under the doctrine of discovery, the discovering European nations held fee title to Indian land, subject to the Indians' right of occupancy and use, sometimes called Indian title or aboriginal title. *County of Oneida v. Oneida Indian Nation of New York,* 470 U.S. 226, 234, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *Oneida Indian Nation of New York v. County of Oneida,* 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). As a consequence, no one could purchase Indian land or otherwise terminate aboriginal title without the consent of the discovering nation's sovereign. *County of Oneida,* 470 U.S. at 234,

105 S.Ct. 1245 (citation omitted). Chief Justice Marshall explained the doctrine of discovery in the seminal case of *Johnson v. McIntosh:*

> On the discovery of this immense continent, the great nations of Europe were eager to appropriate to themselves so much of it as they could respectively acquire.... But, as they were all in pursuit of nearly the same object, it was necessary, in order to avoid conflicting settlements, and consequent war with each other, to establish a principle, which all should acknowledge as the law by which the right of acquisition, which they all asserted, should be regulated, as between themselves. This principle was, that discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession.
>
> The exclusion of all other Europeans, necessarily gave to the nation making the discovery the sole right of acquiring the soil from the natives, and establishing settlements upon it. It was a right with which no Europeans could interfere. It was a right which all asserted for themselves, and to the assertion of which, by others, all assented.
>
> Those relations which were to exist between the discoverer and the natives, were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them.
>
> In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded; but were, necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as a just claim to retain possession of it, and to

use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished and their power to dispose of the soil, at their own will, to whomever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it. While the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been understood by all, to convey a title to the grantees subject only to the Indian right of occupancy.

*Johnson,* 21 U.S. (8 Wheat.) at 572–74. The doctrine of discovery forms the basis of the well-established law of Indian land tenure.

Aboriginal title is the exclusive right of Indian tribes to use and occupy lands they have inhabited " 'from time immemorial.' " *Mashpee Tribe v. Secretary of Interior,* 820 F.2d 480, 481–82 (1st Cir. 1987) (*quoting County of Oneida,* 470 U.S. at 234, 105 S.Ct. 1245). An Indian tribe establishes aboriginal title by proving "actual, exclusive, and continuous use and occupancy [of the land] 'for a long time' prior to the loss of the property." *Zuni Indian Tribe of New Mexico v. United States,* 16 Cl.Ct. 670, 671 (1989) (*quoting Sac and Fox Tribe of Indians of Okla. v. United States,* 161 Ct.Cl. 189, 202, 315 F.2d 896, 903, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963)); *see also United States v. Santa Fe Pac. R.R.,* 314 U.S. 339, 345, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *Clinton & Hotopp, supra,* 31 Me. L.Rev. at 70–71. Aboriginal title makes a tribe's members "the rightful occupants of the soil, with a legal as well as just claim to

retain possession of it." *Johnson,* 21 U.S. (8 Wheat.) at 574. Nevertheless, an Indian tribe has no independent power to convey its aboriginal title to another. *Id.; see also James v. Watt,* 716 F.2d 71, 74 (1st Cir.1983); Cohen, *supra,* at 487.

The right to terminate or "extinguish" aboriginal title, sometimes called the right of extinguishment, is held by the sovereign.[31] *County of Oneida,* 470 U.S. at 234, 105 S.Ct. 1245; *Oneida Indian Nation,* 414 U.S. at 667, 94 S.Ct. 772; *Oneida Indian Nation,* 860 F.2d at 1150. Aboriginal title can be extinguished by the sovereign or with the·sovereign's consent at any time. There. are basically two means of extinguishing aboriginal title. First, aboriginal title may be extinguished by the sovereign through a taking, such as through war or physical dispossession. *See Oneida Indian Nation,* 860 F.2d at 1159 (*citing* 3 *The Writings of Thomas Jefferson* 19 (Lipscomb et al. eds.1904)). Second, the sovereign may extinguish aboriginal title through contract or treaty. *Id.* For example, the sovereign may enter into a purchase contact with the Indians to purchase Indian land or may enter into a treaty of cession with the Indians whereby the Indians agree to cede certain territory in exchange for other rights or property. *See Santa Fe Pac. R.R.,* 314 U.S. at 347, 62 S.Ct. 248 (extinguishment may be accomplished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise").

The holder of the underlying fee title to Indian land, also referred to as the right of preemption, holds the exclusive right to acquire Indian land once aboriginal title has been extinguished. *Johnson,* 21 U.S. (8 Wheat.) at 574; *Oneida Indian*

*Nation,* 649 F.Supp. at 425; *see also* Howard R. Berman. *The Concept of Aboriginal Rights in the Early Legal History of the United States,* 27 Buff. L.Rev. 637,·655 (1978). Generally, the rights of extinguishment and preemption are joined. However, they are separate powers and need not be held by the same entity. *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 142–43, 3 L.Ed. 162 (1810); *Oneida Indian Nation,* 414 U.S. at 667, 670, 94 S.Ct. 772; *Oneida Indian Nation,* 649 F.Supp. at 425.

The underlying fee title or right of preemption can be conveyed or transferred to another. *Mitchel ·v. United States,* 34 U.S. (9 Pet.) 711, 745, 9 L.Ed. 283 (1835). However, "[u]ntil Indian title is extinguished by sovereign act, any holder of the fee title or right of preemption, either through discovery or a grant from or succession to the discovering sovereign, remains subject ... to the Indian right of occupancy, and the Indians may˙not be ejected." *Oneida Indian Nation,* 691 F.2d at 1075 (internal quotations and citations omitted). In other words, as long as an Indian tribe retains aboriginal title, ownership of the fee title or right of preemption brings with it no present right of possession. Rather, the fee owner receives a contingent future interest which ripens into a present interest only when the sovereign extinguishes the Indians' aboriginal title. *James,* 716 F.2d at 74. Once aboriginal title is extinguished by the sovereign, the owner of the underlying fee title or right of preemption obtains fee simple absolute title to the land. *Oneida Indian Nation,* 691 F.2d at 1075.·

As the Supreme Court has long held, "the [Indian] right of occupancy with

---

**31.** Aboriginal title may also be terminated through "abandonment," the physical relinquishment by a tribe of its aboriginal territo-

ry. *See Williams v. City of Chicago,* 242 U.S. 434, 437, 37 S.Ct. 142, 61 L.Ed. 414 (1917). Abandonment is not an issue in this case.

all its beneficial incidents [is] ... as sacred as the fee," *United States v. Shoshone Tribe of Indians*, 304 U.S. 111, 115, 58 S.Ct. 794, 82 L.Ed. 1213 (1938) and is to be "as securely safeguarded as is fee simple absolute title." *Id.* at 117, 58 S.Ct. 794; *accord Santa Fe Pac. R.R.*, 314 U.S. at 345, 62 S.Ct. 248; *Mitchel*, 34 U.S. (9 Pet.) at 745. Accordingly, the Court has held that the intent to extinguish aboriginal title must be "plain and unambiguous." *Santa Fe Pac. R.R.*, 314 U.S. at 346, 62 S.Ct. 248, and will not be "lightly implied." *Id.* at 354, 62 S.Ct. 248. The intent to extinguish aboriginal title must be expressed on the face of the legislative act or treaty authorizing extinguishment or be clear from the surrounding circumstances and legislative history. *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) (citations omitted).

■ Aboriginal title may be extinguished by the United States without creating an obligation to pay just compensation under the Fifth Amendment. *Tee–Hit–Ton Indians v. United States*, 348 U.S. 272, 283–85, 75 S.Ct. 313, 99 L.Ed. 314 (1955). In this respect, aboriginal title is to be distinguished from "recognized" title.

■ Recognized title is title to Indian lands that has been recognized by federal treaty or statute. A treaty may, for example, recognize tribal title by describing a particular land area as being reserved to the tribe. That parcel may or may not have been part of the aboriginal territory of the tribe. Whether or not a treaty recognized title to particular land is a question of intent. In order to establish recognized title, an Indian tribe must show a "definite intention by congressional action or authority to accord legal rights, not merely permissive occupancy." *Id.* at 278–79, 75 S.Ct. 313 (citations omitted).

■ The primary advantage of recognized title is its relative permanence. Recognized title is "property" within the meaning of the Fifth Amendment so that its taking by the federal government gives rise to a right of compensation. *United States v. Creek Nation*, 295 U.S. 103, 109–11, 55 S.Ct. 681, 79 L.Ed. 1331 (1935).

The reason for the distinction between recognized title and unrecognized title was explained by the Supreme Court in *Tee–Hit–Ton Indians:* "[T]he taking by the United States of unrecognized [or aboriginal] Indian title is not compensable under the Fifth Amendment ... because Indian occupation of land without government recognition of ownership creates no rights against taking or extinction by the United States protected by the Fifth Amendment or any other principle of law." 348 U.S. at 285, 75 S.Ct. 313. Unrecognized aboriginal title

means mere possession not specifically recognized as ownership by Congress.... This is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians.

*Id.* at 279, 75 S.Ct. 313.

In the period prior to the American Revolution, Great Britain, recognized as the discovering nation and sovereign after defeating the French, held both the right of extinguishment and the right of preemption of Indian lands located in the colonies. Thus, Britain had the exclusive authority to extinguish Indian title, and its underlying fee title or right of preemption

was good against all other discovering nations.[32]

■ Upon the Revolution, Britain's fee title or right of preemption passed to the individual states (not the United States).[33] *Oneida Indian Nation,* 414 U.S. at 670, 94 S.Ct. 772; *Johnson,* 21 U.S. (8 Wheat.) at 584; *James,* 716 F.2d at 74. The landed states eventually ceded to the new national government their claims to the western territories beyond their present boundaries. *See supra* at Section VI, Part H. As a result, the right of preemption to Indian lands in the western territories passed to the United States. However, the right of preemption to Indian lands within the borders of the thirteen original states remained with those states. *James,* 716 F.2d at 74 (*citing Oneida Indian Nation,* 414 U.S. at 670, 94 S.Ct. 772; *Seneca Nation of Indians v. Christy,* 162 U.S. 283, 16 S.Ct. 828, 40 L.Ed. 970 (1896); *United States v. Franklin County,* 50 F.Supp. 152, 156 (N.D.N.Y.1943); Clinton & Hotopp, *supra,* 31 Me. L.Rev. at 36 & n.73; William E. Dwyer, Jr., *Land Claims Under the Indian Nonintercourse Act, 25 U.S.C. § 177,* 7 B.C. Env. Aff. L.Rev. 259, 265 n.41 (1978); Jensen, *supra,* at 198–238 (1966)). ·

### D. *Canons of Indian Treaty Construction*

■ The dispute here requires the Court to interpret several Indian treaties. It is well established that the interpretation of a treaty is a question of law for the court to decide, not a question of fact for a fact finder. *United States v. Washington,* 135 F.3d 618, 629 (9th Cir.1998); *Cayuga Indian Nation of New York v. Cuomo,* 758 F.Supp. 107, 111 (N.D.N.Y.1991). The Supreme Court has developed canons of construction to assist courts in interpreting Indian treaties. In *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943), the Court stated:

> Of course, treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. Especially is this true in interpreting treaties and agreements with the Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.

*Id.* at 431–32, 63 S.Ct. 672 (internal quotations and citations omitted).

■ "The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *County of Oneida,* 470 U.S. at 247, 105 S.Ct. 1245 (internal quotations and citations omitted).

---

**32.** Britain did of course extinguish Indian title to large quantities of land and therefore held fee simple absolute title to such land. The right of preemption was applicable only to, lands where aboriginal title had not yet been extinguished.

**33.** The lands to which Britain held fee simple absolute title also passed to the individual states upon the Revolution. *See Massachusetts v. New York,* 271 U.S. 65, 85–86, 46 S.Ct. 357, 70 L.Ed. 838 (1926); *Shively v. Bowlby,* 152 U.S. 1, 15, 14 S.Ct. 548, 38 L.Ed. 331 (1894); *Harcourt v. Gaillard,* 25 U.S. (12 Wheat.) 523, 526, 6 L.Ed. 716 (1827); *Johnson,* 21 U.S. (8 Wheat.) at 584.

The Supreme Court recently confirmed these canons of construction for Indian treaties in *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). There, the Court held that when construing Indian treaties, a court should

> look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties. In this case, an examination of the historical record provides insight into how the parties to the Treaty understood the terms of the agreement. This insight is especially helpful to the extent that it sheds light on how the [Indian] signatories to the Treaty understood the agreement because we interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them.

*Id.* at 196, 119 S.Ct. 1187 (internal quotations and citations omitted).

■■■ There are, however, some important limitations on the rule of generous construction of Indian treaties. First, the Supreme Court has cautioned that "even though legal ambiguities are resolved to the benefit of the Indians, courts cannot ignore plain language [in the treaty] that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." *Oregon Dep't of Fish and Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 774, 105 S.Ct. 3420, 87 L.Ed.2d 542, (1985) (internal quotations and citations omitted). In other words, courts cannot, "under the guise of [liberal] interpretation ... rewrite congressional acts [*e.g.,* treaties] so as to mean something they obviously were not intended to mean." *Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 179, 67 S.Ct. 650, 91 L.Ed. 823 (1947) (citations

omitted). "[E]ven Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians,* 318 U.S. at 432, 63 S.Ct. 672 (citations omitted).

■■■ Second, treaties, like statutes, are entitled to a presumption of constitutionality. *See In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1309 (9th Cir.1982). Thus, if there are two plausible constructions of a treaty, one of which makes the treaty constitutional and the other of which would render the treaty outside the constitutional power of the federal government, the court must adopt the constitutional construction and reject the unconstitutional one. *Cf. Edward J. De-Bartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("[w]hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided"); *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895) ("[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality"). This rule applies equally to Indian treaties, even if the unconstitutional construction of the treaty would be more beneficial to the Indians. For example, in *Oneida Indian Nation,* 860 F.2d at 1163–66, the Second

Circuit rejected a construction of the 1784 Treaty of Fort Stanwix put forth by the plaintiff-Indians that would have meant that the Treaty overrode express prohibitions on federal power in the Articles of Confederation, even though such a construction was more favorable to the Indians.

Finally, the rule of generous construction of Indian treaties has not been applied to divest a state of land that it has acquired. *See id.* at 1163–64. On the contrary, the Supreme Court has cautioned that such a construction is not warranted "unless the purpose so to do be shown in the treaty with such certainty as to put it beyond reasonable question." *United States v. Minnesota,* 270 U.S. 181, 209, 46 S.Ct. 298, 70 L.Ed. 539 (1926).

### E. *The 1764 Treaties of Peace*

■■ Plaintiffs claim that until at least 1815, the Seneca Nation held aboriginal title to the entire Niagara region, including the Niagara Islands, and that the Senecas' aboriginal title to the Islands was never extinguished prior to the 1815 conveyance to New York.[34] Thus, according to plaintiffs, in 1815, the Islands were tribal land protected by the Nonintercourse Act.

Defendants dispute whether the Senecas ever possessed aboriginal title to the Niagara Islands or, for that matter, to any of the Niagara region. They contend that plaintiffs cannot establish actual, exclusive, and continuous use and occupancy of the Islands by the Senecas since time immemorial. Defendants further argue, *inter alia,* that assuming *arguendo* the Senecas possessed aboriginal title to the Islands, such title was extinguished by Great Britain pursuant to the 1764 treaties of peace. As a result, Great Britain obtained fee

simple absolute title to the Islands in 1764. Defendants further argue that upon the American Revolution, Britain's title passed, as a matter of law, to the State of New York. Thus, defendants argue, as of the Revolutionary War, New York owned fee simple absolute title to the Niagara Islands.

The Court need not decide whether plaintiffs can establish the elements of aboriginal title, because it finds, as defendants contend, that even if aboriginal title existed (which the Court passes no opinion on), such title was extinguished by Great Britain pursuant to the 1764 treaties of peace.

### 1. *The 1764 Treaties Extinguished Seneca Title to the Niagara Islands*

As discussed *supra,* the French and Indian War between France and Great Britain was concluded by the Treaty of Paris, on February 10, 1763. Pursuant to the Treaty, France ceded to Britain all its claims to lands east of the Mississippi River, which would have included any claims to the Niagara region and the Niagara Islands. Later that year, part of the Seneca Nation (the westernmost Senecas, who had been aligned with the French during the French and Indian War) joined the western Indians in Pontiac's Rebellion against the British and ambushed a British supply column at Devil's Hole, killing scores of British soldiers. *See* Appendix C. After the attack, the British prepared to retaliate against the Senecas unless they agreed to seek terms of peace.

On April 3, 1764, the British and Senecas signed the "Preliminary Articles of

---

**34.** As discussed *infra,* plaintiffs also argue that the 1794 Treaty of Canandaigua gave the Senecas recognized title to the Islands.

Peace, Friendship and Alliance," Article 3 of which provided that the Senecas:

cede to His Maj'ty and his successor for ever, in full Right, the lands from the Fort of Niagara, extending easterly along Lake Ontario, about four miles ... and running from thence southerly, about fourteen miles to the Creek above Fort Schlosser or little Niagara, and down the same to the River, or Strait and across the same, at the great Cataract; thence Northerly to the Banks of Lake Ontario, at a Creek or small Lake about two miles west of the Fort, thence easterly along the Banks of the Lake Ontario, and across the River or Strait to Niagara, comprehending the whole carrying place, with the Lands on both sides the Strait, and containing a Tract of [about] fourteen miles in length and four in breath. -And the Senecas do engage never to obstruct the passage of the carrying place, or the free use of any part of the said Tract. . . .

In the margin of Article 3, the instrument stated as follows: "Agreed to, provided the Tract be always appropriated to H.M.'s sole use, that at the definite Treaty, the lines be run in presence of Sr. Wm Johnson and some of the Seneca's [sic] to prevent disputes hereafter." Thus, under the April 3rd treaty, the Senecas agreed to cede to the British Crown the northern Niagara strip, a four-mile wide strip of land running along each side of the Niagara River, from Lake Ontario to a point just above Niagara Falls. See Appendix G.

On August 6, 1764, the British and Senecas signed the "Treaty of Peace and Alliance," Article 5 of which provided that:

In addition to the grant made by the Chenussio Deputys to His Majesty at Johnson Hall, in April, of the Lands from Fort Niagara, to the upper end of the carrying place, beyond Fort Schlosser and four miles in breadth on each

side of the River [i.e., the northern Niagara strip], the Chenussios now, surrender up all the lands from the upper end of the former Grant (and of the same breadth) to the Rapids of Lake Erie, to His Majesty, for His sole use, and that of the Garrisons, but not as private property, it being near some of their hunting grounds; so that all that Tract, of the breadth before mentioned, from Lake Ontario to Lake Erie, shall become vested in the Crown, in manner as before mentioned excepting the Islands between the great Falls and the Rapids, which the Chenussios bestow upon Sir Wm. Johnson as proof of their regard and of their knowledge of the trouble he has had with them from time to time. All of which the Chenussios hope will be acceptable to His Majesty, and that they may have some token of His favour [sic].

The August 6th treaty was a continuation of the April 3rd treaty and under it, in addition to the northern Niagara strip ceded in the previous treaty, the Senecas agreed to cede the southern Niagara strip, a four-mile wide strip of land on each side of the Niagara River, from the southern end of the northern Niagara strip to Lake Erie. Thus, as a result of the April 3rd and August 6th treaties, the Senecas ceded to the British a four-mile wide strip of land on each side of the Niagara River from Lake Ontario to Lake Erie (the "Niagara strip"). See Appendix H.

The language in the 1764 treaties manifests a plain and unambiguous intent on the part of the British Crown to extinguish any title the Senecas may have had to the northern and southern Niagara strips and the Niagara Islands. The language in Article 3 of the April 3rd treaty provided that the Senecas "*cede* to His Maj'ty and his successor *for ever, in full Right,* [the northern Niagara strip]." (emphasis add-

ed). Similarly, the language in Article 5 of the August 6th treaty provided·that "[i]n addition to the [April] *grant* ... the Chenussios [Senecas] now, *surrender up* [the southern Niagara strip and the Niagara Islands] ... so that all that Tract ... shall become *vested in the Crown* ..." (emphasis added). The above-italicized language plainly and unambiguously indicates the intent of the British Crown, as sovereign and holder of the right of extinguishment, to extinguish Seneca title to the lands described in the treaties. *See Santa Fe Pac. R.R.*, 314 U.S. at 346, 62 S.Ct. 248 (intent to extinguish Indian title must be plain and unambiguous).

This conclusion is also supported by the circumstances surrounding the formation of the 1764 treaties. The treaties were a direct result of the Senecas' participation in Pontiac's Rebellion and more particularly, the Devil's Hole massacre. The British intended the treaties to be treaties of cession, designed to recompense the Crown and to punish the Senecas for their attacks upon the British. In addition, the British wanted to secure the vital Niagara River communication, and especially the portage, against future attacks from or land claims by the Senecas.

Having extinguished Seneca title to the Niagara strip and the Niagara Islands in 1764, Great Britain, as the holder of the right of preemption, obtained fee simple absolute title to those lands.[35]

### 2. *The 1764 Treaties Did Not Simply Recognize Great Britain's Right of Preemption*

Plaintiffs argue that, when viewed in their historical context, the 1764 treaties merely confirmed the British Crown's right of preemption to the Seneca lands in the Niagara region and did not extinguish the Senecas' aboriginal title. Plaintiffs point out that at the time of the treaties, the British had just defeated the French and thereby succeeded to the French claim of fee title by discovery or right of preemption. However, hostilities continued with the Senecas who had been associated with the French. Plaintiffs contend that through the treaties, the British simply wanted to obtain Seneca acknowledgment of the Crown's rights as current European sovereign and its control over the area.

The Court finds plaintiffs' argument that the 1764 treaties were entered into simply to confirm Great Britain's right of preemption unpersuasive. Great Britain's right of preemption to the Seneca lands in the Niagara region vested, as a matter of law, following the 1763 Treaty of Paris with France and did not require confirmation by the Senecas. Even had Britain wanted or needed confirmation from the Senecas that Britain held the preemption right to the Niagara region, it is doubtful that the British would have limited that confirmation to the relatively small holding around the Niagara River, as opposed to the entire region that the Senecas then occupied. The British held the right of preemption over all the area occupied by the Senecas, *i.e.*, from the Niagara River east to Seneca Lake and from Lake Ontario south to Pennsylvania. If it were Britain's intent simply to confirm its preemption rights, it certainly would have done so by confirming those rights for the entire area which the Senecas occupied.

Further, an interpretation of the 1764 treaties allowing the Seneca to continue to use and occupy the land along the Niagara would be inconsistent with the language of

---

**35.** As noted, Great Britain obtained the right of preemption from France pursuant to the 1763 Treaty of Paris.

and purposes behind the treaties. Given the importance of the Niagara region and the history of Britain's struggle to control it, it is clear that Britain wanted exclusive possession and control over the Niagara region and in particular the Niagara portage. The Niagara River had become a vital communication route and was critical to the British for both trade and military reasons. Moreover, the 1764 treaties were intended to recompense the Crown and to punish the Senecas for the massacre at Devil's Hole. In this historical context, the use of the terms "grant," "cede . . . in full Right," and "surrender up all the lands" plainly and unambiguously expressed Britain's intent to extinguish the Senecas' aboriginal title to the Niagara lands, if in fact they had such title.

Contrary to plaintiffs' argument, the language used in the 1764 treaties does not show that the parties contemplated continued use and possession of the Niagara lands by the Senecas. There is no express language in the treaties regarding continued Seneca use and occupancy of the ceded land, nor can the treaties reasonably be interpreted to have allowed such a result. In fact, there is language in the treaties suggesting the opposite. The only language in the treaties recognizing the Seneca right to possess any land is in Article 9 of the April 3rd treaty, which provided: "In consequence of their perfect agreement to the foregoing Articles, Sir [William] Johnson doth . . . promise and engage, that the said Indians . . . shall be left in the quiet and peaceful possession of all their Rights *not comprised in the foregoing articles* . . . ." (emphasis added). This language shows that the parties intended the Senecas to maintain possession only of those lands outside the lands ceded to the Crown.

The treaty language indicating that the land was ceded to the King for his "sole use" further evidences the King's intent to extinguish whatever claim of aboriginal title the Senecas may have had to the ceded lands. The King held only the right of preemption and under the law of Indian land tenure, could not obtain "sole use" of the land without first extinguishing the Senecas' title. *See Johnson,* 21 U.S. (8 Wheat.) at 574, 584–85.

The fact that the treaties required the Senecas to agree "never to obstruct the passage of the carrying place [the Niagara portage]" or interfere with Crown use of the ceded land also did not imply continued Seneca use and occupancy of the area. The inclusion of such a prohibition is explained by the circumstances leading up to the 1764 treaties. The treaties came in the wake of Pontiac's Rebellion and the Devil's Hole massacre. It seems clear that this language was added to the treaty simply to ensure that the Senecas did not repeat such hostile acts.

### 3. *The 1764 Treaties Did Not Violate the 1763 Royal Proclamation*

Plaintiffs next claim that even if the 1764 treaties served to extinguish Seneca title to the northern and southern Niagara strips, they did not extinguish Seneca title to the Niagara Islands as the Islands were expressly excepted from the language of the grant to the Crown and were instead granted to Sir William Johnson, the British Indian Commissioner and the Crown's representative at the treaty negotiations, in his private capacity. Plaintiffs argue that this grant was invalid under British law, because the Royal Proclamation of 1763 expressly prohibited acquisition of Indian land by individuals, without the consent of the Crown. Plaintiffs contend that although Johnson offered the lands to the Crown, there is no evidence that the offer was ever accepted. Thus, plaintiffs argue, since the Crown neither approved the con-

veyance to Johnson nor accepted his attempted grant to the Crown, the grant by the Senecas of the Islands to Johnson failed for violation of the 1763 Royal Proclamation. Again, the Court finds this argument unpersuasive.

A correct construction of the language in Article 5 of the August 6th treaty shows that all the land ceded by the Senecas, including the Niagara Islands, was ceded to the Crown. Thus, there was no violation of the 1763 Royal Proclamation. Article 5 provides in pertinent part:

[T]he Chenussios [Senecas] now, surrender up all lands [in the southern Niagara strip], to His Majesty, for His sole use, and that of the Garrisons, but not as private property ...; so that all that Tract [the southern Niagara strip] ... shall become vested in the Crown, in manner as before mentioned, excepting the Islands between the great Falls and the Rapids [of Lake Erie], which the Chenussios bestow upon Sir Wm. Johnson as proof of their regard and of their knowledge of the trouble he has had with them from time to time.....

A textual reading of Article 5 reveals that the Niagara Islands were an exception to the proviso that the land ceded by the Seneca would not be used as private property, not that the Islands were excepted from the cession to the Crown. "There is a rule of construction that qualifying phrases are generally to be applied to words immediately precedent and not to others more remote." *See Oneida Indian Nation*, 860 F.2d at 1167 (internal quotations and citations omitted). Here, textually, the Niagara Islands are "excepted" from the "manner before mentioned," which, in turn, corresponds to the proviso

that the ceded lands not be used as "private property." Thus, the cession does not purport to give Sir William Johnson title apart from the Crown; rather, Johnson simply was not subject to the proviso that the ceded land not be used as private property. In other words, Article 5 granted the entire southern Niagara strip, including the Niagara Islands, to the King, with the proviso that none of it be used for private property, except the Islands, which were bestowed as private property to Johnson.

Even if Article 5 were construed as making a grant of the Niagara Islands to Sir William Johnson separate and apart from the grant of the southern Niagara strip made to the Crown, Johnson's acceptance of the grant would not have violated the 1763 Royal Proclamation, because he accepted the Islands on behalf of the Crown and not himself. As the most senior British official in charge of Indian affairs, Johnson was in essence the Crown in the field and was mandated to treat with the Indians as no private citizen could. Johnson never expressed any intent or interest in obtaining the Niagara Islands for himself. In fact, he originally requested that the Islands be ceded "to his Majesty." *See* 3 *The Papers of Sir William Johnson, supra,* at 318–19; Joint Stip. at ¶ 52. It was the Senecas who decided to "bestow" the Islands as private property to Johnson.[36] In accepting the grant of the Islands, Johnson was acting in his capacity as the King's agent, not as an individual. In other words, the Islands were essentially deeded to the King through Johnson. In letters to the Earl of Halifax and the Lords of Trade following the treaty, Johnson explained that he ac-

**36.** As discussed *supra* at Section IV, Part E., Subpart 2 Johnson had communicated to the Senecas that he was about to send troops after them when they were late arriving for the treaty. The offer of the Islands to Johnson was obviously an attempt by the Senecas to appease him and get back into his good graces.

cepted the Senecas' offer of the Islands so as to not give "great offence" to them and that it was his intention in accepting the Islands to pass them on to the King. Based on these circumstances, Johnson's "offer" of the Islands to the King was *pro forma;* as the King's agent, he could only have accepted the Islands on the King's behalf.

It appears that the King and the British government fully accepted the terms and conditions of the 1764 treaties, including the proviso in Article 5 of the August 6th treaty regarding the Niagara Islands. There is no indication that the Crown ever attempted to modify, amend, rescind or withdraw from the treaties based on a perceived violation of the 1763 Royal Proclamation. Nor is there any indication that the Crown believed that Johnson actually violated the Royal Proclamation. For example, there is no evidence that Johnson was ever accused of, charged with or punished for violating the Proclamation based on his acceptance of the grant of the Niagara Islands. It is clear from the record that at the time of the 1764 treaties, Johnson was aware of the 1763 Proclamation and its prohibition against the acquisition of Indian land by individuals, without the Crown's consent. *See* 3 *The Papers of Sir William Johnson, supra,* at 376, 894–95. It seems doubtful that he would have intended to violate blatantly the Proclama-

tion by accepting the Niagara Islands in his private capacity as part of a treaty; a treaty he undoubtably knew would be reviewed by Crown officials. All these facts, when taken together, show that Johnson accepted the grant of the Niagara Islands on behalf of the Crown and not in his private capacity, and that the Crown recognized as much.[37]

Sir William Johnson died in 1774. His will made no mention of the Niagara Islands and contained no residuary clause. The will is further evidence that Johnson did not regard the Islands as his private property.[38]

The Court's conclusion that there was no violation of the 1763 Royal Proclamation by Sir William Johnson and that Seneca title to the Niagara Islands was extinguished as a result of the August 6, 1764 treaty has been presaged by Professor Laurence M. Hauptman, Ph.D., one of plaintiffs' experts, who in 1998, wrote the following:

> In both the April and August agreements of 1764, Johnson specifically served as the Crown's agent, not as an individual land speculator ... When Sir William Johnson died in 1774, his will never mentioned Grand Island or other Niagara River islands, proof that John-

---

**37.** Plaintiffs' argument appears to presume, without evidence, that the Crown would have issued some sort of formal, written "acceptance" of Johnson's "offer" of the Islands, if, in fact, the Crown had "accepted" it. However, the Crown may well have regarded Johnson's written explanation as sufficient evidence of Crown title and determined that no further action was necessary. After all, it is doubtful that the Crown would have allowed the Islands, which lie in the middle of the ceded tract, to remain with the Senecas.

**38.** If Sir William Johnson did, in fact, hold any title to the Niagara Islands at the time of his death, such title probably would have

passed to his son and heir, Sir John Johnson. In 1779, the New York Legislature passed a bill of attainder forfeiting the lands of several loyalists, including those of Sir John, who eventually succeeded his father as the King's Indian Superintendent of the Northern Colonies. Attainder Act of Oct. 22, 1779, N.Y. Laws, 3rd Sess., ch. XXV, art. 1; *see also Robins Island Preservation Fund, Inc. v. Southold Dev. Corp.,* 959 F.2d 409, 416 (2d Cir. 1992). Although the Constitution at art. 1, § 9, cl. 3, bars bills of attainder, no such bar existed in 1779 prior to the Constitution's adoption in 1789. Thus, any interest Sir John may have had in the Islands was forfeited to the State of New York in 1779.

son had subsequently transferred these lands to the Crown and that Great Britain's monarch had title to these lands . . . .

See Hauptman, *supra*, 23 Okla. City Univ. L.Rev. at 154.

#### 4. *The Land Grants in the 1764 Treaties Were Not Revoked by the 1768 Treaty of Fort Stanwix*

Plaintiffs next argue that even if the 1764 treaties can be construed as an extinguishment of Seneca title to the lands granted therein; such grants were set aside by the 1768 Treaty of Fort Stanwix, which fixed a permanent line of property between the Six Nations and the colonies; a line drawn far to the east of Seneca territory. See Appendix I. Indian title to the east of the line was expressly extinguished by the Treaty. Plaintiffs point out that as a condition to the 1768 Treaty, the Senecas asked "that none of the Provinces or their people shall attempt to invade [Indian land] under color of any old Deeds ..." Although this condition was not expressly stated in the Treaty itself, plaintiffs contend that it was adopted and confirmed by the British. Thus, plaintiffs argue, the 1768 Treaty accomplished a revocation of all previous grants, including the grant made to the King under the 1764 treaties. The Court finds this argument unavailing.

The express language of the condition itself applies only to "the Provinces or their people." This phrase clearly refers to the colonies and the colonists. It does not refer to the King. Thus, even if plaintiffs' argument is taken as true and the 1768 treaty revoked all previous land grants west of the property line, such revocations applied only to the colonies and their citizens. There is nothing to indicate that the condition was to apply to the lands granted by the Six Nations to the King, such as those granted in the 1764 treaties.

Events following the 1768 Treaty demonstrate that this construction of the treaty condition is correct. At the time of the 1768 Treaty, the Crown held several posts west of the treaty line, such as Forts Oswego, Niagara, Detroit and Michilimackinac (located in present-day Michigan). If plaintiffs' interpretation of the 1768 Treaty condition were correct, the Crown would have been required to surrender all of those posts and any other territory held by the Crown west of the treaty line. This obviously was not intended and, in fact, did not happen. See 8 NYCD, *supra*, at 125; Defs. Ex. 75. The Crown maintained all of these posts following the Treaty and there was never any dispute raised by the Indians about this continued presence.

Moreover, the record shows that the Indians themselves believed that the 1764 cessions of land to the Crown remained in effect after the 1768 Treaty of Fort Stanwix. For example, in 1784, Mohawk Chief Joseph Brant, representing the Six Nations, including the Senecas, stated to the New York treaty commissioners at Fort Stanwix:

> Brothers! You have particularly expressed your wish to have lands at Niagara and Oswego, for the Accommodation of your ancient Settlement at those places. We have formally ceded some Lands to the Government of the late Colony of New York for the Use of the King. This already belongs to You by the Treaty with Great Britain . . . .

1 NYCIA, *supra*, at 61.

Then in 1787, Seneca leaders stated to the New York Indian Commissioners:

> Brothers! The United States have sent word to us, that they expect soon to get Possession of Oswego and Niagara, and that they will take no more Land around each than the King of England had, and

that they then would open the Trade to every Part of our Country.

Brothers! Whenever the United States take Possession of Oswego and Niagara, we request that the Troops may go up the Mohawk River and by the Lake, and not through our Country, as it may disturb our Wives and Children, and we request that no more lands round each may be taken Possession of than what the King of England had, which was four Miles square at Oswego, and at Niagara, from Johnson's Landing four Miles along the River till it reaches Lake Erie.

*Id.* at 111.

In 1790, Seneca leaders stated to President Washington:

The French came among us, and built Niagara; they became our fathers, and took care of us. Sir William Johnston [sic] came and took the fort from the French; he became our father, and promised to take care of us, and did so, until you were too strong for his king. To him we gave four miles round Niagara as a place of trade.

4 *American State Papers, supra,* at 141.

These statements show: (1) that the Senecas believed that the 1764 treaties were treaties of cession, whereby they ceded their lands in the Niagara region to the British Crown; and (2) that the cessions remained in effect following the 1768 Treaty of Fort Stanwix.[39]

### 5. *Great Britain's Title to the Niagara Islands Passed to New York upon the Revolution*

Having determined that as of 1764, Great Britain held fee simple absolute title

to the Niagara strip and the Niagara Islands, the Court further finds that such title passed to the State of New York upon the American Revolution. It is well established that lands to which the British Crown held title prior to Revolution passed to the individual states (not the United States) upon the Revolution. *See Massachusetts v. New York,* 271 U.S. at 85–86, 46 S.Ct. 357. *Shively,* 152 U.S. at 15, 14 S.Ct. 548; *Harcourt,* 25 U.S. (12 Wheat.) at 526. The Niagara strip and the Niagara Islands lie within the boundaries of New York. Thus, upon the Revolution, Great Britain's fee simple absolute title to those lands passed to New York.

Plaintiffs argue that New York cannot claim to have acquired fee simple absolute title from Great Britain because up until the Hartford Compact in 1786, there was still a dispute between New York and Massachusetts concerning their western boundaries. This argument is without merit. New York's cession of its claimed western lands, fixing New York's western boundary, was complete in 1782, and the Niagara Islands are well to the east of that boundary. The fact that Massachusetts' lingering dispute with New York concerning the boundary was not resolved (in New York's favor) until the 1786 Hartford Compact, does not detract from the conclusion that Britain's title passed to New York as a matter of law upon the Revolution (or certainly no later than 1782). *Cf. Oneida Indian Nation,* 860 F.2d at 1167.

### 6. *The Court's Conclusions are Consistent with Those of the ICC*

The Court's conclusions regarding the 1764 treaties are consistent with the findings of the ICC. The ICC found that the

---

**39.** These statements by the Indians are also significant because they make no mention of any exception to the 1764 cessions regarding the Niagara Islands. In fact, the record contains no evidence of an express Seneca claim of ownership of the Islands until 1802, following the 1794 Treaty of Canandaigua.

1764 treaties extinguished Seneca title to the entire Niagara strip, including the Niagara Islands. Specifically, the ICC found that "[t]he treaties of cession of 1764 to the prior sovereign Great Britain are conclusive as evidencing an intent of the Seneca to abandon and relinquish any actual exclusive use and occupancy of the Niagara River strip after 1764." 20 Ind. Cl. Comm. at 180.[40] Thus, the ICC concluded that "as of the date of American sovereignty, the Seneca Indians did not have a compensable interest in the lands within four miles of the Niagara River," including the Niagara Islands. *Id.* at 208.

### F. *The 1784 Treaty of Fort Stanwix*

Furthermore, even assuming *arguendo* that the Senecas held aboriginal title to the Niagara Islands and that the 1764 treaties of peace did not extinguish such title, such title was extinguished by the United States in the 1784 Treaty of Fort Stanwix. As a result, the State of New York, which then owned, at least, the right of preemption to those lands, obtained fee simple absolute title thereto.

### 1. *The 1784 Treaty of Fort Stanwix Extinguished Seneca Title to the Niagara Strip and the Niagara Islands*

As discussed *supra,* following the Revolutionary War, the United States undertook to make peace with those members of the Six Nations that had allied themselves with the British (*i.e.,* the Seneca, Cayuga, Onondaga and Mohawk Nations), and to reaffirm its peaceful relationship with the

Nations that had allied themselves with the United States (*i.e.,* the Oneida and the Tuscarora Nations). On October 22, 1784, at Fort Stanwix, the United States entered into a treaty of peace with the Six Nations which, *inter alia,* fixed the western boundary of the Six Nations. *See* Appendix J. As set out in Article 3 of the Treaty, the agreed western boundary line of the Six Nations' lands began "at the mouth of a creek about four miles east of Niagara, called Oyonwayea [present-day Four Mile Creek], or Johnston's Landing–Place, upon the lake named by the Indians Oswego, and by us Ontario." The line then proceeded "southerly in a direction always four miles east of the carrying-path, between Lake Erie and Ontario, to the mouth of the Tehoseroron, or Buffaloe [sic] Creek, on Lake Erie."[41] From there, the line ran south to the northern border of Pennsylvania. The Treaty provided that "the Six Nations shall and do yield to the United States all claims to the country west of said boundary, and then they shall be secured in the peaceful possession of the lands they [the Six Nations] inhabit east and north of the same." The entire Niagara strip and the Niagara Islands lie west of the Fort Stanwix boundary line.

The language in the 1784 Treaty providing that "the Six Nations shall and do yield to the United States all claims to the country west of said boundary" demonstrates a plain and unambiguous intent on the part of the United States to extinguish any aboriginal title to all lands lying west of the treaty line, including the Niagara strip and the Niagara Islands. This conclusion

---

**40.** Admittedly, the ICC did not use the term "extinguish" in its decision. Instead, it used the phrase "abandon and relinquish." As discussed *supra,* with regard to the law of Indian land tenure, the terms "extinguishment" and "abandonment" have different, distinct meanings. It seems clear, however, that when viewed in the context of the whole decision,

the ICC's use of the phrase "abandon and relinquish" was meant to connote "extinguishment," rather than "abandonment."

**41.** This boundary line is virtually identical to the line drawn by the 1764 treaties. *Compare* Appendix H *with* Appendix J.

is also supported by the language allowing the Six Nations to be "secured in the peaceful possession of the lands they inhabit east and north of the" treaty line. This language necessarily implies that the Six Nations, including the Seneca Nation, had relinquished their right to possess land to the west of the line. Thus, the Court concludes that, pursuant to the 1784 Treaty, the United States extinguished aboriginal title to all lands lying west of the Six Nations' western boundary line, which included the Niagara strip and the Niagara Islands.

The circumstances surrounding the formation of the 1784 Treaty further support this conclusion. As stated *supra*, in entering into treaty negotiations with the Indians, the Continental Congress intended: (1) to extinguish Six Nation claims to certain land in the Northwest Territory so that the such land could be used for payment of the United States' war debts; (2) to punish those Nations that fought against the United States; and (3) to forestall any new Indian war. *See* 25 *Jour. Continental Cong.* at 682–83, 686.

### 2. *As a Result of the 1784 Treaty, New York, Not the United States, Obtained Fee Simple Absolute Title to the Niagara Strip and the Niagara Islands*

It does not appear that plaintiffs dispute that the 1784 Treaty of Fort Stanwix, at least on its face, extinguished Seneca title to the Niagara strip and the Niagara Islands.[42] Where plaintiffs and defendants disagree is on the question of who obtained title to those lands once the Senecas' title

was extinguished. Plaintiffs argue that because the plain language of the Treaty provided that the Senecas yielded all claims to lands west of the treaty line "to the United States," the United States obtained title, or at least the right of possession, to the Niagara strip and the Niagara Islands as a result of the Treaty. Defendants, on the other hand, argue that once Seneca title to the Niagara strip and Niagara Islands was extinguished by the United States, the State of New York, as the holder of the right of preemption, obtained fee simple absolute title to those lands, as a matter of law.

The Court finds unpersuasive plaintiffs' argument that the plain language of the 1784 Treaty of Fort Stanwix constituted a "cession" by the Senecas of their land to the United States. The Treaty provided that the Six Nations "yield ... all claims" to the United States. Instead of a cession (as was done in the 1764 treaties of peace with Great Britain),[43] this language is in the form of a quit-claim, extinguishing Indian title to the subject land by the United States, but not purporting to address the disposition of that land after extinguishment. Had the United States intended the treaty to be a cession of land to the United States, it would have certainly used more explicit language connoting that intention. Because the Treaty was in the form of a quit-claim and did not purport to address the disposition of the land after extinguishment, the disposition of the land would have followed the law of Indian land tenure.

As noted, the right of preemption is the exclusive right to acquire Indian land once

---

**42.** Plaintiffs do argue that the 1784 Treaty of Fort Stanwix did not ultimately extinguish Seneca title because the Treaty was never executed by physical removal of the Senecas. As discussed *infra*, the Court finds that argument without merit.

**43.** Compare the language used in the 1784 Treaty, "yield ... all claims," to the language used in the 1764 treaties of cession, "grant," "cede ... in full Right," "surrender up all the lands," and "[the land will be] vested in the Crown."

aboriginal title has been extinguished. *Oneida Indian Nation,* 649 F.Supp. at 425. Once aboriginal title is extinguished by the sovereign, the holder of the preemption right obtains fee simple absolute title to the land. Prior to the American Revolution, Great Britain held the right of preemption to the Niagara strip and the Niagara Islands.[44] That right passed to the State of New York upon the Revolution. Thus, under the law of Indian land tenure, once the Senecas' purported aboriginal title to the Niagara strip and the Niagara Islands was extinguished by the 1784 Treaty of Fort Stanwix, New York obtained fee simple absolute title to those lands, as a matter of law.

In response to this analysis, the United States and the Plaintiff Tribes appear to raise different arguments. The United States contends that under the 1784 Treaty of Fort Stanwix, the Senecas transferred to the United States only their possessory interest in the subject lands (*i.e.,* their aboriginal title), and that New York continued to hold the right of preemption to those lands, subject to the United States' right of possession. The Plaintiff Tribes, on the other hand, argue that pursuant to the 1784 Treaty, the Senecas ceded their aboriginal title to the United States and the United States took New York's right of preemption, thereby obtaining fee simple absolute title to the ceded lands. The Court rejects both arguments.

### a. *The 1784 Treaty Did Not Pass the Senecas' Right of Possession to the United States*

The United States' argument-that under the 1784 Treaty the Senecas merely passed to the United States their exclusive right of possession, with New York still holding the right of preemption-fails for two reasons. First, this argument is inconsistent with the plain language of the Treaty and the circumstances surrounding its formation, which, as discussed,. show a plain and unambiguous intent on the part of the United States, as sovereign, to extinguish the Senecas' purported aboriginal title to the subject lands. Thus, contrary to the United States' argument, the Treaty did not merely pass the Senecas' right of possession to the United States; .it extinguished the Senecas' aboriginal title.

Second, the United States' argument is inconsistent with the law of Indian land tenure. Aboriginal title can either be retained by the tribe, abandoned by the tribe, or extinguished by the sovereign. The tribe does not have the power to pass its aboriginal title to another. *See Tee–Hit–Ton Indians,* 348 U.S. at 279, 75 S.Ct. 313 (citation omitted). It makes no sense to say that as a result of the Treaty, the Senecas passed to the United States their aboriginal title, with New York *still* holding the right of. preemption. The right.of preemption (*i.e.,* the exclusive right to acquire the land from the Indians once aboriginal title is extinguished), by definition, exists only when the *Indians* still hold the exclusive right of. possession. Once aboriginal title is extinguished, the right of preemption ripens automatically, by operation of law, into fee simple absolute title. *See Oneida Indian Nation,* 691 F.2d at 1075.

### b. *The 1784 Treaty Must Be Construed Consistently with the Articles of Confederation*

The Plaintiff Tribes argue that, pursuant to the 1784 Treaty of Fort Stanwix, the

---

**44.** This is assuming, of course, that Britain did not hold fee simple absolute title to these lands as a result of the 1764 treaties.

United States obtained any interest that the Senecas had to the Niagara Islands and took New York's right of preemption, thereby obtaining fee simple absolute title to the Islands for itself. This argument must also be rejected, as it is inconsistent with the Articles of Confederation.[45] Article IX(4) of the Articles provided that:

The United States in Congress assembled shall also have the sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians, not members of any of the States, *provided that the legislative right of any State within its own limits be not infringed or violated...*

(emphasis added). The above-italicized language has been referred to as the "legislative right proviso." As discussed *supra*, the proviso was advocated by the so-called "landed" states, such as New York, who wanted to prevent federal encroachment upon their respective territories and to curtail national power over Indian affairs. *See Oneida Indian Nation*, 860 F.2d at 1156–57. Its inclusion was a major victory for the landed states and, at least in part, formed the basis for the compromise that lead to ratification of the Articles. *Id.; see also* Jensen, *supra*, at 159. In reliance upon the proviso (and other concessions), the landed states, including New York, agreed to cede their western land claims. Jensen, *supra*, at 159, 225–28.

The purpose of the legislative right proviso " 'was to save to the States their right of preemption of lands from the Indians.' " *Oneida Indian Nation*, 860 F.2d at 1160 (*quoting 2 The Writings of James Madison* 91 (Hunt ed.1901)). Thus, although the United States had the exclusive power under Article IX(4) of the Articles of Confederation to manage Indian affairs, including the exclusive power to make treaties of war and peace with the Indians, that power was subject to the proviso that the United States, when exercising that power, could not infringe or violate a state's right of preemption to Indian land within its borders. *Id.* at 1154–61.

The Plaintiff Tribes contend that the 1784 Treaty of Fort Stanwix was a valid exercise of federal authority under the Articles of Confederation and did not violate the legislative right proviso, because in the special context of war and peace, the confederal government had the authority under the Articles to adjust Indian property rights, including taking title to Indian land for itself, even if that land was located within one of the thirteen original states.[46]

---

**45.** Although not expressly stated in its papers, the United States presumably proposes its construction of the 1784 Treaty (that under the Treaty, the United States obtained only the Senecas' right of possession of the Niagara Islands, with New York still holding the right of preemption thereto), rather than the construction proposed by the Plaintiff Tribes because the United States recognizes that the Plaintiff Tribes' interpretation of the Treaty would render it in violation of the Articles of Confederation, as discussed in more detail *infra*.

**46.** In support of their position, the Plaintiff Tribes point to the 1785 Treaty of Hopewell between the United States and the Cherokee Nation, which included terms of peace and recognized Cherokee lands within the claimed boundaries of North Carolina. The Treaty set out the boundaries of Cherokee lands, repudiating the Treaty of Dumplin Creek, an earlier State treaty by which the Cherokees had relinquished lands to North Carolina. The Plaintiff Tribes contend that the Treaty of Hopewell was never successfully challenged and shows that the United States had the power during the confederal period to adjust the boundaries of Indian land within the thirteen original states. The Treaty of Fort Stanwix, however, is distinguishable from the Treaty of Hopewell. In the Hopewell Treaty, the Continental Congress purported to adjust boundaries between the State of North Carolina and the Cherokees, for the benefit of the Cherokees, by repudiating the prior treaty between the State and the Indians. Here, however, the Plaintiff Tribes contend that pursu-

The Court agrees with the Plaintiff Tribes that the 1784 Treaty, a treaty of peace between the Six Nations and the United States, was a valid exercise of federal authority under the Articles of Confederation. *See Oneida Indian Nation,* 691 F.2d at 1088. As the Second Circuit held in *Oneida Indian Nation,* 860 F.2d at 1154, under Article IX(4) of the Articles the confederal government had the exclusive power to enter into peace treaties with the Indians. This power applied to Indian tribes located anywhere in the United States, including tribes located within the thirteen original states. The Court further agrees that in the special context of war and peace, the confederal government had the exclusive power, under Article IX(4), to extinguish aboriginal title to Indian land if such action was necessary to achieve its war and peace objectives, even if the Indian land was located within one of the thirteen original states. *See id.* at 1159 n. 9. The Court would also agree with the proposition that the confederal government had the power to extinguish aboriginal title and exact a cession of land for its own use with regard to Indian lands lying outside the boundaries of the thirteen original states. The Court disagrees, however, with the Plaintiff Tribes' proposition that under Article IX(4), the United States had the power to enter into a peace treaty with an Indian tribe, whereby the United States extinguished the tribe's aboriginal title to land lying within one of the thirteen original states and took that land for itself. If such a proposition were true, it would endow the confederal government with authority to override the legislative right proviso of Article IX(4) by treaty. In fact, the Plaintiff Tribes' proposed construction of the Treaty is a paradigmatic example of what the legislative right proviso was intended to prevent, that is, the taking of Indian land within a state by the United States by means of an Indian treaty.[47] As the Second Circuit stated in *Oneida Indian Nation,* "[i]t is highly doubtful that under the Articles of Confederation the reconciliation of national power and state prerogatives was subject to adjustment in favor of national power simply by the use of national treaties." *Id.* at 1164.

Because the Plaintiff Tribes' proposed construction of the Treaty would mean that the Treaty violated the Articles of Confederation, that construction must be rejected, unless there is no other reasonable constitutional construction. Treaties, like statutes, are entitled to a presumption of constitutionality. *See In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d at 1309. In other words, when construing a treaty or a statute, the Court must presume that the government did not intend to act outside its authority. Under this presumption, if there are two plausible constructions of an Indian treaty, one of which makes the treaty constitutional and the other of which renders it unconstitutional, the Court is required to adopt the constitutional construction, even if the unconstitutional construction would be more

ant to the Stanwix Treaty, the United States took Indian land lying within the boundaries of the State of New York for itself, not for the benefit of the Indians. As discussed *infra,* the Articles of Confederation clearly prohibited such action by the United States. Thus, the Treaty of Hopewell is inapposite to the situation present here.

**47.** If the Plaintiff Tribes' proposition were correct, it would mean that in the context of the 1784 Treaty (a peace treaty), the United States, had it decided to be less magnanimous toward the Indians, could have extinguished Indian title to all of the Six Nations' lands located in the State of New York, an area stretching roughly from about Albany to the Niagara River, and taken that land for itself. Such a treaty clearly would have violated the legislative right proviso of Article IX(4).

beneficial to the Indians. *See Oneida Indian Nation,* 860 F.2d at 1163–66. Here, the Plaintiff Tribes' proposed construction would mean that the 1784 Treaty overrode express prohibitions on federal power in the Articles of Confederation.[48] Such a construction must be rejected, even though it is more favorable to the Indians in this litigation. Not even the general rule that Indian treaties are to be construed in favor of the Indians requires the Court to adopt a construction of the Treaty that would render it unconstitutional. *Id.* In contrast, the construction of the Treaty proposed by the defendants-that the Treaty extinguished Seneca title to the subject lands, but did not purport to address the disposition of that land after extinguishment-is reasonable and wholly consistent with the legislative right proviso.

**c.** ***The Continental Congress Did Not Intend to Infringe or Violate New York's Preemption Rights or Preexisting Title by Entering into the 1784 Treaty.***

The construction of the 1784 Treaty proposed by the Plaintiff Tribes is also inconsistent with the expressed intention of the Continental Congress not to infringe or violate any state's preemption rights or preexisting title by entering into the Treaty: In adopting the committee report recommending that the United States enter into a peace treaty with the Six Nations, Congress specifically provided that the authorization for the treaty "shall not be construed to affect the territorial claims of any of the states, or their legislative rights within their respective limits." 25 *Jour.*

*Continental Cong.* at 693. Further, when Congress received the Treaty and ordered it published, it adopted language offered by Melancton Smith, a delegate from New York, declaring that "no purchases, which have been or hereafter may be made from the Indians, at any treaties held or to be held with them, of their right to soil within the limits of any state, can, ought, or shall be considered as interfering with the right of any such state to the jurisdiction or soil." 28 *Jour. Continental Cong.* at 426. These congressional resolutions show that is was Congress's intent that the 1784 Treaty be construed consistently with the legislative right proviso in Article IX(4). *See Oneida Indian Nation,* 860 F.2d at 1164–65.

The Plaintiff Tribes argue that because one of the express purposes behind the Treaty was for the United States to obtain a cession of land from the Indians so that it could use the land to pay its war debts, the United States could not have intended to establish title in those lands in the State of New York.

It is important to recognize that under the 1784 Treaty of Fort Stanwix, the United States extinguished Indian title to two distinct areas of land, the Northwest Territory and the Niagara strip, and that the legal ramifications of the extinguishment of Indian title in each of these areas were different. Congress instructed its treaty commissioners to obtain a cession of land from the Indians for the purpose of offsetting the United States' war debts. However, the land specified by Congress for such a cession was the land in the Northwest Territory, outside of New York's

---

**48.** If, in 1784, the State of New York already held fee simple absolute title to the Niagara strip and the Niagara Islands as a result of the 1764 treaties of peace (which the Court has found), any taking of that land by the United States, by treaty or otherwise, would have violated the Articles of Confederation.

More specifically, such a taking would have violated Article IX(2), which provided that: "no State shall be deprived of territory for the benefit of the United States." Article IX(2) was an express prohibition against the confederal government taking state land for its own purposes. *See* Jensen, *supra,* at 159.

western boundary. *See* 25 *Jour. Continental Cong.* at 686. The congressional resolution authorizing the Treaty made no mention of the Niagara strip or the Niagara Islands as lands to which the Indians would be required to relinquish title. It seems clear that Congress limited the proposed cession to lands lying outside the recognized boundaries of the thirteen original states because it did not want to violate the legislative right proviso of Article IX(4). In the same resolution authorizing the proposed cession, Congress stated that the treaty "shall not be construed to affect the territorial claims of any of the states, or their legislative rights within their respective limits." *Id.* at 693.

Although the Congress intended only to obtain the relinquishment of Indian claims to the Northwest Territory, the treaty commissioners at Fort Stanwix nonetheless also obtained the relinquishment of Indian claims to the Niagara strip and the Niagara Islands, which, of course, lie within the western boundary of New York as recognized by the Congress in 1782. The Court has not been provided with, nor has it located, any historical evidence as to why the commissioners went beyond their congressional directive.

Most probably, the treaty commissioners believed that Indian title to the Niagara strip had already been extinguished by the 1764 treaties of peace between the Senecas and Great Britain and were simply reconfirming that fact. The treaty line in the 1784 Treaty and the treaty line in the 1764 treaties were virtually identical. It is doubtful that this was a mere coincidence.

In any event, it appears that the decision to extinguish Seneca title to the Niagara strip and the Niagara Islands in the 1784 Treaty was made by the treaty commissioners, without a directive from Congress.[49] This conclusion is supported by the fact that after the conclusion of the Treaty, the commissioners sent a message to the President of the Congress, stating in part:

> We have the honor of transmitting to your Excellency, the articles of a treaty we concluded with the Six Nations, by which the cession of territory is fixed, so far as it depends upon these Nations. *We have also secured Niagara, the carrying place between lakes Erie and Ontario, together with Oswego, and a competent district around it, to the United States.*

Manley, *supra,* at 96 (emphasis added). The above-italicized language in the message shows that the commissioners were aware of the fact that in extinguishing Indian title to the Niagara strip, they went beyond Congress's directive.

The above-message also shows that the treaty commissioners may not have understood that the legal ramifications of the extinguishment of Indian title to the Niagara strip were different from those of the Northwest Territory. As a result of the landed states' cession of their western land claims, the United States owned both the right of extinguishment and the right of preemption to all Indian lands located outside the boundaries of the thirteen original states, including Indian lands in the Northwest Territory. Thus, once the United States extinguished Indian title to lands in the Northwest Territory pursuant to the 1784 Treaty, it obtained fee simple absolute title to those lands.[50] However, unlike

---

49. Congress subsequently ratified the treaty commissioners' actions by its apparent approval of the Treaty.

50. As it turned out, due to a geographical error, as discussed *supra* at Section IV, Part P, some of the land that the United States believed was located in the Northwest Territory and to which it believed it obtained title

the Northwest Territory, the United States did not own the right of preemption to Indian lands in the Niagara strip. That right belonged to New York.[51] Thus, once the United States extinguished Indian title to the Niagara strip pursuant to the 1784 Treaty, New York, as the holder of the preemption right, obtained fee simple absolute title to those lands. The treaty commissioners' statement that "[w]e have also secured Niagara ... *to the United States*" indicates that they may not have appreciated or realized this distinction.[52] (emphasis added).

The Plaintiff Tribes further argue that in light of the competition at Fort Stanwix between the United States and the State of New York to extinguish Seneca title, it is implausible that the United States, in entering into the 1784 Treaty, intended to extinguish Seneca title to the Niagara strip in favor of New York. Thus, the Plaintiff Tribes argue, "[d]efendants must contend that Seneca title to cession lands was extinguished and transferred to New York by accidental operation of law, in contravention of the parties' intentions." *See* Item No. 369 at 28. Again, the Court finds this argument unpersuasive.

The Plaintiff Tribes' assertion that full fee title to the Niagara strip and the Niagara Islands passed to New York "by accidental operation of law, in contravention of

the parties' intentions" is not supported by the record. Pursuant to the 1784 Treaty, the United States plainly and unambiguously intended to extinguish Seneca title west of the treaty line.[53] Also, the United States clearly intended that the 1784 Treaty not be construed so as to violate New York's right of preemption to any of the Indian lands located within its borders. Further, in 1784, Congress knew that the Niagara strip and the Niagara Islands were located within New York's borders, to the west of the treaty line, as it had recognized New York's western boundary in 1782. Under these facts and circumstances, it seems implausible that the United States did not understand that as a result of the Treaty, the State of New York would obtain fee simple absolute title to the Niagara strip and the Niagara Islands. In fact, the Continental Congress appears to have recognized just such a result when it resolved, after the Treaty, that "no purchases, which have been ... made from the Indians, at any treaties held ... with them, of their right to soil *within the limits of any state, can, ought, or shall be considered as interfering with the right of any such state to the jurisdiction or soil.*" 28 *Jour. Continental Cong.* at 426 (emphasis added).

Moreover, even if the parties to the 1784 Treaty (the United States and the Six

---

pursuant to the Stanwix Treaty was actually located in the State of New York. This error was corrected at the 1794 Treaty of Canandaigua.

**51.** Again, this assumes that New York did not already hold fee simple absolute title as a result of the 1764 treaties.

**52.** This appears to have been a common misconception around that time. For example, following the 1794 Treaty of Canandaigua, treaty commissioner Timothy Pickering wrote that he believed that as a result of the 1783 Treaty of Paris, the United States succeeded to Great Britain's title to the northern Niaga-

ra strip. *Pickering Papers, supra,* at 60:207–09; *Henry O'Reilly Papers, supra,* at 10:48. Similarly, in an 1801 letter regarding the Niagara strip, surveyor Joseph Ellicott wrote that the strip was "ceded by the Seneca Nation of Indians to the King of Great Britain, and by him relinquished by Treaty to the United States." 26 *Publications of the Buffalo Historical Society, supra,* at 140.

**53.** As discussed in more detail *infra,* it is also clear from the record that the Senecas understood that their title to those lands was extinguished by the Treaty.

Nations) did not intend for New York to obtain fee simple absolute title to the Niagara strip and the Niagara Islands, such a result, for the reasons discussed, is legally mandated by the plain language of the Treaty, the Articles of Confederation and the law of Indian land tenure. The Court cannot rewrite the Treaty "to achieve the asserted understanding of the parties." *Choctaw Nation of Indians*, 318 U.S. at 432, 63 S.Ct. 672 (citations omitted). This is especially so when the parties' proposed understanding of the treaty would render it unconstitutional.

### 3. *Removal of the Senecas Was Not Required in Order to Effect an Extinguishment of Aboriginal Title under the 1784 Treaty of Fort Stanwix*

Plaintiffs argue that the 1784 Treaty of Fort Stanwix did not effect an extinguishment of Seneca title because the Treaty was never executed. According to plaintiffs, the Senecas did not acquiesce to the 1784 Treaty and remained in possession of their lands. Plaintiffs contend that a treaty extinguishing aboriginal title does not become effective unless and until the Indians are actually physically removed from the land. The Court finds this argument without merit.

"Indian treaties are virtually always self-executing in nature." *Tsosie v. United States*, 11 Cl.Ct. 62, 73 (1986), *aff'd*, 825 F.2d 393 (Fed.Cir.1987). A self-executing treaty is one that operates of its own force, without the need for any implementing legislation. *Cheung v. United States*, 213 F.3d 82, 94 (2d Cir.2000).

The 1784 Treaty of Fort Stanwix appears to follow the general rule that Indian treaties are self-executing. There is nothing on the face of the Treaty that required the Continental Congress to pass any implementing legislation in order for it to become effective. The Treaty simply extinguished Seneca title to lands west of the treaty line. There is nothing in the Treaty that required the Senecas to remove themselves from that land or that required the national government to remove them. As the Second Circuit stated in *Oneida Indian Nation*, 860 F.2d at 1154, "the Treaty of Fort Stanwix ... became effective when it was signed."

In support of their position that Indian title is not extinguished unless and until the Indians are physically removed from the land, plaintiffs cite three Supreme Court cases: *Fellows v. Blacksmith*, 60 U.S. (19 How.) 366, 15 L.Ed. 684 (1856); *New York v. Dibble*, 62 U.S. (21 How.) 366, 16 L.Ed. 149 (1858); and *The New York Indians*, 72 U.S. (5 Wall.) 761, 18 L.Ed. 708 (1866). These cases all involved two particular federal treaties: one with the New York Indians in 1838, *see* Buffalo Creek Treaty of 1838, Jan. 15, 1838, 7 Stat. 551, and the other with the Seneca Nation in 1842. *See* Buffalo Creek Treaty of 1842, May 20, 1842, 7 Stat. 550. Under the Treaty of 1838, the New York Indians including the Seneca Nation, agreed to remove themselves from New York to lands west of the Mississippi River set aside for them by the federal government. The 1838 Treaty included a cession and deed of conveyance pertaining to four Seneca reservations, Allegany, Cattaraugus, Buffalo Creek and Tonawanda. Under the Treaty, the United States agreed to appropriate money to aid the Indians in their removal and to support them during the first year after their removal. The Indians agreed to remove from New York to their new homes within five years. The 1838 Treaty was proclaimed on April 4, 1840. Before the expiration of the five years, however, difficulties arose between the grantees of the Seneca land in New York and the Senecas, which resulted in a

new treaty on May 20, 1842, between the United States and the Seneca Nation, where it was agreed that the deed embracing the Allegany and Cattaraugus reservations should be canceled and that the Indians should remain in possession of those two reservations with all their original rights. Neither the 1838 Treaty nor the 1842 Treaty made any provisions as to the mode and means in which the removal of the Indians was to take place.[54]

Without going into the specific facts of each case, the Supreme Court basically held in these three cases that the Indians' title to the land covered by the treaties was not extinguished until the Indians were removed by the United States. These cases, however, do not stand for a general rule that Indian title is *never* extinguished unless the Indians are removed. The treaties at issue in these cases were so-called "removal treaties," specifically requiring removal of the Indians from the land. *See* Cohen, *supra,* at 78–92. By their express terms, they were not self-executing in nature. Rather, they required implementing legislation by Congress in order to become effective. The treaties expressly stated that the Indians had five years to remove themselves from the land, but made no provision for how such removal was to take place.

The circumstances present here are distinguishable. The 1784 Treaty of Fort Stanwix was self-executing on its face. There was no requirement in the Treaty that the Indians remove themselves from the land or that Congress enact any implementing legislation in order for the Treaty to become effective. The Indians simply relinquished their claims to all lands west of the treaty line. Thus, the Treaty became effective when signed and immediately extinguished whatever title to the subject lands the Senecas may have had.

Furthermore, even if physical removal were required, the lands at issue in this case are the Niagara Islands and there is no evidence in the record that in 1784, the Senecas were actually physically present on the Islands. Thus, even if there were a requirement that the United States physically remove the Senecas from the Islands before their title to the Islands was extinguished, that requirement would have been automatically met as there were no Senecas actually present on the Islands for the United States to remove.

Plaintiffs' assertion that the Senecas never acquiesced to the 1784 Treaty is also contradicted by the historical record. The Senecas repeatedly acknowledged that they were bound by the 1784 Treaty and that their title to lands lying west of the treaty line had been extinguished. For example, in 1789, the Senecas signed the Treaty of Fort Harmer, where they agreed, for a second time, this time in exchange for compensation, to relinquish their title to lands lying west of the Fort Stanwix treaty line. In 1790–91, the Senecas complained to President Washington about what they perceived to be the unfairness of the Stanwix Treaty. On December 1, 1790, Seneca Chiefs Cornplan-

---

**54.** The Court notes that the split between the Tonawanda Band and the remainder of the Seneca Nation occurred as a result of the 1838 and 1842 treaties. As stated, as part of these treaties, the Seneca Nation agreed to cede and convey the Tonawanda Reservation. However, the chiefs of the Tonawanda Band had apparently signed neither treaty, and the Seneca Indians residing on the Tonawanda Reservation refused to leave their land. *See Poodry v. Tonawanda Band of Seneca Indians,* 85 F.3d 874, 877 n. 1 (2d Cir.1996) (citation omitted), *cert. denied,* 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996). The Tonawanda Band secured federal recognition as a distinct and independent Indian nation in 1857.

ter, Half–Town and Great–Tree stated to President Washington:

> [At Fort Stanwix] our chiefs felt your power, and were unable to contend against you, and they therefore gave up that country. What they agreed to, *has bound our nation,* but your anger against us must, by this time, be cooled; . . . we ask you to consider calmly, Were the terms dictated to us by your commissioners reasonable and just?

\*   \*   \*   \*   \*   \*

> The French came among us, and built Niagara; they became our fathers, and took care of us. Sir William Johnston [sic] came and took the fort from the French; he became our father, and promised to take care of us, and did so, until you were too strong for his king. To him we gave four miles round Niagara as a place of trade. We have already said, how we came to join against you; we saw that we were wrong; we wished for peace; *you demanded a great country to be given up to you; it was surrendered to you, as the price of peace,* and we ought to have peace and possession of the little land which you then left us.

4 *American State Papers, supra,* at 141–42 (emphasis added).

On January 10, 1791, the Senecas again voiced their complaints about the Stanwix Treaty to President Washington:

> You say that you have spoken plainly on the great point. That you will protect us in the land secured to us at fort Stanwix . . . This is very good. But our nation complain [sic] that you compelled us at that treaty to give up too much of our lands. *We confess that our nation is bound by what was done there;* and acknowledging your power, we have now appealed to yourselves against that treaty, as made while you were too angry at us, and, therefore, unreasonable and un-

just. To this you have not given us an answer.

> Father: That treaty was not made with a single State, it was with the thirteen States. We never would have *given* all that land to one State. We know it was before you had the great authority, and as you have more wisdom than the commissioners who forced us into that treaty, we expect that you have also more regard to justice, and will now, at our request, consider that treaty, and *restore* us part of that land.

\*   \*,   \* ,   \*   \*   \*

> Father: We see that you ought to have the path at the carrying place from lake Erie to Niagara, as it was marked down at fort Stanwix, and *we are all willing it should remain to be yours* . . . Our nation will rejoice to see an open path for you and your children . . . [b]ut let us also pass along the same way, and continue to take fish of those waters in common with you.

*Id.* at 143 (emphasis added). These statements by the Senecas show that, although they were dissatisfied with the 1784 Treaty and wanted the United States to reconsider it, they accepted the fact that they were bound by the Treaty and that their title to lands lying west of the treaty line, including the Niagara strip, was extinguished by the Treaty.

Plaintiffs contend that as part of President Washington's response to the Senecas' complaints, he guaranteed that the Senecas still living on land west of the treaty line could remain there. Specifically, plaintiffs point to President Washington's statement that "[those Senecas still living west of the treaty line] . . . have not been disturbed in their possession, and I should hope, while . . . they continue to demean themselves peaceably, and to manifest their friendly dispositions to the people of the United States, that they will be

suffered to remain where they are." *Id.* at 144. The Court disagrees with plaintiffs' contention that this statement was some sort of guarantee that the Senecas could retain possession of their land. As discussed *supra*, the Senecas to whom President Washington was referring were those that discovered after the survey of New York's western boundary in 1790, that they were actually living within the boundaries of New York rather than Pennsylvania. These Senecas had been guaranteed certain reservations by Pennsylvania when Pennsylvania purchased their land after the 1784 Treaty of Fort Stanwix. Washington merely "hope[d]" that these Senecas would be "suffered" by New York to remain where there were. He was not making any type of guarantee that they could remain there.

### 4. *The Constitution's Supremacy Clause Does Not Affect the Proper Construction of the 1784 Treaty of Fort Stanwix*

Plaintiffs next argue that even if the taking of Indian land within the boundaries of one of the thirteen original states by the confederal government would have violated the Articles of Confederation, such a violation would have been retroactively cured by the Supremacy Clause in Article VI of the Constitution.[55] The Court finds this argument without merit.

Treaties made under the Articles of Confederation, such as the 1784 Treaty of Fort Stanwix, "became 'the supreme Law of the Land' by virtue of Article VI of the Constitution." *Oneida Indian Nation,* 860 F.2d at 1155. As stated in *Worcester,* 31 U.S. (6 Pet.) at 559, "[t]he constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations . . . . ."

The issue in this case is not whether the 1784 Treaty was *valid.* At issue here are the *meaning* and legal *consequences* of the Treaty. In determining the Treaty's meaning, the Court must view it through the lens of the Articles of Confederation, the authority under which the confederal government was acting at that time. For example, in *Oneida Indian Nation,* although the Second Circuit acknowledged that Indian treaties made during the confederal period became "the supreme Law of the Land" by virtue of the Supremacy Clause, 860 F.2d at 1155, it interpreted the 1784 Treaty of Fort Stanwix (the same Treaty at issue here) through the lens of the Articles of Confederation and determined that under the Articles, New York had the power to purchase Indian lands without federal approval. This Court must likewise construe the Stanwix Treaty in accordance with the Articles of Confederation.

What plaintiffs are really arguing here is that the Supremacy Clause somehow makes the entire Constitution apply retroactively to actions taken or treaties made by the confederal government under the Articles of Confederation. In other words, they are basically arguing that even if the confederal government could not have lawfully taken Indian land located within a state under the Articles of Confederation, it could have done so under the Constitution, and that the Supremacy Clause would retroactively cure the illegal taking by re-

---

**55.** The Supremacy Clause provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

quiring application of the Constitution, rather than the Articles of Confederation. There is simply no support for this argument in the law.

The Supremacy Clause was intended to ensure the supremacy of federal law, especially confederal treaties, over state law. *See* Louis Henkin, *Foreign Affairs and the Constitution* 156 (2d ed.1996); *see also Confederated Tribes of Colville Indian Reservation v. Washington,* 591 F.2d 89, 91 (9th Cir.1979) (citations omitted). The Supremacy Clause has nothing to do with retroactively validating acts or treaties by the confederal government that violated the Articles of Confederation.

The only case plaintiffs cite in support of their position is *Ware v. Hylton,* 3 U.S. (3 Dall.) 199, 1 L.Ed. 568 (1796). In *Ware,* a creditor from Great Britain sued debtors in Virginia who had made payments on their debt into an office established for the collection of such payments under a 1777 Virginia sequestration statute. Under the Virginia statute, the money was then put into the State treasury and held there. The plaintiff-creditor sought to collect from the debtors the full amount of the debt, relying in part on Article IV of the 1783 Treaty of Paris, which provided that "Creditors on either Side shall meet with no lawful Impediment to the Recovery of the full Value, in Sterling Money of all bona fide Debts heretofore contracted." Thus, *Ware* presented the issue of whether a confederal treaty (the 1783 Treaty of Paris) took precedence over a conflicting state law.

In determining the effect of the Supremacy Clause, Chief Justice Chase, writing for the Court, held that:

Four things are apparent on a view of this 6th article of the national constitution. 1st. That it [the Supremacy Clause] is retrospective, and is to be considered in the same light as if the constitution had been established before the making of the treaty of 1783.2d. That the constitution or laws of any of the states, so far as either of them shall be found contrary to that treaty, are, by force of the said article, prostrated before the treaty.3d. That, consequently, the treaty of 1783 has superior power to the legislature of any state, because no legislature of any state has any kind of power over the constitution, which was its creator. 4th. That it is the declared duty of the state judges to determine any constitution or laws of any state, contrary to that treaty (or any other), made under the authority of the United States, null and void. National or federal judges are bound by duty and oath to the same conduct.

*Id.* 3 U.S. (3 Dall.) at 237. Thus, in *Ware,* the Court held that the Supremacy Clause operated retroactively to make the confederal Treaty of Paris supreme over the competing and thus constitutionally inferior state law. This result should have come as no surprise as that is exactly what the Supremacy Clause was intended to do. *Ware* does not stand for the proposition that the Supremacy Clause would somehow retroactively validate a confederal treaty that violated the Articles of Confederation.[56]

### G. *The 1794 Treaty of Canandaigua*

Plaintiffs next argue that even if it is assumed *arguendo* that the New York

---

**56.** In fact, the defendant-debtors in *Ware* did argue that the Continental Congress lacked the authority under the Articles of Confederation to enter into Article IV of the Treaty of Paris, if such Article were construed to override state law. Chief Justice Chase, however, held that Congress did have such authority under the Articles. *Id.* 3 U.S. (3 Dall.) at 237 Thus. *Ware* expressly did not involve a situation where the Congress acted outside its power under the Articles of Confederation.

State obtained fee simple absolute title to the Niagara Islands as a result of either the 1764 treaties of peace or the 1784 Treaty of Fort Stanwix, the 1794 Treaty of Canandaigua between the United States and the Six Nations divested New York of such title and bestowed upon the Seneca Nation recognized title to the Islands. The Court finds this argument without merit for two reasons. First, the Treaty of Canandaigua cannot be interpreted, as a matter of law, to have included the Niagara Islands as land to which the United States was purportedly recognizing title in the Seneca Nation because the Treaty does not show beyond reasonable question Congress's intent to divest New York of its title to the Islands. Second, even if the Treaty could be interpreted to have included the Islands in the land to which the United States was purportedly recognizing Seneca title. New York was not divested of its title to the Islands because just compensation was never paid by the United States to New York as required under the Fifth Amendment of the Constitution.

### 1. *The 1794 Treaty of Canandaigua Cannot be Interpreted to Have Included the Niagara Islands*

In Article III of the 1794 Treaty of Canandaigua, the United States purported to give back to the Senecas the southern Niagara strip, to which the Senecas had relinquished all claims in the 1784 Treaty of Fort Stanwix. Like the Treaty of Fort Stanwix, the western boundary line of Seneca territory described in Article III of the Treaty of Canandaigua started at Lake Ontario, about four miles east of the mouth of the Niagara River and then ran south along present-day Four Mile Creek, all the

way to the Niagara River just above Fort Schlosser. However, unlike the Stanwix line, the Canandaigua line then ran "*along the river Niagara* to Lake Erie" (emphasis added), and continued along Lake Erie to the northeast corner of Pennsylvania, thus returning the southern Niagara strip to the Senecas. Plaintiffs claim that the return of the southern Niagara strip to the Senecas also included the return of the Niagara Islands. *Compare* Appendix L *with* Appendix M.

Although there is no express mention of the Niagara Islands in the Treaty of Canandaigua, plaintiffs contend that in 1794, the boundary call "along the river Niagara" would have been understood by the parties to the Treaty to have included the Islands within the western boundary of the land belonging to the Seneca Nation. According to plaintiffs, in the 1790's, since American common law was not yet well developed, American courts generally followed the English common law. In particular, early American notions of riparian rights in the boundary calls in deeds and grants were influenced by English common law. According to plaintiffs, under the English common law the owner of the bank of a "non-navigable" river owned to the middle of the river, including any islands in the river. A "non-navigable" river was defined as a river not affected by tides. Thus, under this rule, the owner of land adjacent to a nontidal river owned all islands to the middle of the river, unless of course the islands were excepted from the deed. Plaintiffs contend that the Niagara River, which is a fresh water river unaffected by tides, would have been considered under the English common law to have been a "non-navigable" river.[57] Thus,

---

**57.** The Niagara River is obviously navigable in fact. However, according to plaintiffs, under the English common law, it would still have been considered "non-navigable" be-

cause it is not affected by tides. American courts eventually rejected the English common law definition of non-navigable, and adopted instead a navigable-in-fact standard.

plaintiffs argue, in 1794, a grant or deed conveying an interest in land adjacent to the Niagara River would have conveyed an interest to the middle of the River, including any islands between the bank and the middle of the river.

According to plaintiffs, under the English common law, the middle of the Niagara River would have been considered to be the middle of the main channel, which passes to the west of Grand Island. All the Niagara Islands, except Navy Island, lie between the east bank and the middle of the River. Thus, plaintiffs conclude, the boundary call "along the river Niagara" in the Treaty of Canandaigua should be construed as including all the Niagara Islands (except Navy Island, which belongs to Canada) within the western boundary of the Seneca Nation.[58]

Plaintiffs argue that under the rule of generous construction of Indian treaties, *see Oneida County,* 470 U.S. at 247, 105 S.Ct. 1245; *Choctaw Nation,* 318 U.S. at 431–32, 63 S.Ct. 672, the Court is required, as a matter of law, to accept their proposed construction of the "along the river Niagara" boundary call. The Court disagrees.

The rule of generous construction of Indian treaties does not apply where the proposed construction of the treaty would

divest a state of land that it has acquired. *See Oneida Indian Nation,* 860 F.2d at 1163–64. On the contrary, the Supreme Court has cautioned that such a construction is not warranted "unless the purpose [to divest the state of its land] be shown in the treaty with such certainty as to put it beyond reasonable question." *United States v. Minnesota,* 270 U.S. at 209, 46 S.Ct. 298 (Court rejected United States' argument that it divested Minnesota of its lands via an Indian treaty); *see also Oneida Indian Nation,* 860 F.2d at 1163–64 (court rejected Indian plaintiffs' construction of the Treaty of Fort Stanwix which would have divested New York of land it had acquired).

Thus, under *United States v. Minnesota* and *Oneida Indian Nation,* a party (be it the United States or an Indian tribe) proposing a construction of an Indian treaty that would result in a state being divested of its land cannot rely on the rule of generous construction, but must instead show, "beyond reasonable question," based on the language in the treaty itself, that it was Congress's intent to take the state's land.[59] In other words, in such a situation, the rule of generous construction is trumped by the "beyond reasonable question" requirement.

*See Massachusetts v. New York,* 271 U.S. at 89, 46 S.Ct. 357; *United States v. Holt State Bank,* 270 U.S. 49, 56, 46 S.Ct. 197, 70 L.Ed. 465 (1926); *The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 457, 13 L.Ed. 1058 (1851); *Kingman v. Sparrow,* 12 Barb. 201, 1851 WL 5370 (1851) (noting that the common law rule did not apply to lands bordered by the Niagara River).

**58.** Plaintiffs have dropped any claim of recognized title to the Niagara Islands lying down river from Fort Schlosser (*i.e.,* within the northern Niagara strip), such as Goat Island.

**59.** This assumes in the first place, of course, that the United States, under its treaty-making powers, has the power to take state land pursuant to an Indian treaty. In *United States v. Minnesota,* the Supreme Court expressly declined to decide whether the United States has such power. This Court has not located any other case addressing this issue. As noted *supra* at Section IV, Part R, in 1793, President Washington's Cabinet opined that the United States lacked such power. For purposes of this case, the Court need not decide this issue and thus, as the Supreme Court did in *United States v. Minnesota,* shall assume, without deciding, that the United States' treaty-making power includes the power to take state land pursuant to an Indian treaty.

Neither *United States v. Minnesota* nor *Oneida Indian Nation* provides any explanation or reasoning behind the "beyond reasonable question" requirement. Nor has the Court found any other cases explaining or applying the requirement.[60] Presumably, the requirement is, at least in part, an express notice requirement, so that the state, which generally is not a party to a federal Indian treaty, is put on notice that its land is being taken as a result of the treaty.

Here, plaintiffs' proposed construction of the "along the river Niagara" boundary call in the Treaty of Canandaigua would result in the State of New York being divested of its fee simple absolute title to the Niagara Islands. Accordingly, under *United States v. Minnesota* and *Oneida Indian Nation,* the rule of generous construction does not apply and instead, the burden is on plaintiffs to show "beyond reasonable question," based on the language in the Treaty itself, that it was Congress's intent to take New York's title to the Islands. Plaintiffs have failed to make such a showing.

The language used in the 1794 Treaty of Canandaigua did not provide New York with express notice that the United States intended to take its title to the Niagara Islands. The Treaty makes no mention of the Niagara Islands, nor does it mention the State of New York or its interest in the Islands.[61]

Although the term "along the river Niagara" can reasonably be construed to mean "along the middle of the river" as plaintiffs propose, it is equally susceptible to a different reasonable construction. Common meanings for the word "along" include "beside," "parallel to the length or direction of," and "from one end to the other of." *See Webster's Encyclopedic Unabridged Dictionary of the English Language* 59 (2001). Thus, the phrase "along the river" can also reasonably be construed to mean "along the river's edge" or "along the river's bank." Such a construction would mean that the Niagara Islands were not included as Seneca land under the Treaty. *Compare* Appendix L *with* Appendix M. The Court need not decide which construction-"along the middle of the river" or "along the river's

---

**60.** In fact, the Court has not found any other cases where the United States has purported to take state land and given it to an Indian tribe pursuant to an Indian treaty. Plaintiffs contend that the case of *Lessee of Lattimer v. Poteet,* 39 U.S. (14 Pet.) 4, 10 L.Ed. 328 (1840) is such a case. The central question in that case, however, was whether the parties to the Treaty of Tellico, a federal Indian treaty, could "vary in any degree the treaty line of [the Treaty of] Holston [a previous federal Indian treaty]; so as to affect private rights, or the rights of North Carolina." *Id.* 39 U.S. (14 Pet.) at 13. The Supreme Court answered this question as follows: "The answer to this is, that the Tellico treaty does not purport to alter the boundary of the Holston treaty, but by the acts of the parties, this boundary is recognised [sic]. Not that a new boundary was substituted, but that the old one was substantially designated." *Id.* Thus, the *Poteet* case was not a case where the United States purported to take land belonging to a

state and give it to an Indian tribe pursuant to an Indian treaty. It merely confirmed an already established boundary line. Here, in contrast, plaintiffs claim that the Treaty of Canandaigua should be interpreted as having drawn a new boundary line that would have divested the State of New York of its land.

**61.** Plaintiffs contend that the Treaty does not mention New York or New York's interest in the Niagara Islands because, at that time, no one, including New York, recognized that New York held such an interest. However, even if this is true (the Court makes no finding on this point), it does not change the fact that New York held fee simple absolute title to the Islands at the time of the Treaty, as matter of law. Thus, New York could only be divested of its title if the intent to do so was shown in the Treaty "with such certainty as to put it beyond reasonable question."

bank"-is correct. Because "along the river" is susceptible to two different reasonable constructions, one of which includes the Islands and the other of which does not, it simply does not put "beyond reasonable question" Congress's intent to divest New York of its title to the Islands pursuant to the Treaty. Thus, New York retained its title to the Islands following the Treaty as a matter of law.

Plaintiffs have offered extrinsic evidence, including the historical background of the 1794 Treaty, the negotiations leading to the Treaty, and events occurring after the Treaty, that they argue shows that it was the intent and understanding of the parties to the Treaty that the Niagara Islands were to be included within the lands conferred to the Senecas in the Treaty. Under *United States v. Minnesota* and *Oneida Indian Nation,* however, such extrinsic evidence is not relevant. Both those cases state that the intent to divest a state of its land must " 'be shown *in the treaty.'* " *See Oneida Indian Nation,* 860 F.2d at 1163–64 (*quoting United States v. Minnesota,* 270 U.S. at 209, 46 S.Ct. 298) (emphasis added). In other words, Congress's intention to take the state's land must be expressly stated in the language of the treaty; otherwise, the "beyond reasonable question" is not satisfied, regardless of any extrinsic evidence of intent. This obviously makes sense if the "beyond reasonable question" requirement is viewed as an express notice requirement.

The importance of the "beyond reasonable question" requirement as a notice requirement is exemplified by the instant case. Not long after the 1794 Treaty, the State of New York actually construed "along the river Niagara" to mean "along the river's bank." In a letter dated February 12, 1812, New York's Governor Tompkins wrote to the New York Assembly's Committee on Indian affairs regarding the Niagara Islands. In the letter, Governor Tompkins discussed a meeting he had with some of the leaders of the Seneca Nation. He states in the letter:

I took that opportunity of explaining to them the nature and slenderness of their title by shewing [sic] them that by Mr. Pickering's Treaty held at Canandaigua in November 1794, the lands which they reserved were specifically described by metes and bounds, which metes and bounds excluded the aforesaid Islands, and that as by that treaty they expressly released every pretention [sic] and claim to any lands without the boundaries of their Reservation, the said Islands did now in strictness belong to the State of New York.

Tompkins, *supra,* at 480–81; Joint Stip. at ¶ 106. This letter shows that Governor Tompkins construed the "along the river Niagara" boundary call to mean "along the river's bank" and believed that New York held fee simple absolute title to the Islands even after the Treaty of Canandaigua.

The fact that New York gave the 1794 Treaty a reasonable construction different from the one now offered by the plaintiffs demonstrates the need for the "beyond reasonable question" requirement. Had the Treaty put New York on express notice that the Islands were intended to be included in the land belonging to the Senecas under the Treaty, New York may have acted differently and this whole case may have been avoided. For example, New York may have tried to challenge or change the Treaty, or sought compensation from the United States. Or, knowing that the Islands clearly belonged to the Senecas following the 1794 Treaty, New York may have made an effort to seek federal approval of the 1815 conveyance.

In sum, the Court finds, as a matter of law, that the 1794 Treaty of Canandaigua

did not divest New York of its title to the Niagara Islands, because the language used in the Treaty does not show "beyond reasonable question" that it was the United States' intent to do so.

## 2. *New York Retained Its Title Because It Was Never Paid Just Compensation*

Even if it is assumed, *arguendo*, that the United States had the power to take the State of New York's title to the Niagara Islands pursuant to the 1794 Treaty of Canandaigua and that the language used in the Treaty put "beyond reasonable question" the United States' intent to exercise that power, New York still retained its title to the Islands after the Treaty because it was never paid compensation for such a taking pursuant to the Just Compensation Clause of the Fifth Amendment.[62]

As an incident of national sovereignty, the federal government enjoys the power of eminent domain to take private property for public purposes, without the property owner's consent. *Kohl v. United States*, 91 U.S. 367, 371, 23 L.Ed. 449 (1875). The United States' power of eminent domain also extends to the taking of state-owned property without the state's consent. *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 534–35, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941). In either case, the United States must pay just compensation to the property owner for the property it takes. U.S. Const. Amend. V; *see also Block v. North Dakota ex rel. Bd. of Univ. & School Lands*, 461 U.S. 273, 291, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983).

The Supreme Court has long held that the United States "may take property pursuant to its power of eminent domain in one of two ways: it can enter into physical possession of property without authority of a court order; or it can institute condemnation proceedings under various Acts of Congress providing authority for such takings." *United States v. Dow*, 357 U.S. 17, 21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958).

■ Pursuant to formal, or *de jure*, condemnation, the United States files an action in court. The final judgment of the court determines the compensation that is due to the land owner. In general, the "title and right to possession [of property] vests in the United States" when payment is made to the court. *Kirby Forest Indus. v. United States*, 467 U.S. 1, 4, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984).

■ In contrast, pursuant to inverse, or *de facto*, condemnation, the United States "appropriates" property without filing a condemnation action. Such *de facto* condemnations may occur in different ways. For example, the government may engage in regulatory actions that limit the use of property. *See, e.g., Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414–15, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The government may also acquire property summarily by actually or constructively entering into possession of the property. *See, e.g., Dow*, 357 U.S. at 21, 78 S.Ct. 1039 (appropriation of physical possession of land); *United States v. Causby*, 328 U.S. 256, 265, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (constructive occupation of land by overflights). A *de facto* condemnation "shifts to the landowner the burden to discover the encroachment and to take affirmative action to recover just compensation." *United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980).

---

**62.** The Just Compensation Clause provides as follows: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V.

534

The Supreme Court has long held that in either a *de jure* or a *de facto* condemnation, the property owner's title to the property being taken by the United States passes to the United States "only when the owner receives compensation." *Dow,* 357 U.S. at 21, 78 S.Ct. 1039 (citation omitted); *see also Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 340, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Stringer v. United States,* 471 F.2d 381, 384 (5th Cir. 1973), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973). As the Court explained in *Albert Hanson Lumber Co. v. United States,* 261 U.S. 581, 43 S.Ct. 442, 67 L.Ed. 809 (1923):

> The power of eminent domain is not dependent upon any specific grant; it is an attribute of sovereignty, limited and conditioned by the just compensation clause of the Fifth Amendment. The owner is protected by the rule that title does not pass until compensation has been ascertained and paid, nor a right to the possession until reasonable, certain and adequate provision is made for obtaining just compensation.

*Id.* at 587, 43 S.Ct. 442 (citations omitted).

Here, plaintiffs claim that even if the State of New York held fee simple absolute title to the Niagara Islands prior to the 1794 Treaty of Canandaigua, the United States took New York's title pursuant to the Treaty and bestowed recognized title to the Islands upon the Seneca Nation.[63] However, it is undisputed that the United States never paid New York any compensation for the Niagara Islands. Thus, even if the United States had the power and intended to take New York's title to the Niagara Islands pursuant to the Treaty of Canandaigua, New York retained title following the Treaty because it

was never paid compensation for the Islands.

Plaintiffs raise several arguments against this conclusion. They first argue that the Fifth Amendment does not guarantee a property owner whose property has been taken by a *de facto* condemnation the right to bring a just compensation claim whenever it chooses. Plaintiffs point out that the Supreme Court has held, in the context of takings claims, that "[a] constitutional claim can become time-barred just as any other claim can." *Block,* 461 U.S. at 292, 103 S.Ct. 1811 (citations omitted). Thus, plaintiffs argue, a takings claimant loses the ability to initiate suit against the United States for compensation once the claim is time-barred. The Court agrees with this argument, as far as it goes. The United States can certainly establish a statute of limitations for takings claims. However, plaintiffs have failed to show that there was any such statute of limitations in place during the period 1794 (the Treaty of Canandaigua) to 1815 (the purported conveyance of the Islands by the Senecas to New York). Thus, any claim by New York for just compensation from the United States for the taking of the Islands would not have been time-barred prior to 1815.

Even if there were some sort of statute of limitations in place prior to 1815, requiring New York to seek just compensation within a certain time period, the expiration of that statute of limitations would not have effectuated a transfer of title from New York to the United States. It simply would have meant that New York could no longer seek just compensation for the taking. The Supreme Court's decision in *Block* is instructive on this point. In *Block*

**63.** The taking of New York's title would have to have been in the nature of a *de facto* condemnation rather than a *de jure* condemnation as there were no formal condemnation proceedings initiated against New York State.

the State of North Dakota brought an action against several federal officials in order to quiet title to the bed of the Little Missouri River. North Dakota asserted that the River was "navigable" and therefore passed to the State under the equal footing doctrine. The federal government, on the other hand, asserted that the River was "non-navigable" and that title therefore remained with the United States. The Court held that North Dakota's claim could only be brought under the federal Quiet Title Act ("QTA") and that the suit was therefore subject to the 12–year statute of limitations in the QTA. North Dakota argued that even if Congress intended the statute of limitations and the QTA to apply to the states, and even if valid when applied in suits relating to other kinds of land, the statute of limitations was unconstitutional under the equal footing doctrine and Tenth Amendment insofar as it purported to bar claims to lands constitutionally vested in the State. The Court rejected this argument, stating:

> The State probably is correct in stating that Congress could not, without making provision for payment of compensation, pass a law depriving a State of land vested in it by the Constitution. Such a law would not run afoul of the equal footing doctrine or the Tenth Amendment, as asserted by North Dakota, but it would constitute a taking of the State's property without just compensation, in violation of the Fifth Amendment. [The QTA's statute of limitations], however, does not purport to strip any State, or anyone else for that matter, of any property rights. The statute limits the time in which a quiet title suit against the United States can be filed; but, unlike an adverse possession provision, [the QTA's statute of limitations] does not purport to effectuate a transfer of title. *If a claimant has title to a disputed tract of land, he retains*

*title even if his suit to quiet his title is deemed time-barred under [the QTA's statute of limitations]. A dismissal pursuant to [the QTA's statute of limitations] does not quiet title to the property in the United States.* The title dispute remains unresolved. Nothing prevents the claimant from continuing to assert his title, in hope of inducing the United States to file its own quiet title suit, in which the matter would finally be put to rest on the merits.

*Id.* at 291–92, 103 S.Ct. 1811 (footnotes omitted) (emphasis added). The Court further noted that "[w]hether, in the absence of a suit by it, the United States would ever acquire good title to the disputed area would, under the present status of the law, be strictly a matter of state law. In many instances, the United States would presumably eventually take the land by adverse possession, but, if so, it would be purely by the virtue of state law." *Id.* at 292 n. 28, 103 S.Ct. 1811 (citations omitted).

*Block* is analogous to the instant case. Here, the State of New York and the United States dispute whether the Treaty of Canandaigua resulted in an actual taking of New York's title to the Niagara Islands (as stated, this Court finds that there was no taking). Under *Block*, even if a suit by the State to either quiet title to or receive just compensation for the Islands were somehow time-barred prior to 1815, the dispute regarding title to the Islands would still have remained. In other words, the running of any statute of limitations would not have effectuated a transfer of title from New York to the United States.

Plaintiffs next argue that even if the Treaty of Canandaigua did not immediately effect a transfer of title of the Niagara Islands from New York to the United States, and then immediately to the Sene-

cas, the Senecas took title to the Islands before 1815 through adverse possession or prescription.[64] Pursuant to adverse possession, "the lapse of time ... not only bars the remedy, but it extinguishes the right, and vests a perfect title in the adverse holder." *Bicknell v. Comstock*, 113 U.S. 149, 151, 5 S.Ct. 399, 28 L.Ed. 962 (1885). Whether the Senecas (as the adverse holder) obtained title to the Islands through adverse possession is strictly a matter of state law. *See Block*, 461 U.S. at 292 n. 28, 103 S.Ct. 1811.

During the early 1800's, the elements of adverse possession under New York law were color of title, and open and notorious possession that was hostile to the interest of the land owner, for a period of years. *See Brandt v. Ogden*, 1 Johns. 156, 1806 WL 853 (N.Y.Sup.1806). Plaintiffs contend that the New York adverse possession period in the early 1800's was 20 years and that the Senecas satisfied this requirement, because they possessed the disputed lands from 1794 to 1815 (21 years). This contention is incorrect. Although the period of adverse possession against *private landowners* in the early 1800's was 20 years, the period of adverse possession against the *State* in the early

1800's was 40 years. *See* 1788 N.Y. Laws, ch. 43, at 683; *see also County of Oneida*, 470 U.S. at 258 n. 6, 105 S.Ct. 1245 (Stevens, J., dissenting). Even if the other elements of adverse possession can be met (upon which the Court passes no opinion), the Senecas did not obtain title to the Niagara Islands by adverse possession prior to 1815 because they did not possess the Islands for the requisite number of years.[65]

Alternatively, plaintiffs argue that the issue of vesting of title is not even present in this case, because under the Treaty of Canandaigua, the United States took from New York, if anything, only its right of possession. According to plaintiffs, after the Treaty, New York still retained its underlying fee title or right of preemption. Thus, plaintiffs argue, the issue of whether New York's *title* passed to the United States is not relevant.

This argument is likewise without merit because even if it were assumed that the United States only took New York's right of possession to the Islands under the 1794 Treaty, New York would still have been entitled to just compensation for such a taking and, until compensation was paid, New York would have retained its fee

---

**64.** In their papers, plaintiffs sometimes state that the United States obtained title to the Islands through adverse possession, and at other times, state that it was the Senecas who obtained title through adverse possession. It seems clear that plaintiffs must argue that it was the Senecas rather than the United States that obtained title, because it was the Senecas, not the United States, who were asserting the right of possession of the Niagara Islands under color of title (*i.e.*, the Treaty of Canandaigua) and who purportedly possessed the Islands during the adverse possession period.

**65.** Plaintiffs' state, in a footnote, that "[a]rguably, the United States-which does not stand in the same relation to the State as do its citizens-is not subject to the 40 year period. *See [DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 161–62, 103 S.Ct. 2281,

76 L.Ed.2d 476 (1983)] (rejecting state rule that interfered with national policies)." *See* Item No. 363 at 7 n.12. The Court rejects this contention for several reasons. First, although plaintiffs state that the United States "arguably" should not be subject to the 40–year period, they fail to set forth what that argument is. Second, it is the Senecas, not the United States, who claim to have obtained title by adverse possession. Finally, and perhaps most importantly, plaintiffs' contention is directly contrary to the Supreme Court's statement in Block that the United States can take title to state property through adverse possession, but that the determination of whether the requirements of adverse possession are satisfied is strictly a matter of state law. The *Block* Court mentioned no special exception to state law for the United States.

simple absolute title to the Islands. A compensable *de facto* condemnation or taking occurs "if a government has committed or authorized a permanent physical occupation of the property." *Southview Assocs. v. Bongartz*, 980 F.2d 84, 92–93 (2d Cir.1992), *cert. denied*, 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993). Under this standard, it is clear that if the United States took New York's right of possession of the Islands pursuant to the Treaty and gave that right to the Senecas, New York would have been entitled to compensation for that taking pursuant to the Just Compensation Clause.[66] Under *Dow* and *Albert Hanson Lumber*, until such compensation was paid, New York retained its fee simple absolute title to the Islands.

If plaintiffs' argument were correct, then the issue of title would never be present in a *de facto* condemnation case, because, by definition, a *de facto* condemnation involves a situation where the government has only taken the property owner's right to use or possess the property, and has not commenced formal condemnation proceedings to take the owner's title. This is simply not correct. In *Dow*, the Supreme Court held that in a *de facto* condemnation case, the property owner is protected by the rule that *title* does not pass until compensation has been paid. In other words, a property owner whose property has been taken via a *de facto* condemnation is protected because he or she can still seek compensation for or re-

turn of the property based on his or her title to the property. Further, the owner's title is still good against all others. Thus, the issue of *title* is always present in a *de facto* condemnation case, including this one.

## H. New York's 1815 "Purchase" of the Niagara Islands

As discussed *supra*, in order to establish a violation of the Nonintercourse Act, plaintiffs must show, *inter alia*, that the land at issue was tribal land at the time of the alleged violation. The alleged violation in this case is the purported conveyance of the Niagara Islands by the Seneca Nation to the State of New York in 1815, without federal approval. However, because the Senecas held neither aboriginal nor recognized title to the Niagara Islands in 1815, the Islands were not tribal land at the time of the alleged violation. Thus, plaintiffs cannot succeed on their Nonintercourse Act claim as matter of law.

Plaintiffs contend that such a result is "preposterous" in light of the parties' actions from 1794 to 1815. *See* Item No. 304 at 33–37. Plaintiffs point out that during this period, the Senecas consistently and repeatedly demonstrated their understanding that the Niagara Islands belonged to them. For example, the Senecas: (1) expressly reserved the Islands from New York's 1802 purchase of the southern Niagara strip; (2) abandoned their neutrality and went to war on behalf of the United

---

**66.** In fact, under plaintiffs theory-that under the 1794 Treaty, the United States took from New York only its right of possession, with New York retaining its underlying fee title or right of preemption-New York would have lost all its cognizable property rights in the Niagara Islands as a result of the Treaty. As the Court has found, prior to the Treaty of Canandaigua, New York held fee simple absolute title to the Niagara Islands. According to plaintiffs, after the Treaty, New York held only the right of preemption. Plaintiffs have

repeatedly argued in this case, and at least one district court has held, that the right of preemption does not constitute a property right. *See Cayuga Indian Nation of New York v. Cuomo*, 758 F.Supp. 107, 116 (N.D.N.Y. 1991). If that is correct, it would mean that New York went from holding fee simple absolute title to the Islands before the Treaty to having no property interest in the Islands whatsoever after the Treaty. This would certainly constitute a taking of New York's *title* in any sense of the word.

States in the War of 1812 to protect Grand Island, which they believed they owned, from British attack; (3) negotiated the sale of the Islands to New York; and (4) acknowledged the importance of the Islands to them by expressly reserving their right to fish and camp on or around the Niagara Islands in the 1815 conveyance. Plaintiffs assert that this historical evidence demonstrates that in 1815, the Senecas believed they owned the Niagara Islands as a result of the 1794 Treaty of Canandaigua.

It may be that the Senecas in fact *believed* they owned the Niagara Islands as a result of the 1794 Treaty of Canandaigua. However, the fact that the Senecas may have thought that they held title to the Islands as a result of the Treaty does not make it so. In light of the foregoing analysis, it is clear that New York held full fee title to the Niagara islands before the Treaty of Canandaigua and that the Treaty did not divest New York of that title. The Court "cannot, under any acceptable rule of interpretation, hold that the Indians owned the lands merely because they thought so." *Confederated Bands of Ute Indians*, 330 U.S. at 179, 67 S.Ct. 650.

Plaintiffs also contend that New York's actions following the Treaty of Canandaigua show that it too believed the Niagara Islands belonged to the Senecas after the Treaty. Plaintiffs argue that the State would not have entered into prolonged negotiations with the Senecas and authorized a major purchase of the Islands from the Senecas if it did not believe that the Senecas owned the Islands. Plaintiffs also point to the fact that the State delayed the survey and sale of the Islands until after purchasing them from the Indians as further evidence that the State believed that the Senecas owned the Islands in 1815.

Plaintiffs' contention that New York would not have purchased the Islands from the Senecas if it did not believe that the Senecas owned the Islands is belied by the record. In fact, the record shows that in 1815, New York believed that it already owned the Islands, but decided to "purchase" them from the Senecas anyway in order to avoid any conflict with them. New York first became intent on clarifying ownership of the Islands in about 1810. New York was concerned about the ambiguity of the United States–British Canada boundary under the 1783 Treaty of Paris, as it related to the Islands. New York anticipated a possible new war with Great Britain and recognized the strategic and economic importance of the Islands to both the State and the United States.

As a result of its negotiations with the Senecas over the 1802 purchase of the southern Niagara strip, New York was aware of the Senecas' claim of ownership of the Islands. Accordingly, in 1811 the State Legislature authorized the purchase of the Islands from the Senecas. In February 1812, however, negotiations for the purchase of the Islands were postponed due to the then precarious relations with Canada. On February 12, 1812, New York's Governor Daniel D. Tompkins wrote to the New York State Assembly's Committee on Indian Affairs that he had met with some of the Seneca leaders and explained to them that under the Treaty of Canandaigua, they had "expressly released every pretention [sic] and claim" to the Niagara Islands and that the Islands therefore "did ... in strictness belong to the State of New York." Tompkins, *supra*, at 480–81; Joint Stip. at ¶ 106. He nevertheless told them that the State would purchase the Islands from Senecas in order "to manifest its friendship and liberality towards them." Tompkins, *supra*, at 480–81; Joint Stip. at ¶ 106.[67]

---

**67.** As noted *supra* at n. 30, Governor Tompkins states later in the same letter that Grand

Following the War of 1812, New York once again sought to purchase the Niagara Islands from the Senecas. In 1815, Governor Tompkins wrote to the agent for the Senecas as follows:

Although it is questionable whether these Indians have any title to the lands; yet I am willing (with a view to avoid any collisions, and to perpetuate the good understanding which at present exists between them & the government) to pay Twelve thousand dollars for the relinquishment of their right to all the Islands—This sum is however to cover all the incidental expenses attending the purchase.

ICC Br. at 63; Defs. Ex. 39.

The above-letters from Governor Tompkins make clear that New York did not believe that the Senecas owned the Niagara Islands as a result of the Treaty of Canandaigua, but decided to purchase them anyway as a diplomatic gesture.[68]

When considering New York's intentions and motivations for "purchasing" the Islands from the Senecas in 1815, it is important to keep in mind the historical context in which the "purchase" took place. Only about 30 years earlier, New York and the Senecas were at war with each other during the American Revolution. During the War of 1812, western New York was one of the main battlegrounds between American and British forces, each assisted by Indian allies. Thus, in 1815, western New York was still a dangerous place, where disputes over land with the Indians were more likely to be resolved by either bloodshed or treaty, than in the peaceful

confines of a court of law. It is not surprising that in this context, New York opted to pay the Senecas to relinquish their claim to the Islands rather than risk the chance of a renewed conflict with them.

Nor is there any merit to plaintiffs' claim that New York delayed the survey and sale of the Niagara Islands because it believed the Senecas owned them. The record shows instead that the delay was caused by uncertainty regarding the location of the United States–Canada border. For example, even after the "purchase" of the Islands from the Senecas in 1815, the State did not immediately survey and sell the land on Grand Island, as the boundary commission created by the Treaty of Ghent had not yet determined whether the Islands fell within the territory of the United States or Canada. In a 1820 letter, the New York State Surveyor–General explained that: "Nothing will probably be done with Grand Island in the Niagara River till the boundary line between us and the British is settled which may not be done in some years from this." *See* Hauptman, *supra*, at 172 n. 68.

In 1822, the boundary commission finalized its report, determining that the boundary through the Niagara River generally followed the main channel of the River to the west of Grand Island. Thus, with the exception of Navy Island, all the Niagara Islands were determined to be within the boundaries of the United States. Only then, in 1824, did New York authorize the survey and sale of lots on Grand Island.

---

Island belonged to the Senecas. That statement is not necessarily inconsistent, however, with his other statements in the letter that New York owned the Island. Tompkins recognized that the Senecas claimed ownership and that the State would probably have to "purchase" the Island in order to quiet title.

**68.** In fact, the United States itself argued to the ICC that: "New York's agreement to purchase [the Niagara Islands] was not based on the concept that the Senecas owned the islands but based on diplomatic justification." ICC Br. at 61.

Finally, even assuming *arguendo* that plaintiffs are correct and New York did believe in 1815 that the Senecas owned the Niagara Islands as a result of the Treaty of Canandaigua, that would not make it so. Whether New York knew that it held fee simple absolute title to the Islands in 1815 is irrelevant. The fact remains that it did hold such title.

## I. The Interests of Justice Support the Court's Conclusion

The Court has found that the defendants in this case are not liable under the Nonintercourse Act and are therefore entitled to summary judgment.[69] Not only is this result required as a matter of law, it is the just result based on the facts and circumstances present here.

Unlike other Indian land claim cases in New York, this is not a case involving an Indian tribe's ancestral homelands. The Seneca Nation's ancestral homelands were located in the Genesee Valley, not in the Niagara region and certainly not on the Niagara Islands. The Senecas' contact with the Niagara Islands was minimal, if any at all. Although the Senecas hunted and fished in the Niagara region and set up temporary camps for such activities along the Niagara River, there is no archaeological evidence that the Senecas ever even actually set foot on the Niagara Islands.

The Senecas' minimal contact with the Islands might explain why they repeatedly relinquished *any claims* to them. In its brief before the ICC, the United States itself argued that the Senecas ceded any interest in the Niagara Islands on at least eight different occasions prior to New York's purported purchase of the Islands

in 1815. Simply put, the Senecas' claim of title to the Islands in 1815 is weak, at best.

It is true that in the late 1700's and early 1800's, New York was very aggressive in purchasing land from the Indians and sometimes ignored warnings from the federal government that it must, under the Nonintercourse Act, request the appointment of federal commissioners to supervise any land transaction with the Indians. *See County of Oneida*, 470 U.S. at 232, 105 S.Ct. 1245. Here, however, it appears that New York did not obtain federal approval of its purported purchase of the Niagara Islands in 1815 because it believed that it already owned the Islands, which in fact it did. Thus, any payments that New York made to the Senecas for the Islands were gratuitous and cannot be equated to the type of unconscionable consideration or fraud that the Nonintercourse Act is intended to protect against.

If there was a party who acted unfairly toward the Senecas, it was the United States, not New York, and certainly not the present-day non-State defendant-property owners, who are unquestionably innocent of any wrongdoing. The record shows that Timothy Pickering, the United States' negotiator at the Treaty of Canandaigua, was not operating in good faith when he purported to cede to the Senecas the southern Niagara strip in 1794. Based on Pickering's correspondence following the Treaty, as quoted extensively herein, it is clear that he knew that the land he had relinquished to the Senecas in the Treaty was land over which the United States had absolutely no claim. *See* Campisi & Starna, *supra*, 19 Am. Indian Quarterly at 485. In a December 1794 letter to Secretary of War Henry Knox, Pickering stated, "I knew that the U. States had no right to

---

69. The non-State defendants have also moved for the dismissal of the claims against them based on the so-called "impossibility doc-

trine." In light of the Court's finding of no liability, it need not address this issue.

any part of the Seneka Country but by virtue of the cession made by the States of New York and Massachusetts which Congress had accepted." Letter, Timothy Pickering to Secretary of War Henry Knox (Dec. 26, 1794). *Pickering Papers, supra* at 60:192–97. He later stated, "I felt myself embarrassed—not in making the relinquishment itself but for words to express it which should not be deceptive, by presenting an idea of something *very valuable*, while in fact the subject of the relinquishment was *a shadow.*" *Id.* (emphasis in original). Despite knowing that the United States had no claim to the land he was purportedly ceding, Pickering offered it to the Senecas anyway to induce them to enter into the Treaty.[70] Thus, if anyone acted unfairly toward the Senecas, it was Timothy Pickering on behalf of the United States.

The ICC reached a similar conclusion in 1968 and sought to remedy Pickering's wrongdoing:

> Colonel Timothy Pickering, the United States negotiator for the 1794 treaty, wrote of his embarrassment in making the ostensible relinquishment to the Indians of land of which he felt the United States did not have the power of disposition ... Fortunately, it is within the purpose of the Indian Claims Commission Act to cure any deception that might have been visited on the Indians. We find that the words of grant in the 1794 treaty are sufficient to create an equitable estoppel against the United States to deny that these were then Indian lands in which the Seneca had a compensable interest equivalent to a recognized title.

*Seneca Nation of Indians,* 20 Ind. Cl. Comm. at 181. If the Senecas ever did

have a viable claim regarding the Niagara Islands, that claim was properly asserted against the United States and was adjudicated in the Senecas' favor by the ICC.

Unfortunately, instead of acknowledging its own culpability as found by the ICC and taking the lead in attempting to resolve this dispute, the United States decided that its best course of action was to try to shift blame to the State of New York and the 18,000 innocent landowners of the Niagara Islands. The United States' actions have created a tremendous amount of turmoil for the Island landowners and divided the entire community.

The United States is taking a position here that is exactly opposite from the position it took before the ICC. The Court understands that the United States must sometimes change its position in a case when there is a change in the facts or the law. However, the facts in this case are some 200 years old and have not changed since the time of the ICC proceedings. Nor has there been any intervening change in the applicable law. It is difficult to understand how the United States can justify its current position. The reason offered by the United States' counsel for this change in position is as follows:

> The Government is built to change its mind on legal issues. Government is made to change policy. That's why we have multiple parties, that's why we have elections, that's why political people come in and make decisions ....

Transcript of Oral Argument, Aug. 17, 2000 at 143. Thus, the United States' change of position was apparently a "political" decision.

After reviewing the instant Decision and Order, perhaps the United States will

---

**70.** As noted *supra* at Section IV, Part R & n.24, Pickering had previously failed in his attempt to reach a peace agreement with the western Indians and was impatient to conclude a successful peace treaty with the Senecas.

rethink the position it has taken in this litigation.[71] As Justice Powell stated in *County of Oneida*, 470 U.S. at 253, 105 S.Ct. 1245, "this litigation makes abundantly clear the necessity for congressional action." If the United States sincerely believes that the Plaintiff Tribes have been wronged in this case, it has substantial resources available to it to provide them with a remedy. It should not attempt to pass the buck to the State of New York or 18,000 of its own innocent citizens.

## VI. SUMMARY AND CONCLUSION

The Seneca Nation's aboriginal title to the Niagara Islands, if in fact the Senecas ever held such title, was extinguished prior to New York's purported purchase of the Islands in 1815. In 1764, pursuant to treaty, Great Britain extinguished any claim of Seneca title to the Islands, thereby securing fee simple absolute title to the Islands for itself. Upon the American Revolution, Britain's fee simple absolute title passed to the State of New York.

Furthermore, pursuant to the 1784 Treaty of Fort Stanwix, the United States again extinguished any claim of title the Senecas may have had to the Niagara Islands. Under the Articles of Confederation and the law of Indian land tenure, once the Senecas' title was extinguished, New York, as the holder of the right of preemption, obtained fee simple absolute title to the Islands (assuming of course that New York did not already possess such title as a result of the 1764 treaties).

The 1794 Treaty of Canandaigua did not divest New York of its title to the Islands because such purpose was not shown in the Treaty with such certainty as to put it beyond reasonable question. Moreover, even if the Treaty could be interpreted to have included the Islands as land to which the United States was recognizing Seneca title, New York was not divested of its title to the Islands because just compensation was never paid by the United States to New York as required under the Fifth Amendment of the United States Constitution.

Thus, the Court finds that the purported conveyance of the Niagara Islands to New York in 1815 did not constitute a violation of the Nonintercourse Act because at the time of the conveyance, the Islands were not tribal land protected by the Act. Accordingly, the Court: (1) denies plaintiffs' motions for summary judgment; and (2) grants defendants' motion for summary judgment. The Clerk of Court is hereby ordered to enter judgment in favor of the defendants and to take all steps necessary to close the case.

IT IS SO ORDERED.

### Map Appendixes

A  Map of Niagara Region.

B  Map entitled, "The Niagara Frontier 1759," Frank Severance, 2 *An Old Frontier of France: The Niagara Region and Adjacent Lakes Under French Control* Fig. III, opposite p. 1 (1917).

C  Map entitled, "Forts, Battles, Batteries on the Niagara Frontier (As ceded by the Senecas to the British Crown 1764)," copyright Peter A. Porter (Matthew–Northrup Works 1910).

---

**71.** It appears that the United States may have already done so, at least to some extent. After the completion of oral argument on the cross-motions for summary judgment, the United States moved to amend its complaint-in-intervention to drop its claims against the non-State defendants. No action has been taken on that motion. In any event, the Plaintiff Tribes are still asserting their Nonintercourse Act claims against the non-State defendants.

D   Map entitled, "Key to Tribal Territories," 15 *Handbook of North American Indians: The Northeast* ix (Bruce G. Trigger ed., 1978).

E   Map entitled, "Country of the VI Nations," Guy Johnson (1771), reprinted in United States Census, *The Six Nations of New York* 24–26 (1892).

F   Map entitled, "North America in 1763," W.J. Eccles, *France in America* 211 (1973).

G   Map entitled, " Treaty of April 3, 1764."

H   Map entitled, " Treaty of August 6, 1764."

I   Map entitled, " 1768 Deed determining the Boundary Line between the Whites and Indians."

J   Map entitled, " 1784 Treaty of Ft. Stanwix, 7 Stat. 15."

K   Map entitled, " 1786 Hartford Compact."

L   Map entitled, "Plaintiffs' Interpretation of 1794 Treaty of Canandaigua, 7 Stat. 44."

M   Map entitled, "Defendants' Interpretation of 1794 Treaty of Canandaigua, 7 Stat. 44."

N   Map entitled, " 1797 Treaty of Big Tree, 7 Stat. 601."

O   Map entitled, " 1802 Treaty with New York, Whipple Report, New York Assembly at 214, ratified by the United States Senate on December 31, 1802, 1 Sen. Exec. J. 428."

APPENDIX A

## APPENDIX' B

from Severance, Old Frontier of France, Vol. II, opposite p. 1, Def. Ex. 47.

## APPENDIX C

FORTS
BATTLES
BATTERIES
ON
THE NIAGARA FRONTIER

APPENDIX  D

Key to Tribal Territories

APPENDIX E

Eleventh Census: 1890.

MAP OF THE PROVINCE OF NEW YORK, 1771. SHOWING THE COUNTRY OF THE SIX NATIONS.

Six Nations of New York.

LAKE ONTARIO

THE SIX NATIONS

To His Excellency
WILLIAM TRYON Esq.:
Captain-General & Governor in Chief
of the Province of NEW-YORK &&..
This Map
of the Country of the VI Nations
Proper with Part of the Adjacent Colonies
is humbly inscribed by his Excellency's
Most Obedient humble Servant
Guy Johnson 1771

EXPLANATION

APPENDIX F

North America in 1763.
From W. J. Eccles, *France in America*, Toronto: Fitshenry &
Whiteside, 1973, p.211.

## APPENDIX G

Treaty of April 3, 1764

APPENDIX  H

Treaty of August 6, 1764

## APPENDIX I

1768 Deed determining the Boundary Line
between the Whites and Indians.

(Line of Property) Overlaid on current basemap of New York.

Boundary Line

APPENDIX  J

1784 Treaty of Ft. Stanwix, 7 Stat 15

APPENDIX K

1786 Hartford Compact

APPENDIX  L

Plaintiffs' Interpretation of
1794 Treaty of Canandaigua, 7 Stat. 44

## APPENDIX  M

APPENDIX · N

APPENDIX O

1802 Treaty with New York,
Whipple Report, New York Assembly at 214, ratified by the
United States Senate on December 31, 1802, 1 Sen. Exec. J. 428